| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. LBR 9004-1(b) <br><br> **FOX ROTHSCHILD LLP** <br> 49 Market St. <br> Morristown, NJ 07960 <br> Joseph J. DiPasquale, Esq. <br> Michael R. Herz, Esq. <br> Joseph A. Caneco, Esq. <br> jdipasquale@foxrothschild.com <br> mherz@foxrothschild.com <br> jcaneco@foxrothschild.com <br> Telephone: (973) 992-4800 <br> Facsimile: (973) 992-9125 <br><br> *Proposed Counsel to the Debtor* <br> *And Debtor in Possession* |

| | |
|---|---|
| In re: <br><br> ASSUNCAO BROS., INC., <br><br>                 Debtor. | Chapter 11 (Subchapter V) <br><br> Case No. 22-16159-CMG <br><br> Judge: Hon. Christine M. Gravelle |

**DECLARATION OF MARTIN ASSUNCAO IN SUPPORT
OF VOLUNTARY PETITION AND FIRST DAY MOTIONS**

      I, Martin Assuncao, being of full age, hereby declare pursuant to 28 U.S.C. § 1746 under penalty of perjury as follows:

      1.     I am the President of Assuncao Bros., Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11, subchapter V case (the "Subchapter V Case"), and in that capacity, I am fully familiar with the Debtor's business operations, assets, liabilities,

and business records, and I submit this Declaration in support of the Debtor's voluntary petition and first day motions (the "First Day Motions") filed in the Subchapter V Case.[1]

2. This Declaration is intended to provide the Court and parties-in-interest with an overview of the Debtor's business and the circumstances that precipitated the filing of the Subchapter V Case, as well as to support the factual bases for the First Day Motions. The First Day Motions are necessary to facilitate an orderly and effective transition into chapter 11 while minimizing disruption to the Debtor's business operations. The Debtor intends to operate its business and manage its assets as a debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.

3. Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant business records of the Debtor, information provided to me by the Debtor's employees and professionals, or my experience and knowledge with respect to the operations and financial affairs of the Debtor. If I were called upon as a witness, I would testify competently to the facts set forth in this Declaration.

4. To familiarize the Court and parties-in-interest with the Debtor's business, the relief sought in the First Day Motions, and the Debtor's need for relief through subchapter V of chapter 11 of the Bankruptcy Code, this Declaration is organized in the following sections:

    a. Part I provides an overview of the Debtor's business, including its history, corporate structure, and business operations.

    b. Part II discusses the Debtor's capital structure, including its assets and liabilities.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions.

2

      c.      Part III addresses the events precipitating the Subchapter V Case and the Debtor's goals for the Subchapter V Case.

      d.      Part IV provides an overview of the relief requested in the First Day Motions and the basis for such relief.

**I.**    **The Debtor's Business**

5.    The Debtor is a multi-generational family-run business that was founded in 1958 by my father, Diamantino Assuncao and my uncle, Manuel Assuncao, that began by installing foundations for homes and all facets of masonry work. By the mid-1960's, the Debtor served as a general contractor that submitted bids for public contracts and focused on road reconstruction projects. In 1994, I purchased Manuel's interest in the Debtor and became the Debtor's President.

6.    Currently, the Debtor operates as a New Jersey Disadvantaged Business Enterprise ("DBE"). DBEs are for-profit small business concerns where socially and economically disadvantaged individuals own at least a 51% interest and also control management and daily business operations. The Debtor is known to its contractor client base as a business that satisfies their DBE requirements. The Debtor specializes in concrete work, including, but not limited to curb, sidewalk, bridge, barriers, and slabs.

7.    As of the Petition Date, the Debtor currently has 19 non-bonded projects and 14 Bonded Projects (defined infra).

8.    The Debtor's principal place of business is located at 29 Wood Avenue, Edison, New Jersey 08820 (the "Property"), which consists of office, warehouse space, and equipment yard. The Debtor has occupied and operated its business from the Property as a tenant since the early 1960's. The Debtor's books and records are located on the Debtor's premises and at the firm of S. Komma & Company, LLC, as applicable.

9. The Debtor is owned by one (1) stockholder, as follows:

| **Stockholder** | **Interest Percentage** |
|---|---|
| Martin Assuncao | 100% |

10. As of the Petition Date, the Debtor employed 23 employees (collectively the "Employees"). The Debtor pays its Employees in the ordinary course on a weekly basis in arrears. The Debtor's total payroll per pay period is approximately $47,300.00.

