**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FOX ROTHSCHILD LLP**
49 Market St.
Morristown, NJ 07960
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Joseph A. Caneco, Esq.
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
jcaneco@foxrothschild.com
Telephone:  (973) 992-4800
Facsimile:   (973) 992-9125

*Proposed Counsel to the Debtor*
*And Debtor in Possession*

In re:

ASSUNCAO BROS., INC.,

              Debtor.

Chapter 11 (Subchapter V)

Case No. 22-16159-CMG

Judge Christine M. Gravelle

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) POST-PETITION FINANCING AND (B) USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING

The debtor and debtor-in-possession, Assuncao Bros., Inc. (the "Debtor"), in the above captioned chapter 11, subchapter V case (the "Subchapter V Case"), by and through its proposed counsel, Fox Rothschild LLP, hereby files this motion (the "Motion") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507(b), Rules 4001(b) and (c) and 6004(h) of the Federal Rules of Bankruptcy Procedure, and D.N.J. LBR 4001-3, for entry of interim and final orders (i) authorizing (a) post-petition financing and (b) use of cash collateral and affording adequate protection; (ii)

modifying the automatic stay; and (iii) scheduling a final hearing.  In support of the Motion, the

Debtor respectfully states as follows:

## **RELIEF REQUESTED**

1.      The Debtor seeks entry of entry of an interim order, substantially in the form

submitted herewith (the "Interim Order"), and a final order (the "Final Order,"[1] and together with

the Interim Order, the "Orders" or the "DIP/Cash Collateral Orders"):

  a.  authorizing, pursuant to section 364 of the Bankruptcy Code, the Debtor to obtain up

     to $200,000.00 of post-petition financing (the "DIP Loan") from, and granting a first

     priority lien on the Debtor's assets (excluding encumbered vehicles) to, Vollers

     Excavating and Construction, Inc. ("Vollers"), to pay, if necessary and on an interim

     basis, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll

     taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain

     Non-Bonded Projects (as defined below) for which the Debtor and Vollers will execute

     a Subcontract (as defined below) at closing if the sale of certain of the Debtor's assets

     is approved, as contemplated by Vollers and the Debtor and described more fully

     herein; and (iii) insurance coverage; on a final basis, the DIP Loan may be extended to

     be used for expenses on the Non-Bonded Projects for which the Debtor's Subcontracts

     are approved if the anticipated asset sale is approved;

  b.  authorizing the Debtor's use of cash collateral, as such term is defined in section 363(a)

     of the Bankruptcy Code (the "Cash Collateral"), subject to the terms of the DIP/Cash

     Collateral Orders, and granting adequate protection to Manasquan Bank (as defined

     below) in respect of its rights under the Loan Documents (as defined below) and its

---

[1]      The proposed Final Order will be provided to the Court in advance of the Final Hearing.

interests in the Prepetition Collateral (as defined below) pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code with respect to any diminution in the value of such rights and interests on and after the Petition Date (as defined below);

c.  vacating and modifying the automatic stay arising under section 362 of the Bankruptcy Code in accordance with the provisions hereof to the extent necessary to implement and effectuate the terms and provisions of the DIP/Cash Collateral Orders;

d.  scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rule 4001(b)(2) to be held before this Court to consider entry of a Final Order authorizing and granting the relief requested in the Motion on a final basis; and

e.  granting related relief.

In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and procedural predicates for the relief requested in this Motion are sections 105, 361, 362, 363, 364 and 507(b) of 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Rules 4001(b) and (c) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-3 of the *Local Rules of the United States Bankruptcy Court, District of New Jersey* (the "Local Rules").

3

## BACKGROUND

5.      On August 3, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11, subchapter V, of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court").  The Debtor is continuing in possession of its property and is operating and managing its business as debtor-in-possession pursuant to Bankruptcy Code section 1184.

6.      The factual background, including an overview of the Debtor's business, information on the Debtor's debt structure and information relating to the events leading to the filing of the Subchapter V Case, are set forth in detail in the *Declaration of Martin Assuncao in Support of Voluntary Petition and First Day Motions* (the "Assuncao Declaration") filed contemporaneously herewith and incorporated herein by reference.

7.      As set forth in the Assuncao Declaration, the Debtor is a contractor that specializes in concrete work, including, but not limited to, curb, sidewalk, bridge, barriers, and slabs.  The Debtor intends to continue to operate its business post-petition through a sale of its business and assets.  As discussed below, continued operations, including continuing to work on certain projects, is necessary to preserve the value of the Debtor's assets and maximize value for the estate.

## THE DEBTOR'S PREPETITION SECURED DEBT[2]

### A.      The Manasquan Bank Loan

8.      The Debtor has a line of credit (the "Prepetition Loan") with Manasquan Bank (the "Prepetition Lender") pursuant to a promissory note, loan agreement (the "Loan Agreement"), security agreements, mortgages, pledge agreements, collateral assignments, guarantees, and other

---

[2]      Nothing contained in this Motion shall prejudice the Debtor's rights to dispute the amount, priority, or secured status of any claim described herein.

agreements, instruments, certificate, and documents (collectively, as amended or modified, the "Loan Documents") dated August 24, 2015. The Line of Credit was originally $700,000.00 and was increased to $1,000,000.00 on or about November 16, 2017. The Loan Documents were modified by a Loan Modification Agreement (the "Modification") by and between the Debtor and Manasquan Bank, executed on or about August 14, 2019, whereby, among other things, the Line of Credit was further increased to $1,300,000.00.