11. Most of the employees are unionized workers, and the Debtor contributes approximately $28,000.00 per pay period towards various union or multi-employer benefit plans which provide health and welfare, retirement, vacation, and other benefits. The Debtor's unionized workers are with Operating Engineers Local 825; Heavy and General Laborers Local 472 and Local 172; Eastern Atlantic States Regional Council of Carpenters Local 153; and Ironworkers Local 11.

12. The Debtor maintains various insurance policies through several different insurance carriers in connection with the Debtor's business. Collectively, these policies provide coverage (as renewed, amended, modified, endorsed, and/or supplemented from time to time) for, among other things: (a) general liability, (b) automobile, (c) workers' compensation, (d) group health, and (e) officer life (collectively, the "Insurance Policies").

## II. Pre-Petition Capital Structure

13. As of the Petition Date, and based in part on the Debtor's most recent unaudited balance sheet through July 31, 2022, the Debtor has total assets worth approximately $4.3 million inclusive of accounts receivable on numerous executory construction contracts, and total liabilities of approximately $7.6 million, inclusive of disputed, unliquidated, and contingent claims. The Debtor's assets primarily consist of: (i) various vehicles, trailers, and construction equipment

(collectively, the "Vehicles and Equipment"), with an orderly liquidation value of approximately $2.15 million (net of depreciation), and which are scattered at the Debtor's various jobsites throughout New Jersey; (ii) accounts receivable totaling approximately $2 million, of which, approximately $1,900,371 is from unbonded projects and $155,874 is from bonded projects; (iii) cash totaling approximately $20,000, (iv) contracts for active projects for the Debtor to provide concrete-related services, including 19 non-bonded projects (the "Non-Bonded Projects") and 14 bonded projects (the "Bonded Projects"); (v) inventory; (vi) leasehold interests; (vii) intellectual property; and (viii) miscellaneous assets, including office furniture and equipment worth approximately $65,600.  The Debtor does not own any real property.

14. The Debtor has a line of credit (the "Manasquan Bank Loan") with Manasquan Bank pursuant to a promissory note, loan agreement (the "Loan Agreement"), security agreements, mortgages, pledge agreements, collateral assignments, guarantees, and other agreements, instruments, certificate, and documents (collectively, as amended or modified, the "Loan Documents") dated August 24, 2015.  Since August 2019, the limit on the Manasquan Bank Loan has been $1.3 million, and, as of the Petition Date, the balance due Manasquan Bank under the Manasquan Bank Loan , inclusive of principal and interest, is approximately $1,309,232.14, plus additional fees, costs and expenses that may be due.  The Manasquan Loan is in default, with the Debtor missing an interest payment on July 24, 2022.  Pursuant to a letter agreement dated August 9, 2021, the maturity date for the Manasquan Loan is August 24, 2022.

15. In May 2021, the Debtor executed a Loan Authorization and Agreement with the U.S. Small Business Administration (the "SBA") for an Economic Injury Disaster Loan (the "SBA Loan"), the principal amount of which was $500,000. The annual interest rate of the SBA Loan is

3.75%, and, as of the Petition Date, the entire principal amount remains outstanding on the SBA Loan.

16.     Prior to the Petition Date, NGM Insurance Company ("NGM" or "Surety"), executed certain performance and payment bonds (the "Bonds") on behalf of the Debtor including the Bonds bearing bond numbers for certain obliges (the "Project Owners") of and for 14 of the Debtor's ongoing Bonded Projects which Bonds relate to certain of the contracts which the Debtor was performing under as of the Petition Date.

17.     In order to induce the Surety to execute the Bonds on behalf of the Debtor, the Debtor, as well as certain individuals (collectively, the "Indemnitors"), entered into an Agreement of Indemnity (the "Indemnity Agreement") with the Surety.

18.     The Debtor also has secured obligations with respect to several vehicles and pieces of operating equipment totaling approximately $600,000 (the "Equipment Loans").

19.     Outside of the Manasquan Bank Loan, SBA Loan, and the Equipment Loans the Debtor has unsecured liabilities by way of trade debt and operational-related expenses totaling approximately $5.2 million (inclusive of contingent, unliquidated, and disputed claims).