9.      In connection with the Prepetition Loan, as part of the Loan Documents, the Debtor also executed a security agreement (the "Security Agreement"), pursuant to which the Debtor granted Manasquan Bank the Prepetition Lien in the Prepetition Collateral (as those terms are each defined below).

10.     As further security for the Prepetition Loan, non-debtors Martin Assuncao and Lisa Assuncao (the "Guarantors") (i) executed a guaranty agreement for the Debtor's obligations under the Loan Agreement (which they consented to continue unaltered in conjunction with the Modification) and (ii) gave Manasquan Bank a mortgage in the Guarantors' property in Warren, New Jersey.

11.     As of the Petition Date, the outstanding amount due and owing by the Debtor to Manasquan Bank under and in connection with the Loan Documents, inclusive of principal and accrued interest, is approximately $1,309,232.14,[3] plus charges, fees, costs and expenses (including attorneys' fees and legal expenses), plus any and all other amounts required to be paid under and in connection with the Loan Documents (collectively, the "Secured Obligations").

---

[3]      The amount of principal due is approximately $1,299,717.25.

12.     In addition to the Guaranty and the Mortgage, the Secured Obligations were secured pursuant to the Loan Documents and applicable law by a first priority security interest and lien (the "Prepetition Lien"), granted under the Security Agreement by the Debtor to Manasquan Bank, in substantially all of the Debtor's assets (then owned or thereafter acquired including accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts and investment property, and all  cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds (the "Prepetition Collateral").

13.     The Debtor believes that the value of its assets securing the Manasquan Loan (i.e., the assets not securing the Equipment Loan) is insufficient to pay the loan in full, and thus Manasquan Bank is undersecured.  Manasquan Bank disputes that assertion.

14.     Manasquan Bank filed a UCC-1 financing statement relating to the Prepetition Lien with the Department of Treasury, State of New Jersey on August 25, 2015.  Manasquan Bank filed a UCC-3 continuation on July 21, 2020.

**B.     The U.S. Small Business Administration Loan**

15.     On or around May 3, 2021, the Debtor executed a Loan Authorization and Agreement (the "SBA Loan Agreement") with the U.S. Small Business Administration (the "SBA") for an Economic Injury Disaster Loan (the "SBA Loan"), the principal amount of which was $500,000.00. The annual interest rate of the SBA Loan is 3.75%. Under the terms of the SBA Note, the Debtor must pay principal and interest payments of $2,437.00 every month beginning in May 2022. SBA will apply each installment payment first to pay interest accrued to the day SBA receives the payment and will then apply any remaining balance to reduce principal. All remaining principal and interest is due and payable thirty (30) years from May 2021.

16.     As security for the payment of Debtor's obligations under the SBA Loan Agreement, the Debtor executed a security agreement (the "SBA Security Agreement"), pursuant to which the Debtor granted to the SBA a security interest in: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes, (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software, and (k) as-extracted collateral, as such terms may from time to time be defined in the Uniform Commercial Code (collectively, the "SBA Collateral")[4]. The security interest the Debtor granted under the SBA Security Agreement includes all accessions, attachments, accessories, parts, supplies and replacements for the SBA Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

17.     The SBA filed a UCC-1 financing statement relating to the SBA Loan with the Department of Treasury, State of New Jersey on May 17, 2021.  As such, and to the extent that the SBA and Manasquan Bank have valid and enforceable liens, the SBA is subordinate to Manasquan Bank with respect to their respective security interests in the Cash Collateral.

18.     The SBA Loan is guaranteed by Martin Assuncao.

19.     As of the Petition Date, the principal balance due under the SBA Loan is approximately $500,000.00.

**C.      The Debtor's Prepetition Surety Bond Program**

---

[4]      The SBA Collateral does not include the Debtor's rolling stock or vehicles.

20.     Prior to the Petition Date, NGM Insurance Company ("NGM" or the "Surety") executed certain performance and payment bonds (the "Bonds") on behalf of the Debtor including Bonds bearing bond numbers and for certain obligees (the "Project Owners") of and for fourteen (14) of the Debtor's ongoing construction projects (the "Bonded Projects") which Bonds relate to certain of the contracts which the Debtor was performing under as of the Petition Date.

21.     In order to induce the Surety to execute the Bonds on behalf of the Debtor, the Debtor, as well as Martin Assuncao and Lisa Assuncao (collectively, the "Indemnitors"), entered into an Agreement of Indemnity (the "Indemnity Agreement") with the Surety.