20.     Based on the Debtor's most recent unaudited records, the Debtor's net income for this year through June 30, 2022, is approximately negative $1.5 million.

21.     As of the Petition Date, the Debtor maintained checking accounts at TD Bank and one Manasquan Bank through which the Debtor conducts its day-to-day business operations. The Debtor also maintains a payroll account at TD Bank. The Debtor intends to designate these accounts as "debtor-in-possession" accounts, and shall cause all checks, statements, and other forms associated with the accounts to bear the notation "debtor-in-possession." I understand that

TD Bank and Manasquan Bank are designated as authorized depositories by the United States Trustee for Region 3 and are insured by the Federal Deposit Insurance Corporation ("FDIC").

### III. Events Precipitating Filing and Goal in Chapter 11

22. As noted at the outset, the Debtor is a family-run business that has operated for approximately 64 years. Unfortunately, the Debtor, like so many other businesses, experienced extraordinary challenges and setbacks over the last 24 months due to the COVID-19 pandemic which resulted in delays starting projects and disruption in management of projects by having to replace managers and workers that were unfamiliar with the projects.

23. The Debtor encountered the following industry challenges especially relating to municipal projects: (i) less gross profit margins for the work while the cost of materials and labor increased significantly; (ii) working capital constraints – long term projects requiring significant time and expense to complete with the majority of payment upon completion; and (iii) collection issues.

24. The Debtor initiated aggressive bidding to win projects and was subject to losses, miscalculations, and unprofitable jobs. The Debtor also hired new financial management which led to significant errors in reporting and mis-projecting profit and losses on jobs.

25. Additionally, several creditors have initiated litigation against the Debtor and/or alleged guarantors, including NGM, American Express, a vendor/supplier, and others.

26. All told, the Debtor is a multi-generational family-run business with the potential for a bright future, but an orderly liquidation through bankruptcy is necessary at this time to enable the Debtor to shed its burdens and effectuate an orderly transition to a new owner that will help it realize its full potential.[2]

---

[2] The Debtor anticipates filing a motion to approve the sale of the Debtor's machinery, equipment, and vehicles to Vollers Excavating and Construction, Inc. ("Vollers"). Vollers has also agreed to finish certain

**IV.     First Day Motions**

27.     To minimize the adverse effects of the commencement of this Subchapter V Case on the Debtor's ability to transition into and ultimately successfully sell its assets in bankruptcy, the Debtor has filed certain First Day Motions designed to facilitate a smooth transition into chapter 11.

28.     I have reviewed each of the First Day Motions with the Debtor's attorneys and financial advisors, and the facts stated therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each First Day Motion is tailored to meet the goals described above and is in the best interest of the Debtor's estate and creditors.  I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

29.     I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in pertinent part, that the Court will not consider motions to pay prepetition claims during the first 21 days following the filing of a Chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."  Cognizant of this requirement, the Debtor has narrowly tailored its requests for immediate authority to instances where failure to pay such claims would cause irreparable harm to itself and its estate

30.     Accordingly, the Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in preserving the value of the Debtor's estate for the benefit of all parties-in-interest.

**A.     Motion Authorizing (i) the Continued Use of Cash Management System; (ii) Authorizing the Continued Use of Existing Bank Accounts; and (iii) Granting Related Relief (the "Cash Management Motion")**

---

of the Non-Bonded Projects.  In addition, Vollers will also be reaching out to NGM to negotiate completion of the Bonded Projects.

31. The Debtor maintains a cash management system as part of the ordinary course of its business that allows the Debtor to efficiently collect, transfer, and disburse funds, and to fund its weekly payroll. Post-petition, the Debtor proposes to retain its current cash management system and prepetition bank accounts (collectively, the "Cash Management System").

32. Prior to the Petition Date, the Debtor maintained three (3) bank accounts (the "Bank Accounts") at the following banks:

| Bank | Account Number (last 4) | Description (i.e. used for payroll, disbursements to healthcare etc.) |
|---|---|---|
| TD Bank | -8707 | Operating |
| TD Bank | -7430 | Payroll |
| Manasquan Bank | -7803 | Operating |

33. It is imperative for the Debtor to maintain its Bank Accounts and Cash Management System in order to manage its payroll, facilitate its projects, and monitor expenses that occur in the ordinary course of business. As a matter of convenience and internal control, it is important for the Debtor to continue to operate its business without disrupting the status quo as it navigates through the early stages of this Subchapter V Case. Accordingly, the Debtor proposes to maintain its existing Bank Accounts post-petition. The Bank Accounts are maintained at institutions insured by the Federal Deposit Insurance Corporation ("FDIC") and are essential for the Debtor's continued use of the Cash Management System.