22.     The Debtor believes that the progress payments, retainage, change order and claim proceeds that are outstanding and/or which may be earned and come due in the future with respect to the Bonded Projects (collectively, "Bonded Project Proceeds"), when paid by Project Owners may constitute trust funds for the benefits of laborers, subcontractors, suppliers and materialmen of the Bonded Projects pursuant to applicable state statutes. The Debtor further believes that such Bonded Project Proceeds may be subject to the interests of Surety under (i) the trust provisions of the Indemnity Agreement; (ii) where applicable, state statutes; and (iii) common law principles of subrogation to the extent Surety has made or may make payment under the Bonds (the "Trust Fund Beneficiaries").

23.     For purposes of Debtor's use of Cash Collateral, the Debtor seeks authority to segregate Bonded Project Proceeds from the proceeds and financing for Non-Bonded Projects in order to comply with certain statutory and common law obligations, such that when Bonded Project Proceeds are paid by Project Owners to the Debtor or its assigns such Bonded Project

Proceeds constitute trust funds and shall be applied exclusively to satisfy Bond obligations and claims of Trust Fund Beneficiaries.[5]

**D.    Asset Sale to Vollers**

24.    The Debtor anticipates that it will enter into an asset purchase agreement (the "Asset Purchase Agreement") with Vollers to sell certain of its assets to Vollers and will file a motion seeking an order of the Court authorizing such a sale (the "Sale Motion").

25.    The pertinent terms of the anticipated sale transaction with Vollers (the "Vollers Transaction") and how it is expected to affect the relief sought in this Motion are as follows:

a.    Vollers will purchase all of the Debtor's rights, title and interest in all equipment, tools and forms, and all accounts receivable related to Un-bonded Projects.

b.    Vollers will pay directly to Manasquan Bank at closing the Manasquan Settlement Amount (as further defined below) of $975,000, as set forth in the description of the Manasquan Bank Settlement, below.

c.    Vollers will also assume the Debtor's obligations under the Equipment Loans, which are approximately $600,000. A list of the Equipment Loans to be assumed and assigned to Vollers will be attached to the Sale Motion the (the "Assigned Equipment Loans"[6]).

d.    Vollers will provide, the DIP Loan of up to $200,000 to pay, if necessary, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-bonded Projects for which the Debtor and Vollers will execute a Subcontract (as defined below) at closing if the sale is approved; and (iii) insurance coverage.

e.    Subject to the Court authorizing the Vollers Transaction and authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will assume the entirety of the DIP Loan at Closing.

---

[5]    As of the Petition Date, the Debtor has 19 non-bonded projects.

[6]    For the avoidance of doubt, the term "Assigned Equipment Loans" shall include all underlying agreements, leases, notes, and other documentations pertaining to each of the Assigned Equipment Loans.

f.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will complete any work required on the Non-Bonded Projects for which a Subcontract is executed (the "Subcontracted Projects" and each a "Subcontracted Project"), and Vollers will perform all of the Debtor's remaining scope (work) obligations and will be entitled to all billed and unpaid contract balances and balances to bill.

g.    Subject to approval of the Vollers Transaction and authorization for the Subcontracts, Vollers will consent to extending the DIP Loan for use to complete the Subcontracted Projects, subject to sharing net proceeds from those Non-Bonded Projects with the Debtor's estate as described in immediately below.

h.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will share 15% of the net proceeds of each Subcontracted Project (the "Kicker Provision"), after application of direct costs and allocated overhead of 15%, with the Debtor's estate.

i.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will (i) make offers of employment on terms and conditions not less favorable than current employment terms to the Debtor's non-union employees, (ii) assume certain holiday, vacation and sick time for employees of Debtor that Vollers hires; and (iii) pay all accrued principal union benefit plan obligations with respect to Subcontracted Projects.

j.    If the Court does not approve the Vollers Transaction and authorize the Subcontracts, Vollers's first priority DIP Lien (as defined below) on all assets of the estate (including accounts receivable, but excluding the Equipment Loan) will remain in place for the DIP Loan up to the Maximum DIP Amount (defined below); however, if the Vollers Transaction is approved then no such lien will remain in effect.

**E.    The DIP Loan; Efforts to Obtain Credit (Local Rule 4001-3(b)(1)**

26.    The Debtor has failed to obtain credit elsewhere, and it is precisely this reason that the Subchapter V Case was filed.  Traditional lenders will not be interested in funding the Debtor's labor-related costs in the period between the Petition Date and the approval of the Sale Motion. The Debtor engaged in extensive negotiations with Vollers and Manasquan Bank whereby, through the asset sale and the Subcontracts, there will be some value that can be realized for the

10

estate and secured creditors, but this cannot happen without the bridge for payroll costs on such
Non-Bonded Projects which will be subcontracted to Vollers in the interim.