34. Additionally, to minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and subcontractors, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders, and invoices (collectively, the "Business Forms")) as such forms were in existence immediately before the Petition Date, with a stamped or written

notation of "Debtor-In-Possession. Case No. 22-_____" on all checks, provided however, that upon depletion of the Debtor's Business Forms stock, the Debtor will obtain new check stock reflecting its status as a debtor-in-possession.  With such authorization, the Debtor will be able to avoid the expense and delay of ordering entirely new business forms and the significant disruption to the Debtor that such delay will cause.

      **B.**      **Motion (i) Authorizing Debtor to Pay and Honor Pre-Petition Employee Wages, Salaries, Benefits, Benefits, Expenses, and Other Obligations; and (ii) Granting Related Relief (the "Employee Wages Motion")**

35.      As stated herein, the Debtor has 23 Employees who are compensated on a weekly basis and are entitled to participate in certain employee benefit plans and policies, which mainly consist of various union or multi-employer benefit plans that provide health and welfare, retirement, vacation, and other benefits (collectively, the "Employee Benefit Programs") and for which the Debtor must make contributions for each employee.  Payroll is approximately $47,300 per pay period and it is expected that approximately $18,920 of the payroll usually due and owing on the next regularly scheduled pay date will be attributable to pre-petition wages.

36.      In the absence of a court order granting the relief requested herein, the Debtor may be prohibited from delivering payments or other benefits to the employees (collectively, the foregoing enumerated items are the "Employee Obligations"), and the checks, wire transfers, and direct deposit transfers issued with respect to the prepetition Employee Obligations may be dishonored.  If the relief requested herein is not granted, the Debtor's Employees may suffer great hardship and, in many instances, financial difficulties, given that these monies are needed to enable them to meet their own personal obligations.  To maintain Employee morale and to minimize personnel attrition due to any hardship the Debtor's employees and their dependents may

experience if the Employee Obligations are not paid when due, the Debtor seeks authority to honor, in its discretion, the Employee Obligations.

37. Additionally, the Debtor's Employees are vital to the Debtor's continuing operations and the ultimate ability of the Debtor to liquidate its assets for value in this Subchapter V Case. The Debtor is reliant on its Employees' skills, knowledge and understanding of the Debtor's business and operations to sustain the Debtor during this critical time. The work performed by the Debtor's employees requires a specialized set of skills and knowledge. Therefore, the Debtor believes it is in its best interest and the best interest of its estate to continue to utilize those employees who are the most equipped to perform for the Debtor during the course of the Debtor's Subchapter V Case. The Debtor believes that by ensuring it can continue the Employee Obligations, such action will eliminate, or at least minimize, employee turnover during this critical time in the Debtor's operations.

38. If the Debtor suffers a decline in its workforce, which is likely if the Debtor is not authorized to provide the relief sought in the Employee Wages Motion, it will cause irreparable harm and have a deleterious impact on the Debtor's estate and its creditors. The Debtor simply cannot afford a reduction to its employee base. Accordingly, the Debtor requests authorization to honor, in its discretion, the Employee Obligations, without interruption, to encourage the employees to remain employed while the Debtor proceeds in bankruptcy.

**C. Motion for Entry of Interim and Final Orders (i) Authorizing (a) Pest-Petition Financing and (B) Use of Cash Collateral and Affording Adequate Protection; (ii) Modifying the Automatic Stay; and (iii) Scheduling a Final Hearing (the "DIP/Cash Collateral Motion")**

39. To preserve the Debtor's business and assets for the benefit of all creditors, the Debtor seeks authorization to use the Cash Collateral in accordance with the budget attached to the accompanying Interim Order as **Exhibit 1** thereto (the "Budget"). The Debtor proposes to use

the Cash Collateral[3] in accordance with the Budget on an interim basis through and including the date of the Final Hearing (the "Initial Period") to fund operating expenses plus additional amounts to provide adequate protection as contemplated herein. Thereafter, and following the Final Hearing to be scheduled by the Court, the Debtor will seek final approval of its use of Cash Collateral pursuant to the Final Order.