27.     The DIP Loan will be for up to $200,000, at 1% interest (the "Maximum DIP
Amount").  During the Interim Period, it will be used specifically to fund (i) accrued and unpaid
payroll as of the Petition Date (net of applicable payroll taxes) and (ii) payroll and labor costs
(including applicable payroll taxes).  In exchange, in order to secure the DIP Loan up to the
Maximum DIP Amount, Vollers will be granted a first priority lien (the "DIP Lien") on all assets
(other than those securing the Equipment Loans) that secures the DIP Loan up to the Maximum
DIP Amount and a superpriority claim for the amount of any indebtedness incurred under the DIP
Loan.  If the Sale Motion is approved the DIP Lien be will of no effect as Vollers will assume the
DIP Loan and own the assets securing the DIP Lien.  Manasquan Bank's lien and claim will, upon
the closing of the Vollers Transaction and subject to Manasquan Bank being paid at the closing
per the terms of a proposed settlement, be extinguished as against the Debtor.

28.     Vollers, Manasquan Bank, and the Debtor engaged in extensive, arm's length
discussions regarding a global agreement that would (i) pay down the Manasquan Loan, (ii) ensure
that certain of the Debtor's projects will continue thereby providing some recovery to the estate
and for administrative costs (through the so-called "Kicker Provision" described in the Sale Motion
and the carve-outs described herein), while also reducing potential creditor claims that would result
if these projects were not continued, (iii) ensure that such recoveries were not lost through a forced
liquidation, (iv) provide the DIP Loan to pay necessary labor costs on projects until the sale can
close, (v) provide most employees with continued employment, (vi) provide for the assumption of
certain union benefits, and (vii) provide for the assumption of approximately $600,000 in
Equipment Loans.  Therefore, the extension of credit from Vollers has been made in good faith.

## CONCISE STATEMENT OF RELIEF REQUESTED CONCERNING
## USE OF CASH COLLATERAL PURSUANT TO
## BANKRUPTCY RULE 4001(b)(1)(B) AND (c)(1)(B)[7] AND LOCAL RULE 4001-3

29.    To preserve the Debtor's business and assets for the benefit of all creditors, the Debtor seeks authorization to use the Cash Collateral and obtain the DIP Loan in accordance with the budget attached to the accompanying Interim Order as **Exhibit 1** (the "Budget"). The Debtor proposes to use the Cash Collateral[8] in accordance with the Budget on an interim basis through and including the date of the Final Hearing (the "Initial Period") to fund operating expenses plus additional amounts to provide adequate protection as contemplated herein. Additionally, on an interim basis, the DIP Loan will be used to fund (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes) and (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-Bonded Projects for which the Debtor and Vollers will execute a Subcontract. Thereafter, and following the Final Hearing to be scheduled by the Court, the Debtor will seek final approval of its use of Cash Collateral and further access/authority for uses for the DIP Loan during the pendency of the Subchapter V Case, pursuant to the Final Order.

30.    Without the use of Cash Collateral and access to the DIP Loan, the Debtor will be unable to pay its ordinary and necessary business expenses including, but not limited to, payroll and related obligations, taxes, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, rent, and costs of administration of this Subchapter V Case. To maintain its operations and preserve the going concern value of its assets and maximize value for the estate,

---

[7]    The Motion is intended to provide only a summary of the relief requested. To the extent there are inconsistencies between the Interim Order and the Motion, the Interim Order shall govern.

[8]    The amount of Cash Collateral utilized during the Interim Period is anticipated to be $130,000. This figure takes into account the generation of receipts as set forth in the Budget. However, with access to the DIP Loan the Debtor expects to remain cash flow positive during the Initial Period.

the Debtor seeks approval of the use of the Cash Collateral and DIP Loan in accordance with the

Orders and Budget.

## BASIS FOR RELIEF REQUESTED

**A.      Applicable Legal Authority**

      (i)      *The DIP Loan*

31.      In pertinent part, section 364 of the Bankruptcy Code states:

      (a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

      (b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

      (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

      (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

      (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

      (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364. Therefore, no notice or a hearing is required for unsecured post-petition financing

(which may be treated as an administrative expense) obtained in the ordinary course of business.

32.      Courts have articulated a three-part test to determine whether a debtor is entitled to

financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

      a      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

      b      the credit transaction is necessary to preserve the assets of the estate; and

      c      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

33.     Consistent with this authority, and for the reasons discussed below, the Debtor respectfully submits that the Court should approve the Debtor's decision to enter into the DIP Agreement because (i) under the Interim Order Vollers is extending unsecured credit to fund certain of the Debtor's labor costs, and (ii) if the Sale Motion is denied the lien that Vollers will receive as security for the DIP Loan will be secured by property not already subject, or only partially subject to a lien. Additionally, no other parties will extend credit on such terms and as part of the global settlement reached between Manasquan Bank, Vollers, and the Debtor.