40. Additionally, the Debtor seeks to obtain up to $200,000.00 of post-petition financing (the "DIP Loan") from Vollers Excavating and Construction, Inc. ("Vollers") to pay, if necessary and on an interim basis, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain non-bonded projects for which the Debtor and Vollers will execute a subcontract to complete performance and collect accounts receivable (a "Subcontract" and each such project a "Subcontracted Project") at closing if the sale is approved through the Sale Motion (as defined below).

41. The Debtor has failed to obtain credit elsewhere, and it is precisely this reason that the Subchapter V Case was filed. Traditional lenders will not be interested in funding the Debtor's labor-related costs in the period between the Petition Date and the approval of the Sale Motion. The Debtor engaged in extensive negotiations with Vollers and Manasquan Bank whereby, through the asset sale, the settlement with Manasquan Bank, and the Subcontracts, there will be some value that can be realized for the estate and secured creditors, but this cannot happen without the bridge for payroll costs on the Subcontracted Projects in the interim.

---

[3] The amount of Cash Collateral utilized during the Interim Period is anticipated to be $130,000. This figure takes into account the generation of receipts as set forth in the Budget. However, with access to the DIP Loan the Debtor expects to remain cash flow positive during the Initial Period.

42. Vollers, Manasquan Bank, and the Debtor engaged in extensive, arm's length discussions regarding a global settlement that would (i) pay down a portion of the Manasquan Loan, while preserving a deficiency claim for the remainder, (ii) ensure that certain of the Debtor's projects will continue thereby providing some recovery to the estate and for administrative costs (through the so-called "Kicker Provision" of 15% of net proceeds on Subcontracted Projects if the Sale Motion is approved, as described in more detail in the Sale Motion), while also reducing potential creditor claims that would result if these projects were not continued, (iii) ensure that such recoveries were not lost through a forced liquidation, (iv) provide the DIP Loan to pay necessary labor costs on projects until the sale can close, (v) provide most Employees with continued employment, and (vi) provide for the assumption of certain union benefits, and (vii) provide for the assumption of approximately $600,000 in equipment loans. Accordingly, the negotiations were in good faith and the most beneficial package for financing that the Debtor had available. A copy of the DIP Loan agreement is attached as <u>Exhibit A</u> to the DIP/Cash Collateral Motion.

43. Without the use of Cash Collateral and access to the DIP Loan, the Debtor will be unable to pay its ordinary and necessary business expenses including, but not limited to, payroll and related obligations, taxes, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, rent, and costs of administration of this Subchapter V Case. To maintain its operations and preserve the going concern value of its assets, the Debtor seeks approval of the use of the Cash Collateral and authority to obtain the DIP Loan in accordance with the Cash Collateral Orders and Budget.

44. The Debtor proposes to grant, as adequate protection for use of the Cash Collateral, the Adequate Protection Liens, Superpriority Claim, and certain other assurances to Manasquan Bank. Manasquan Bank has consented to the proposed Interim Order.

**D. Motion for Entry of an Order (i) Authorizing Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (ii) Approving Settlement, (iii) Authorizing Debtor to Enter Into Subcontracts with Vollers for Non-Bonded Projects, and (iv) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases (the "Sale Motion")**

45. The Sale Motion is filed with a request to be heard on shortened time at a time after the First Day Motions are heard. However, this declaration provides a summary of the relief sought therein and describes exhibits relevant thereto for the Court's reference and as support for the Sale Motion when it is heard. The relief sought in the Sale Motion is very relevant to the First Day Motions and is vital to the Debtor's goals in this Subchapter V Case.

46. The Debtor has entered into an asset purchase agreement (the "Asset Purchase Agreement") with Vollers to sell certain of its assets to Vollers. A copy of the Asset Purchase Agreement will be attached to the Sale Motion as Exhibit A.