      (ii)    *Cash Collateral*

34.     Section 363(a) of the Bankruptcy Code defines Cash Collateral as:

accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

35.     The "interest" set forth in Section 363(a) of the Bankruptcy Code refers to a valid and perfected security interest between the parties that secures the Cash Collateral. See In re Comer Pockets of the Sw., Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (stating that "[o]nly perfected security interests give rise to 'cash collateral' as defined by" Section 363 of the Bankruptcy Code) (citing Waldron v. Nw. Acceptance Corp. (In re Johnson), 62 B.R. 24, 28-29

(B.A.P. 9th Cir. 1986)); In re Fairview- Takoma Ltd. P'ship., 206 B.R. 792, 796-800 (Bankr. D.Md. 1997).  A creditor holding a perfected security interest in property will be entitled to the protection of the Cash Collateral provisions of Section 363(a) because such interests are not avoidable under the "strong arm" provisions of Section 544(a)(1) and (3) of the Bankruptcy Code. See Batt v. Scully, 168 B.R. 541, 545 (D.N.J. 1994); see also Indian Motorcycle Assocs. III L.P. v. Massachusetts Housing Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995) (holding that the secured creditor "would have to demonstrate that it held a perfected lien or security interest" in certain collateral, "otherwise, as property of the chapter 11 estate, any unperfected line . . . would be subject to avoidance by the debtor in possession pursuant to its 'strong arm' powers.").

36.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor-in-possession may not use Cash Collateral unless: (1) each entity with an interest in such Cash Collateral consents; or (2) the court, after notice and hearing, authorizes the use, sale, or lease of such Cash Collateral in accordance with the provisions of Section 363 of the Bankruptcy Code. See 11 U.S.C. § 363(c)(2).  Section 363(e) provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the [debtor-in-possession], the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

37.    In turn, adequate protection can be provided where the debtor:

•    makes cash payments or periodic cash payments;

•    grants an additional or replacement lien; or

•    provides other relief as will result in the secured creditors' realization of the "indubitable equivalent" of its interest in pre-petition collateral.

11 U.S.C. § 361.

15

38.     What constitutes sufficient adequate protection is decided on a case-by-case basis.

*See* Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16

F.3d 552 (3d Cir. 1993) ("[A] determination of whether there is adequate protection is made on a

case by case basis."); see also In re Martin, 761 F.2d 472, 474 (8th Cir. 1985); In re Mosello, 195

B.R 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360, 366 (Bankr.

S.D.N.Y. 1992); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2

(Bankr. D. Del. Feb. 18, 1992).

39.     Section 363(p) of the Bankruptcy Code provides that the debtor-in-possession has

the burden of proof on the issue of adequate protection, and the entity asserting an interest in

property has the burden of proof on the issue of the validity, priority, or extent of such interest.

11 U.S.C. § 363(p).

**B.      The Debtor Should Be Authorized to Use Cash Collateral, Obtain the DIP Loan, and
        Grant Adequate Protection in Connection Therewith.**

40.     Pursuant to Local Rule 4001-3(a)(2)(B) and (C) and (b)(2), the Debtor proposes the

following uses of Cash Collateral, the DIP Loan, and grant of adequate protection to Manasquan

Bank, to the extent of any diminution in value of its interests in the Prepetition Collateral, from

and after the Petition Date as follows:[9]

| (*With Provisions to be Highlighted Pursuant to Local Rule 4001-3(c)*) | |
|---|---|
| **DIP Loan**: | |
| **Maximum DIP Commitment Amount** Local Rule 4001-3(b)(2)(A), (c)(1), | • Vollers will provide the DIP Loan of up to **$200,000** to pay, if necessary, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes) and (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non- |

---

[9]     All capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

| | |
|---|---|
| Interim Order ¶ B | Bonded Projects for which the Debtor and Vollers will execute a Subcontract at closing if the sale is approved.<br><br>• Subject to approval of the Sale Motion and authorization for the Subcontracts, Vollers will consent to extending the DIP Loan for use to complete the Subcontracted Projects (will be authorized by the proposed the Final Order). |
| **Material Conditions to Closing**<br>Local Rule 4001-3(b)(2)(B) | • Approval of the Sale Motion is a condition for Vollers to assume DIP Loan and consent to use of DIP Loan proceeds for expenses other than set forth Interim Order. |
| **Fees, Costs, etc.**<br>Local Rule 4001-3(b)(2)(C)<br><br>DIP Agreement §§ 5.1, 5.3 | • No fees or costs.  Interest at 1% per annum, default interest at 3% per annum. |
| **Effect on Existing Liens**<br>Local Rule 4001-3(c)(1)<br><br>Interim Order ¶ C | • Vollers will be granted the DIP Lien, which, if the Vollers Transaction is approved, will be extinguished when Vollers assumes the DIP Loan and owns the assets. The DIP Lien will remain in place if the Vollers Transaction is not approved. |
| **Extra Consideration (DIP Loan)**<br>Local Rule 4001-3(c)(9)<br><br>Interim Order ¶ B | • If the Vollers Transaction is approved and the DIP Loan and union obligations are repaid with collections under the Subcontracts, Vollers will immediately provide the Debtor's Professionals $75,000. |
| **Termination; Events of Default (DIP Loan)**<br>Local Rule 4001-3(c)(3), (4)<br><br>DIP Agreement §9.1 | • Events of default include (i) sale of assets other than the Vollers Transaction without the consent of Vollers, (ii) conversion to chapter 7 or appointment of a chapter 11 trustee or examiner, (iii) orders modifying or limiting the DIP Lien, (iv) denial of the Sale Motion, , and (v) notice  by Vollers that it does not intend to proceed with the Sale Transaction for any reason.<br><br>• Additionally, unless the Vollers Transaction is approved within 21 days after the Petition Date the Debtor will be in default. |
| **Cash Collateral**: | |
| **Adequate Protection**<br>Bankruptcy Rule | • <u>Replacement Liens</u>: As adequate protection for and solely to the extent of the amount of diminution in value from and after the Petition Date, of its interests in the Collateral, including, without |