47. An integral part of the Vollers Transaction is a settlement between the Debtor, Manasquan Bank and Vollers the ("Manasquan Bank Settlement"). Manasquan Bank has asserted that the value of its collateral, along with certain litigation rights against the Debtor, would result in the repayment in full of the Manasquan Loan, an assertion disputed by the Debtor. In lieu of costly litigation that would burden the estate with substantial administrative expense and reduce recoveries to creditors, the Debtor, Manasquan Bank, and Vollers expect to agree to the following settlement, the terms of which are hereby approved pursuant to Fed. R. Bankr. P. 9019:

   a. Debtor and Vollers acknowledge that through the prepetition liens related to the Manasquan Loan and through the Adequate Protection Liens to be provided under the Cash Collateral/DIP Motion, Manasquan Bank has properly perfected lien rights in all of the Debtor's assets, and that Debtor and Vollers require the consent

14

      of Manasquan Bank to proceed with the Vollers Transaction;

b. In settlement of the properly perfected prepetition liens and Adequate Protection Liens provided under the Cash Collateral/DIP Motion in favor of Manasquan Bank, and the other consideration to be provided by Manasquan Bank, Vollers has agreed to pay Manasquan Bank $975,000 (the "Manasquan Settlement Amount") on the Closing Date (as defined in section 2.01 of the Asset Purchase Agreement);

c. Manasquan Bank has agreed to accept the Manasquan Settlement Amount in exchange for the release of its liens and consent to the Vollers Transaction if, and only if, the Manasquan Settlement Amount is actually paid directly to Manasquan Bank at the closing of the Vollers Transaction; Manasquan Bank will not consent to the Vollers Transaction or the release of its liens if, for any reason, payment of the Manasquan Settlement Amount is delayed beyond, or otherwise cannot be made directly to Manasquan Bank at or before the Closing Date; Debtor and Vollers likewise acknowledge and agree that the Vollers Transaction cannot proceed absent the consent of Manasquan Bank and the Manasquan Settlement Amount being paid directly to Manasquan Bank on the Closing Date;

d. Upon receipt of the Manasquan Settlement Amount, Manasquan Bank will pay $25,000 from the Manasquan Settlement Amount to the Subchapter V Case professionals as a reimbursement of expenses related to the Vollers Transaction;

e. After payment of the Manasquan Settlement Amount to Manasquan Bank, Manasquan Bank will have an agreed upon allowed unsecured deficiency to claim against Debtor of $359,232.14;

f. Notwithstanding this settlement and its receipt of the Manasquan Settlement Amount, Manasquan Bank will continue to have the right to pursue any guarantors of the Manasquan Loan for any amounts of the Manasquan Loan remaining unpaid, including remaining principal, interest, default interest, fees, expenses, attorney's fees, and costs;

g. On the Closing Date, Debtor and its estate, and Vollers shall release Manasquan Bank and related parties from any and all claims and causes of action, whether known or unknown, that may exist against Manasquan Bank. On the Closing Date, subject to receipt of the Manasquan Settlement Amount, Manasquan Bank shall release Vollers and related parties from any and all claims and causes of action, whether known or unknown, that Manasquan Bank may possess against Vollers as may be related in any way to this Subchapter V Case. In no event shall the releases contained in the Manasquan Bank Settlement be deemed to release any claims against any principal or related party of the Debtor, including without limitation any guarantor of the Manasquan Loan.

48. The pertinent terms of the transaction with Vollers (the "Vollers Transaction") are to be as follows:

   a. Vollers will purchase all of the Debtor's rights, title and interest in all equipment, tools and forms, and all accounts receivable related to Non-Bonded Projects.

   b. Vollers will pay directly to Manasquan Bank at closing the Manasquan Settlement Amount (as further defined below) of $975,000, as set forth in the description of the Manasquan Bank Settlement, below. [4]

   c. Vollers will also assume the Debtor's obligations under the Equipment Loans, which are approximately $600,000. A list of the Equipment Loans to be assumed and assigned to Vollers will be attached to the Sale Motion as Exhibit B (the "Assigned Equipment Loans"[5]).

   d. Vollers will provide, the DIP Loan of up to $200,000 to pay, if necessary, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-bonded Projects for which the Debtor and Vollers will execute a Subcontract (as defined below) at Closing if the sale is approved; and (iii) insurance coverage. Additionally, the DIP Loan will provide a $75,000 carve-out to the estate for the fees of the Debtor's professionals.

   e. Subject to the Court authorizing the Vollers Transaction and authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will assume the entirety of the DIP Loan at closing.

   f. Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will complete any work required on the Non-Bonded Projects for which a Subcontract is executed (the "Subcontracted Projects" and each a "Subcontracted Project"), and Vollers will perform all of the Debtor's remaining scope (work) obligations and will be entitled to all billed and unpaid contract balances and balances to bill.

   g. Subject to approval of the Vollers Transaction and authorization for the Subcontracts, Vollers will consent to extending the DIP Loan for use to complete the Subcontracted Projects, subject to sharing net proceeds from those Non-Bonded

---

[4] It is anticipated that approximately seven vehicles used in the business and owned by a non-debtor entity will be sold to Vollers alongside the sale of the Debtor's assets. The value is expected to be no greater than $50,000.