| | |
|---|---|
| 4001(b)(1)(B)(iv); Local Rule 4001-3(c)(2) Interim Order ¶ E | limitation, the aggregate amount of Cash Collateral used by any Debtor on a dollar-for-dollar basis, the imposition of the automatic stay and any other act or omission which causes Diminution in Value to the extent of the use of any of Manasquan Bank's Cash Collateral, Manasquan Bank is granted the Adequate Protection Liens, but without requiring any additional filing or recordation of statements or documents. |
| | • <u>Section 507(b) Priority Claims</u>: Manasquan Bank shall be entitled to an allowed claim under section 507(b) of the Bankruptcy Code to the extent of any diminution of Manasquan Bank's Cash Collateral from the Petition Date (the "<u>Adequate Protection Superpriority Claim</u>"). The Adequate Protection Superpriority Claim shall have priority over all administrative expense claims, including administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, and unsecured claims against the Debtor and its Estate now existing or hereafter arising, of any kind or nature whatsoever. |
| **Carve Out (Cash Collateral)** Local Rule 4001-3(c)(9) Interim Order ¶ F | • There is a Carve-Out of $25,000 from the Cash Collateral. The Debtor may continue to use the Carve-Out for the payment of any unpaid Professional's fees of the Debtor. |
| **Validity, Perfection, or Amount of Pre-Petition Claim; Waiver of Claims** Local Rule 4001-3(c)(9) Interim Order ¶ 8, 9, 16 | • As of the Petition Date, the Debtor is in default of its obligations under the Manasquan Loan Documents. The Secured Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtor and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law. The Debtor does not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature, or description which would in any way affect the validity, enforceability and nonavoidability of any of the Secured Obligations. |
| | • As of the Petition Date, the Secured Obligations were secured pursuant to the Loan Documents and applicable law by valid, perfected, enforceable and non-avoidable first priority security interests and liens (the "Prepetition Liens") granted by the Debtor to Manasquan Bank (including any applicable agents), for the benefit of Manasquan Bank, upon certain collateral (as set forth in the Loan Documents) (the "Prepetition Collateral"). The Prepetition Liens (i) are valid, binding, perfected and enforceable liens and security interests on all of the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization, |

| | |
|---|---|
| | recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law, and (iii) constitute legal, valid, unavoidable and binding obligations of the Debtor, enforceable in accordance with the terms of the Loan Documents. <br><br> • The Debtor, on behalf of itself and its estate and all of its past, present and future predecessors, successors, subsidiaries, affiliates, and assigns (collectively, the "Releasors") agree that they hold no valid or enforceable "claim" (as defined in the Bankruptcy Code), counterclaim, cause of action, defense or setoff rights of any kind against Manasquan Bank or its officers, directors, equity holders, members, shareholders, affiliates, representatives, or agents with respect to the Loan Documents and/or the Secured Obligations.  The Releasors hereby forever waive and release any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights with respect to the Loan Documents and the Secured Obligations that the Releases have, have had or may have against Manasquan Bank and its officers, directors, equity security holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, representatives, or agents, whether at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code and under any other similar provisions of applicable state or federal law. |
| **Termination or Default Provisions** Local Rule 4001-3(c)(3) <br><br> Interim Order ¶ Q | • <u>Suspension</u>: The Debtor's authority to use Cash Collateral shall be suspended (and Debtor shall therefore not be authorized to use such Cash Collateral for any purpose, except as further ordered by the Court) for so long as any one or more of the following conditions (collectively, an "<u>Event of Default</u>") exists: (i) the Debtor has failed to discharge any duty or other obligation imposed upon it in this Order, or has otherwise violated any requirement or condition to use of Cash Collateral provided in this Order, and has not cured such failure or violation within five (5) business days after receiving written notice thereof from Manasquan Bank (provided that the Debtor shall have the ability to seek an emergency hearing within 72 hours to challenge any such written notice, and authority to continue usage of Cash Collateral until the Court rules on such dispute), or (ii) the filing of any motion by the Debtor to dismiss or convert this Subchapter V Case to a case under chapter 7. |