[5] For the avoidance of doubt, the term "Assigned Equipment Loans" shall include all underlying agreements, leases, notes, and other documentations pertaining to each of the Assigned Equipment Loans.

        Projects with the Debtor's estate as described immediately below.

    h. Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will share 15% of the net proceeds of each Subcontracted Project (the "Kicker Provision"), after application of direct costs and allocated overhead of 15%, with the Debtor's estate.

    i. If the Court does not approve the Vollers Transaction and authorize the Subcontracts, Vollers's first priority DIP Lien on all assets of the estate (including accounts receivable, but excluding the Equipment Loan) that secures the DIP Loan up to the Maximum DIP Amount shall remain in place; however, if the Vollers Transaction is approved then no such lien will remain in effect.

    j. Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will (i) make offers of employment on terms and conditions not less favorable than current employment terms to the Debtor's non-union employees, (ii) assume certain holiday, vacation and sick time for employees of Debtor that Vollers hires; and (iii) pay all accrued union benefit plan obligations with respect to Subcontracted Projects.

49. With respect to the Kicker Provision, it is estimated that gross current and future accounts receivable on the Subcontracted Projects will total approximately $12 million. It is anticipated that sufficient receipts will be recovered in excess of Vollers' expenses to provide a recovery to the estate.

50. It is estimated that Vollers will have to allocate approximately $9 million in order to complete the Subcontracted Projects. Additionally, Vollers will engage the Debtor's Surety to discuss and negotiate completion of Bonded Projects in the discretion of the Surety and Vollers. Moreover, Vollers has agreed that it will make employment offers to all of the Debtor's non-union employees on terms no less favorable to such employee than the terms on which such employee was employed with the Debtor, and to pay all of the Debtor's union benefit obligations on the Non-Bonded Projects.

51. The Debtor reached out to multiple contractor firms to gauge interest in acquiring the Debtor's business and assets. Vollers is the only entity that expressed interest.

52. Manasquan Bank's consent to the Vollers Transaction is expressly conditioned on Court approval and full consummation of the Manasquan Bank Settlement described above, including payment in full of the Manasquan Settlement Amount by the Closing Date. Holders of Equipment Loans' debt will be assumed by Vollers. The SBA is also being provided with notice of the Motion.

### E. Motion for Order Pursuant to Bankruptcy Rule 1007(c) Granting Additional Time for Filing Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedules of Executory Contracts and Unexpired Leases (the "<u>Extension Motion</u>")

53. Although the Debtor has commenced the extensive process of gathering the necessary information to prepare and finalize its schedules and statements (the "<u>Schedules and Statements</u>"), the fourteen (14) day time period provided by Bankruptcy Rule 1007(c) likely will be insufficient for the Debtor to complete the Schedules and Statements given the speed at which the Debtor was forced to file its petition and the attention that it and its professionals must dedicate to ensuring that the Sale (as defined in the Sale Motion) closes and the Debtor can realize the proceeds therefrom.

54. The Debtor recognizes that its Schedules and Statements must provide complete and accurate information. Furthermore, the Schedules and Statements must provide complete and accurate information and evidence the financial condition of the Debtor as of the Petition Date. In order to prepare the Schedules and Statements as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), the Debtor must gather information from books, records and documents relating to a multitude of parties, transactions, and contracts. Consequently, collection of the information requires an expenditure of substantial time and effort on the part of the Debtor's employees. Given the substantial amount of work required to compile the Schedules and Statements, along with the additional tasks inherent upon filing a subchapter V case, the Debtor

will not be in a position to prepare the Schedules and Statements within fourteen (14) days. Therefore, the Extension Motion seeks the Court's authorization to file its Schedules and Statements by thirty (30) days after the commencement of the Subchapter V Case.

I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief.

By: <u>/s/ Martin Assuncao</u><br>Martin Assuncao

Dated: August 3, 2022

135924328