- Termination: The Debtor's authority to use Cash Collateral shall terminate for all purposes (except to pay the Secured Obligations) upon the soonest to occur of the following events or conditions: (i) the Interim Period expires and no final order or extension has been approved by the Court, (ii) a chapter 11 trustee is appointed for the Debtor, (iii) this Subchapter V Case is converted to a chapter 7 case or dismissed, (iv) the Court enters an order confirming a chapter 11 plan of reorganization or liquidation for the Debtor, (v) the Court enters an order granting Manasquan Bank relief from the automatic stay to exercise rights and remedies in respect of any property of the Debtor, (vi) there is a change in the current senior management of the Debtor as evidenced by a notice  thereof filed with the Court by the Debtor (and the Debtor shall file such notice no later than three (3) business days after any such change in management), (vii) any party seeks relief from the automatic stay with respect to the Prepetition Collateral or the collateral subject to the Adequate Protection Liens; (viii) the Debtor files a motion to sell any portion of the Debtor's estate without first consulting with or obtaining the consent of Manasquan Bank; (ix) the filing of a motion by the Debtor, without the prior written consent of Manasquan Bank, seeking authorization to obtain further postpetition financing  that is senior or *pari passu* to the Secured Obligations or the Adequate Protection Liens, (x) the Debtor shall create, incur or suffer any other claim which is *pari passu* or senior to the Superpriority Claim granted to Manasquan Bank hereunder; (x) any misrepresentation of a material fact made after the Petition Date by the Debtor or its agents about the financial condition of the Debtor, or the nature, extent, location or quality of any Prepetition Collateral or the disposition or use of any Prepetition Collateral; (x) a filing by the Debtor of any motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of the Prepetition Liens or any other cause of action against Manasquan Bank and/or the Secured Obligations, or in the event that the Debtor supports such a motion, application or adversary proceeding filed by a third party, (xi) any sale of the Debtor's assets occurs without payment to Manasquan Bank, (xii) September 30, 2022, (xiii) this Order is amended, vacated, stayed, reversed or otherwise modified, as a result of a motion or other court filing by the Debtor, without the prior written consent of Manasquan Bank, or (xiv) any default or termination event under the DIP Loan.

- Upon the occurrence of a Termination Event, Manasquan Bank may seek relief from the automatic stay provisions of section 362 of the Bankruptcy Code by filing and serving on the

| | Debtors, the Subchapter V Trustee, all parties filing notices of appearance, the DIP Lender, the SBA, and the United States Trustee, a notice, including a certification, that requests relief from the automatic stay and describes in detail the alleged Termination Event ("Notice of Termination Event").  The Debtors and the Subchapter V Trustee shall have five (5) days from the receipt of the Notice of Termination Event to object to Manasquan Bank's required relief from the automatic stay and to seek a hearing on shortened notice whether a Termination Event has occurred or otherwise to object to Manasquan Banks' requested relief.  If neither the Debtor nor the Subchapter V Trustee files such an objection to the Notice of Termination Event, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified solely for Manasquan Bank to take any or all of the following actions without further order of or application to the Court: (a) immediately terminate the Debtor's use of Cash Collateral; and (b) take any other actions or exercise any other rights or remedies permitted under the Loan Documents or applicable law.  If the Debtor or Subchapter V Trustee files an objection to the Notice of Termination Event and requests a hearing within the required timeframe, the Bankruptcy Court shall determine whether a Termination Event has occurred and whether Manasquan Bank is entitled to relief from the automatic say to exercise any rights and remedies |
|---|---|
| **506(c) Rights**<br>Local Rule 4001-3(c)(6)<br><br>Interim Order ¶ C | In consideration of the Carve-Out, the Debtor and its estate have waived rights under section 506(c) of the Bankruptcy Code. |
| **Avoidance Actions**<br>Local Rule 4001-3(c)(8)<br><br>Interim Order ¶ C | Manasquan Bank shall not have a replacement lien on any claims or causes of action of the Debtor under 11 U.S.C. §§ 544, 547, 548, 549, 550, and 551 ("Avoidance Actions") or any proceeds of any such claims or causes of action ("Avoidance Proceeds"). |

41.    The Adequate Protection Liens are a valid form of adequate protection. See In re Prichard Plaza Assocs. Ltd., 84 B.R. 289, 302 (Bankr. D. Mass. 1988) ("If the proceeds stream is likely to remain stable through the collection of new accounts receivable or the sale of new inventory, adequate protection is often ensured by a replacement lien on post-petition accounts and inventory and their proceeds and by some provision for monitoring the use of proceeds."); In

re Airport Inn Assocs. Ltd., 132 B.R. 951, 960 (Bankr. D. Colo. 1990) ("The [c]ourt could order a

lien in post-petition accounts receivable as adequate protection if that relief was requested…."); In

re Int'l Design & Display Group, Inc., 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (authorizing

debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien

on all post-petition accounts receivable, inventory and contracts to the extent the creditor's

collateral was depleted).

42.    The Debtor respectfully submits that the Adequate Protection Liens and the

Adequate Protection Superpriority Claim are appropriate to protect against diminution in value, if

any, and provide adequate protection of Manasquan Bank's interests for the Debtor's use of Cash

Collateral.    Further, the Debtor respectfully submits that the Adequate Protection Payments

provide additional adequate protection of Manasquan Bank's interests for the Debtor's use of Cash

Collateral.

43.    The Debtor believes that the proposed adequate protection for Manasquan Bank is

necessary and appropriate to ensure that the Debtor can continue to use the Cash Collateral to pay

the Debtor's ordinary and necessary operating expenses as reflected in the Budget during this

Subchapter V Case.    More specifically, the Debtor has an immediate need to use the Cash

Collateral to permit, among other things, the Debtor to continue to operate its business in order to

complete the Subcontracted Projects and through a sale of its business and assets pursuant to

Section 363 of the Bankruptcy Code.    The access to sufficient working capital and liquidity through

the use of Cash Collateral is vital to the preservation and maintenance of the Debtor's business

operations until the closing on the sale.    Absent the ability to use cash collateral, the Debtor would

have to cease operations, which would critically impair its ability to collect receivables and

generate future income through continuing work on its Non-Bonded Projects until a sale.  The continued use of cash collateral is thus vital for the Debtor to maximize value for the estate.

44.     Therefore, the Debtor should be authorized to use the Cash Collateral in accordance with the Budget initially on an interim basis and, thereafter, on a final basis. The Debtor has been advised by Manasquan Bank that in exchange for the adequate protection outlined above, Manasquan Bank consents to the Debtor's use of the Cash Collateral provided such use is in accordance with the Budget and the Interim Order.  As it relates to the SBA, and in considering its subordinate position relative to Manasquan Bank, the Debtor's use of the Cash Collateral will not diminish Manasquan Bank's interests to the point where it would impact the SBA.

**C.      Automatic Stay Should be Modified on a Limited Basis**

45.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to (a) implement the terms and conditions of the Interim Order and the transactions contemplated thereby and (b) permit Manasquan Bank and the Debtor to create and perfect the Replacement Liens and other liens granted under the Interim Order.

46.     The Debtor has determined, in an exercise of its business judgment, that such stay modification is appropriate under the circumstances in the context of a negotiated, consensual cash collateral order. Further, stay modifications of this kind are ordinary, reasonable, and fair under the circumstances of this Subchapter V Case.

**D.      Immediate Relief is Necessary and Appropriate**

47.     Bankruptcy Rule 4001(b)(2) and (c)(2) provide that a final hearing on a motion to use cash collateral pursuant to Section 363 or obtain post-petition financing pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of

23

the motion. Upon request, however, the Court is empowered to conduct a hearing before such fourteen-day period and authorize the use of cash collateral or obtaining post-petition credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. See Fed. R. Bankr. P. 4001(b)(2) and (c)(2).

48.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtor requests that the Court conduct an interim hearing on the Motion within two business days of the Petition Date and authorize the Debtor to use the Cash Collateral and obtain the DIP Loan on an interim basis in the amounts reflected in the Budget and pursuant to the terms of the Interim Order. As demonstrated above, the Debtor has an urgent need to use cash collateral and obtain financing to operate its business and preserve assets. Absent interim relief, the Debtor and its estate will suffer immediate and irreparable harm resulting from the Debtor's inability to operate its business. Accordingly, it is appropriate for the Court to approve the Motion on an interim basis.

49.     During the Interim Period and pending a Final Hearing pursuant to Bankruptcy Rule 4001(b)(2 and (c)(2), the use of cash collateral and the DIP Loan will be governed by the terms of the Interim Order and the Budget. A proposed Final Order will be submitted before the Final Hearing on substantially similar terms or incorporating such terms as may be agreed upon by the Debtor, Manasquan Bank, and Vollers.

50.     Accordingly, it is appropriate for the Court to hear the Motion on an expedited basis.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H) REQUIREMENTS

51.     The Debtor requests a waiver of any notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of the order(s) approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash

collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders

otherwise." Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtor requires immediate relief to

continue ordinary organizational operations for the benefit of all parties in interest. Accordingly,

the Debtor submits that cause exists to justify a waiver of the notice requirements under

Bankruptcy Rule 6004(a) and the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the

extent such notice requirements and stay apply.

## WAIVER OF MEMORANDUM OF LAW

52.    The Debtor represents that the facts and circumstances set forth herein do not

present novel questions of law, and, as such, respectfully request that this Court waive the

requirement of filing a memorandum of law in accordance with Local Rule 9013-1.

## NO PRIOR REQUEST

53.    No previous request for the relief sought herein has been made to this Court or any

other court.

## NOTICE

54.    The Debtor will provide notice of this Motion to: (i) the Office of the United States

Trustee; (ii) the entities appearing on the Debtor's list of twenty (20) largest unsecured creditors

on a consolidated basis; (iii) counsel to Manasquan Bank and Vollers; (iv) the Office of the United

States Attorney; (v) the Attorney General for the State of New Jersey; (vi) the Internal Revenue

Service; (vii) the SBA; (viii) NGM; and (ix) those persons who have formally appeared in

Subchapter V Case and requested service pursuant to Bankruptcy Rule 2002.  Notice of this Motion

and any order with respect hereto will be served in accordance with Local Rule 9013-5(b), (c), and

(f). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary under the circumstances.

**<u>CONCLUSION</u>**

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Interim Order following the interim hearing on the Motion and a Final Order following the Final Hearing on the Motion, and grant such other relief as the Court deems just and appropriate under the circumstances.

DATED: August 4, 2022                **FOX ROTHSCHILD LLP**

Proposed Counsel for the Debtor and Debtor-in-Possession

By:     _/s/  Joseph J. DiPasquale_
        Joseph J. DiPasquale, Esq.