**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FOX ROTHSCHILD LLP**
49 Market Street
Morristown, NJ 07960
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Joseph A. Caneco, Esq.
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
jcaneco@foxrothschild.com
Telephone:  (973) 992-4800
Facsimile:  (973) 992-9125

*Proposed Counsel to the Debtor
and Debtor in Possession*

|  |  |
|---|---|
| In Re:<br><br>ASSUNCAO BROS., INC.,<br><br>        Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 22-16159-CMG<br><br>Judge Christine M. Gravelle |

**DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS TO VOLLERS EXCAVATING AND CONSTRUCTION, INC., (II) APPROVING SETTLEMENT, (III) AUTHORIZING DEBTOR TO ENTER INTO SUBCONTRACTS WITH VOLLERS FOR CERTAIN NON-BONDED PROJECTS, AND (IV) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Assuncao Bros., Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-caption chapter 11, subchapter v case (the "Subchapter V Case"), by and through its proposed attorneys, Fox Rothschild LLP, hereby submits this motion (the "Motion") seeking entry of an order pursuant to 11 U.S.C. §§ 105(a), 363, and 365, and Rules 6003, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure, and D.N.J. LBR 6004-1, (i) authorizing the Debtor to sell certain

of its assets to the Vollers Excavating and Construction, Inc. (the "Buyer" or "Vollers") free and

clear of any and all claims, liens, rights, interests, and encumbrances; (ii) approving a settlement

among Debtor, Vollers, and Manasquan Bank as secured lender to Debtor, (iii) authorizing the

Debtor to enter into the Subcontracts (defined below) with Vollers for Vollers to complete

Debtor's remaining work on certain of the Debtor's Non-Bonded Projects (defined below); and

(iv) authorizing the Debtor to assume and assign to Vollers certain executory contracts and

unexpired leases.   In support of this Motion, the Debtor relies on the *Declaration of Martin

Assuncao in Support of Voluntary Petition and First Day Motions* (*the* "Assuncao Declaration"),

and respectfully states:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and

157, and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United

States District Court for the District of New Jersey, dated September 18, 2021 (Simandle, C.J.).

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of the

Debtor's Subchapter V Case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and

1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363, and

365 of title 11 of the United States code (the "Bankruptcy Code") and Rules 6003, 6004, and 9019

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      The facts set forth in the Assuncao Declaration and the Assuncao Declaration are

incorporated herein by reference.

4.      On August 3, 2022 (the "Petition Date"), the Debtor commenced this Subchapter

V Case by filing a voluntary petition for relief under subchapter v of the chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its property as a debtor-in-possession in accordance with section 1184 of the Bankruptcy code.

5.      The Debtor is a contractor specializing in concrete services, including but not limited to, curb, sidewalk, bridge, barriers, and slabs. The Debtor is a family-owned business that has been operating since 1958 and currently maintains offices located at 29 N. Wood Avenue, Edison, New Jersey 08820. The Debtor is currently contracted to work on both bonded and non-bonded projects throughout the state of New Jersey. As of the Petition Date the Debtor had 23 employees, most of which are unionized workers.

6.      The Debtor operates as a New Jersey Disadvantaged Business Enterprise ("DBE"). DBEs are for-profit small business concerns where socially and economically disadvantaged individuals own at least a 51% interest and also control management and daily business operations.

7.      As of the Petition Date, the Debtor has total assets worth approximately $4.3 million inclusive of accounts receivable on numerous executory construction contracts, and total liabilities of approximately $7.6 million, inclusive of disputed, unliquidated, and contingent claims. The Debtor's assets primarily consist of: (i) various vehicles, trailers, and construction equipment (collectively, the "Vehicles and Equipment"), with an orderly liquidation value of approximately $2.15 million (net of depreciation), and which are scattered at the Debtor's various jobsites throughout New Jersey; (ii) accounts receivable totaling approximately $2 million, of which, approximately $1,900,371 is from unbonded projected and $155,874 is from bonded projects; (iii) cash totaling approximately $20,000, (iv) contracts for active projects for the Debtor to provide concrete-related services, including 19 unbonded projects (the "Non-Bonded Projects") and 14 bonded projects (the "Bonded Projects"); (v) inventory; (vi) leasehold interests; (vii)

intellectual property; and (viii) miscellaneous assets, including office furniture and equipment worth approximately $65,600.  The Debtor does not own any real property.

8.    Certain of the Debtor's Vehicles and Equipment are subject to secured obligations in the aggregate amount of approximately $600,000 (the "Equipment Loans").

9.    On or about August 24, 2015, the Debtor into a loan agreement and related documents with Manasquan Bank f/k/a Manasquan Savings Bank ("Manasquan Bank") for a line of credit in the principal amount of $700,000 with an interest rate of 6.5%.  Through subsequent modification agreements, the most recent dated August 14, 2019, the line of credit from Manasquan Bank was increased to $1.3 million (the "Manasquan Loan").  The Debtor has pledged substantially all of its assets as security for the Manasquan Loan subject only to the aforementioned Equipment Loans.[1]  As of the Petition Date, the balance due to Manasquan Bank under the Manasquan Loan, inclusive of principal and interest, is approximately $1,309,232.14, plus additional fees, costs and expenses that may be due.  The Manasquan Loan is in default, with the Debtor missing an interest payment on July 24, 2022.  Pursuant to a letter agreement dated August 9, 2021, the maturity date for the Manasquan Loan is August 24, 2022.  The Debtor asserts that the value of its assets securing the Manasquan Loan (i.e., the assets not securing the Equipment Loan) is less than the amount of the Manasquan Loan, and therefor Manasquan Bank is undersecured.  Manasquan Bank disputes that the value of its collateral in the Debtor's assets is less than the full value of the Manasquan Loan.  Notwithstanding that dispute, given the limited resources of the estate, the parties have agreed to a settlement in lieu of litigation, subject to

---

[1]    Pursuant to a UCC-1 financing statement recorded by Manasquan Bank with the State of New Jersey on August 25, 2015 and continued by filing recorded on July 21, 2020, Manasquan Bank's lien includes:  "All of the Debtor's assets, including but not limited to, all now owned or hereafter acquired, created, or arising accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts and investments property, and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds."

approval by the Court, as described in the Manasquan Bank Settlement as set forth below.

10.    On or about May 3, 2021, the Debtor entered into a Loan Authorization and Agreement with the United States Small Business Administration (the "SBA") for an Economic Injury Disaster Loan in the principal amount of $500,000 (the "SBA Loan"), with an annual interest rate of 3.75%. The SBA Loan is secured by a subordinate lien on substantially all of the Debtor's assets.[2] As of the Petition Date, the balance due on the SBA Loan, inclusive of principal and interest, is approximately $523,000. The assets securing the SBA Loan are the same as those securing the Manasquan Loan, and the Debtor asserts that there is no asset value in excess of the Manasquan Loan which renders the SBA fully unsecured.

11.    Outside of the secured obligations to Manasquan Bank, the SBA, and the various lienholders for the Equipment Loans, the balance of the Debtor's liabilities consist of various trade and operational-related expenses totaling approximately $5.2 million (inclusive of contingent, unliquidated, and disputed claims).

12.    Prior to the Petition Date, NGM Insurance Company ("NGM" or "Surety"), executed certain performance and payment bonds on behalf of the Debtor including bonds bearing bond numbers for certain project owner obligees of and for the Debtor's ongoing Bonded Projects, which bonds relate to certain of the contracts which the Debtor was performing under as of the Petition Date.

---

[2]    Pursuant to a UCC-1 financing statement recorded by the SBA with the State of New Jersey on May 17, 2021, the SBA Loan is secured by: "All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products and collections thereof and all records and data relating thereto." The SBA does not have a lien on or security interest in the Debtor's rolling stock or vehicles.

13.     Additional factual background relating to the Debtor's business, capital structure, and the circumstances giving rise to the filing of this Subchapter V Case are set forth in the Assuncao Declaration.

14.     Pursuant to the Debtor's Motion for Entry of Interim and Final Orders (i) Authorizing (a)Post-Petition Financing and (b) Use of Cash Collateral; (ii) Modifying the Automatic Stay; and (iii) Scheduling a Final Hearing (the "Cash Collateral/DIP Motion") [D.I. 13], the Debtor has sought approval of up to $200,000 of post-petition financing from Vollers to pay, if necessary, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-bonded Projects for which the Debtor and Vollers will execute a Subcontract (as defined below) at closing if the sale is approved; and (iii) insurance coverage (the "DIP Loan").  Also pursuant to the Cash Collateral/DIP Motion, Manasquan Bank will be granted adequate protection liens in all of the Debtor's assets to allow the Debtor to use Manasquan Bank's pre-petition collateral and cash collateral for the preservation of the business (the "Adequate Protection Liens").

## PROPOSED TRANSACTION WITH VOLLERS

15.     As detailed in the Assuncao Declaration, the Debtor is a multi-generational family-run business that is currently working on a number of projects that are anticipated to generate substantial revenue, but an orderly liquidation through bankruptcy is necessary at this time to enable the Debtor to shed its burdens and orderly transition certain of its construction contracts to a new owner that will help the Debtor's business realize a significant benefit.

16.     The Debtor has entered into an asset purchase agreement (the "Asset Purchase Agreement") with Vollers to sell certain of its assets to Vollers.  A copy of the Asset Purchase Agreement is attached as **Exhibit A** hereto.

17.     Vollers has delivered quality construction services to public, commercial and private clients throughout New Jersey, Pennsylvania and New York since 1949.  Vollers is a family business founded on the principals of integrity, safety, and unparalleled customer satisfaction.  Vollers continuously innovates and delivers best in class site work, paving, environmental, utilities, demolition, excavating, concrete, landscaping, recycling, and engineering solutions for its clients.  Vollers has over 250 employees and is a party to multiple collective bargaining agreements.  Vollers annual revenues average between $80-$100M with a current backlog of $80M and enjoys an aggregate bonding limit of $100M.

18.     The pertinent terms of the transaction with Vollers (the "Vollers Transaction") are as follows:

a.     Vollers will purchase all of the Debtor's rights, title and interest in all equipment, tools and forms, and all accounts receivable related to Non-Bonded Projects.

b.     Vollers will pay directly to Manasquan Bank at closing the Manasquan Settlement Amount (as further defined below) of $975,000, as set forth in the description of the Manasquan Bank Settlement, below.

c.     Vollers will also assume the Debtor's obligations under the Equipment Loans, which are approximately $600,000.  A list of the Equipment Loans to be assumed and assigned to Vollers is attached as Schedule 1.03(d) to the Asset Purchase Agreement (the "Assigned Equipment Loans"[3]).

d.     Vollers will provide, the DIP Loan of up to $200,000 to pay, if necessary, (i) accrued and unpaid payroll as of the Petition Date (net of applicable payroll taxes); (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-Bonded Projects for which the Debtor and Vollers will execute a Subcontract (as defined below) at closing if the sale is approved; and (iii) insurance coverage.

e.     Subject to the Court authorizing the Vollers Transaction and authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will assume the entirety of the DIP Loan at closing.

---

[3]     For the avoidance of doubt, the term "Assigned Equipment Loans" shall include all underlying agreements, leases, notes, and other documentations pertaining to each of the Assigned Equipment Loans.

f.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will complete any work required on the Non-Bonded Projects for which a Subcontract is executed (the "Subcontracted Projects" and each a "Subcontracted Project"), and Vollers will perform all of the Debtor's remaining scope (work) obligations and will be entitled to all billed and unpaid contract balances and balances to bill.

g.    Subject to approval of the Vollers Transaction and authorization for the Subcontracts, Vollers will consent to extending the DIP Loan for use to complete the Subcontracted Projects, subject to sharing net proceeds from those Non-Bonded Projects with the Debtor's estate as described in ¶ 16(h) below.

h.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will share 15% of the net proceeds of each Subcontracted Project (the "Kicker Provision"), after application of direct costs and allocated overhead of 15%, with the Debtor's estate.

i.    If the Court does not approve the Vollers Transaction and authorize the Subcontracts, Vollers will, pursuant to the relief sought in the Cash Collateral/DIP Motion, be granted a first priority DIP Lien on all assets of the estate (including accounts receivable relating to the Non-Bonded Projects only, but excluding the Equipment Loans) that secures the DIP Loan up to the Maximum DIP Amount.

j.    Subject to the Court authorizing the Debtor to enter into the Subcontracts with Vollers, Vollers will (i) make offers of employment on terms and conditions not less favorable than current employment terms to the Debtor's non-union employees, (ii) assume certain holiday, vacation and sick time for employees of Debtor that Vollers hires; and (iii) pay all accrued union benefit plan obligations with respect to Subcontracted Projects.

19.    As additional consideration, once Vollers has collected on receivables such that (i) the DIP Loan has been paid off and (ii) any amounts for union benefit plans assumed by Vollers has been repaid, Vollers will make a direct payment of $75,000 as Additional Consideration for the Debtor's Subchapter V Case professionals.

20.    With respect to the Kicker Provision, it is estimated that gross current and future accounts receivable on the Subcontracted Projects will total approximately $12 million.  It is anticipated that sufficient receipts will be recovered in excess of Voller's expenses to provide a

recovery to the estate.

21.     It is estimated that Vollers will have to allocate approximately $9 million in order to complete the Subcontracted Projects.  Additionally, Vollers will engage the Debtor's Surety to discuss and negotiate completion of Bonded Projects in the discretion of the Surety and Vollers. Moreover, Vollers has agreed that it will make employment offers to all of the Debtor's non-union employees on terms no less favorable to such employee than the terms on which such employee was employed with the Debtor, and to pay all of the Debtor's union benefit obligations on the Non-Bonded Projects.[4]

22.     The Debtor reached out to multiple contractor firms to gauge interest in acquiring the Debtor's business and assets.  Vollers is the only entity that expressed interest.

23.     The Asset Purchase Agreement was negotiated in good faith at arm's length, and Vollers is not an insider of the Debtor.

24.     Subject to the terms of the Manasquan Settlement, below Manasquan Bank will provide its consent to the proposed Vollers Transaction, and holders of Equipment Loans' debt will be assumed by Vollers.  The SBA is also being provided with notice of the Motion.[5]

## PROPOSED MANASQUAN BANK SETTLEMENT

25.     As set forth above, through the prepetition liens related to the Manasquan Loan and through the Adequate Protection Liens to be provided under the Cash Collateral/DIP Motion, Manasquan Bank has properly perfected lien rights in all of the Debtor's assets.

26.     Manasquan Bank is owed at least $1,309,232.14, plus additional fees, costs, and

---

[4]     As of the Petition Date, the Debtor owed approximately $175,000 in union-related benefits with respect to Non-Bonded Projects.

[5]     The SBA may be entitled to proceeds, if any, recovered over and above the claim of Manasquan Bank to the extent the SBA has a valid lien on the underlying asset or proceeds therefrom.  However, based on the value of the assets, the Debtor asserts that SBA is likely fully unsecured.

expenses, as of the Petition Date.

27.    The Debtor asserts that the preservation of the value of the Debtor, along with the ability of the Debtor to preserve certain jobs and complete certain projects for value, is contingent upon the completion of the Vollers Transaction.  The Debtor and Vollers acknowledge that the consent of Manasquan Bank is required to allow the Vollers Transaction to proceed.

28.    Manasquan Bank has asserted that collection of the value of its collateral would result in the repayment in full of the Manasquan Loan.  The Debtor disputes that assertion.

29.    In lieu of costly litigation regarding full repayment of the Manasquan Loan that would burden the estate with substantial administrative expense and reduce recoveries to creditors, the Debtor, Manasquan Bank, and Vollers have agreed to the following settlement hereby submitted to this Court for approval pursuant to Fed. R. Bankr. P. 9019 (the "Manasquan Bank Settlement"):

    a. Debtor and Vollers acknowledge that through the prepetition liens related to the Manasquan Loan and through the Adequate Protection Liens to be provided under the Cash Collateral/DIP Motion, Manasquan Bank has properly perfected lien rights in all of the Debtor's assets, and that Debtor and Vollers require the consent of Manasquan Bank to proceed with the Vollers Transaction;

    b. In settlement of the properly perfected prepetition liens and Adequate Protection Liens provided under the Cash Collateral/DIP Motion in favor of Manasquan Bank, and the other consideration provided by Manasquan Bank herein, Vollers has agreed to pay Manasquan Bank $975,000 at closing of the Vollers Transaction (the "Manasquan Settlement Amount");

    c. Manasquan Bank has agreed to accept the Manasquan Settlement Amount in

10

exchange for the release of its liens and consent to the Vollers Transaction if, and only if, the Manasquan Settlement Amount is actually paid directly to Manasquan Bank at the closing of the Vollers Transaction; Manasquan Bank will not consent to the Vollers Transaction or the release of its liens if, for any reason, payment of the Manasquan Settlement Amount is delayed beyond, or otherwise cannot be made directly to Manasquan Bank at or before the time of closing of the Vollers Transaction; Debtor and Vollers likewise acknowledge and agree that the Vollers Transaction cannot proceed absent the consent of Manasquan Bank and the Manasquan Settlement Amount being paid directly to Manasquan Bank at the time of closing;

d. Upon receipt of the Manasquan Settlement Amount, Manasquan Bank will immediately pay $25,000 from the Manasquan Settlement Amount to the Debtor's professionals as a reimbursement of expenses related to the sale;

e. After payment of the Manasquan Settlement Amount to Manasquan Bank, Manasquan Bank will have an allowed unsecured deficiency claim against Debtor of $359,232.14;

f. Notwithstanding this settlement and payment of the Manasquan Settlement Amount, Manasquan Bank will continue to have the right to pursue any guarantors of the Manasquan Loan for any and all amounts remaining unpaid in connection with the Manasquan Loan, including remaining principal, interest, default interest, fees, expenses, attorneys' fees, and costs, all of which may continue to accrue;

g. At the time of closing of the Vollers Transaction, Debtor and its estate, and Vollers release Manasquan Bank and related parties from any and all claims and causes of

11

action, whether known or unknown, that may exist against Manasquan Bank.  Upon receipt of the Manasquan Settlement Amount, Manasquan Bank shall release Vollers and related parties from any and all claims and causes of action, whether known or unknown, that Manasquan Bank may possess against Vollers as may be related in any way to this case.  In no event shall the releases contained in this settlement be deemed to release any claims against any principal or related party of the Debtor, including without limitation any guarantor to the Manasquan Loan.

## PROPOSED SUBCONTRACTS WITH VOLLERS

30.    The Debtor and Vollers have agreed to enter into several subcontracts, whereby Vollers will complete and/or perform all of Debtor's remaining scope obligations on certain Non-Bonded Projects, and where Vollers will then be entitled to all billed and unpaid contract balances and balances to bill (the "Subcontracts", and each a "Subcontract").  A form of Subcontract is attached as Exhibit B to the Asset Purchase Agreement.

31.    As described above, if the Subcontracts are authorized along with the approval of the Vollers Transaction, Vollers has agreed to (i) consent to the use of the DIP Loan to fund Subcontracted Project costs, (ii) honor the Kicker Provision, which could bring 15% of net profits of the Subcontracted Projects into the estate, (iii) make offers of employment to the Debtor's non-union employees, and (iv) pay the arrears for union benefits associated with Subcontracted Projects.  All of this will have the effect of reducing liabilities of the estate and, in fact, possibly bringing in much needed funds through the Kicker Provision which will be used to fund the estate and this Subchapter V Case.

## RELIEF REQUESTED

32.    By this Motion, the Debtor seeks entry of an order, pursuant to sections 105(a),

363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6003, 6004, and 9019 (i) authorizing the Debtor to sell certain all of its assets to Vollers for the Purchase Price as set forth in the Asset Purchase Agreement free and clear of any and all claims, liens, rights, interest, and encumbrances; (ii) authorizing the Debtor to enter into the Subcontracts with Vollers for Vollers to complete work on the Subcontracted Projects; (iii) approving the Manasquan Bank Settlement, and (iv) authorizing the Debtor to assume and assign to Vollers the Assigned Equipment Loans.

**A.      Authority to Sell Under 11 U.S.C. § 363(b)**

33.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that, "[t]he trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate….".  11 U.S.C. § 363(b)(1).

34.      The Third Circuit has interpreted 11 U.S.C. § 363(b) to require a finding by the Court that the purchaser of the assets is a good faith buyer, consistent with 11 U.S.C. § 363(m). *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-150 (3d Cir. 1986) ("*Abbotts Dairies*").   While "good faith" is not defined in the Bankruptcy Code, the Third Circuit has observed that the "phrase encompasses one who purchases in 'good faith' and 'for value.'" *Id*. at 147 (*citing In re Bel Air Assocs.*, 706 F.2d 301, 305 (10th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197, (7th Cir. 1978)).   For further illumination, the bona fides of a purchaser under a 11 U.S.C. § 363(b) sale have been analogized to a purchase at a judicial sale:

> The requirement that a purchaser act in good faith….speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidder or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies*, 788 F.2d at 147 (*quoting In re Rock Indus. Mach. Corp.* 572 F.2d at 1198.

35.      The Third Circuit has further observed the sales of a debtor's assets should be

13

authorized if the proposed sale is based upon the sound business judgment of the debtor. *See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (noting that with respect to a bankruptcy liquidation, "under normal circumstances, the court would defer to the trustee's judgment so long as there is a legitimate business justification."); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions.").  Factors that courts consider when determining whether a sale outside the ordinary course of business is appropriate include:  "(1) whether there is a sound business reason for the sale; (2) whether the sale is proposed in good faith; (3) whether adequate and reasonable notice has been afforded; and (4) whether a fair and reasonable purchase price is offered." *In re Sea Oaks Country Club, LLC*, 2020 WL 6588412, *10 (Bankr. D.N.J. Nov. 10, 2010) (*citing In re Congoleum Corp.*, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007)); *see also In re Summit Global Logistics, Inc.*, 2008 WL 819934, *9 (Bankr. D.N.J. March 26, 2008) (accord).

36.    A debtor's showing of a sound business purpose need not be unduly exhaustive, but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  A sound business purpose for the sale of a debtor's assets outside of the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the estate, creditors, or interest holders. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997).

37.    Additionally, pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of the [Bankruptcy Code]." 11 U.S.C. § 105(a). Courts have regularly observed section 105(a) to be a broad provision, endowing bankruptcy courts with equitable powers to craft "necessary and appropriate" remedies that further the aims of the Bankruptcy Code. *See In re United Steel Enterprises*, 2006 WL 3544583, at *6 (D.N.J. Dec. 8, 2006); *In re BWP Gas, LLC*, 354 B.R. 701, 707 (E.D.Pa. 2006); *McHugh v. Otlowski*, 2011 WL 1833370, at *3 (Bankr. D.N.J. May 11, 2011). In this vein, "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).

38.    Here the proposed Vollers Transaction is within the Debtor's sound business judgment. The consideration to be provided by Vollers is fair and reasonable and it was negotiated in good faith at arm's length with a non-insider. The consideration that is at stake is considerable, including (i) $975,000 for the assets which will be paid from Vollers to Manasquan Bank to pay down the Manasquan Loan and release its lien, (ii) $25,000 from Manasquan Bank as a professional fee reimbursement, (iii) Voller's assumption of $600,000 of liabilities under the Equipment Loans, (iv) the ability to obtain $200,000 of credit in the form of the DIP Loan to bridge the gap to the closing of the Vollers Transaction (which will be assumed by Vollers upon closing); (v) $75,000 from Vollers to the estate in the form additional consideration (earmarked for professionals' fees) upon Vollers assuming the DIP Loan (i.e., approval of the Sale Motion), (vi) assumption and payment of liabilities in respect of arrears owed for certain union benefit plans (estimated to be approximately $175,000) and (vii) reduced expenses and claims for costs and expenses related to the Subcontracted Projects.

39.    Of further note, a piecemeal liquidation of the Debtor's assets at this juncture, and in particular, the Vehicles and Equipment, would be difficult and costly due to the fact that the Vehicles and Equipment would have to be corralled from the Debtor's various worksites and

15

secured pending sale.  Moreover, much of the Vehicles and Equipment will be needed by Vollers

to complete the Subcontracted Projects, the proceeds from which will fund the Kicker Provision

(assuming the Court authorizes the Subcontracts).  In a piecemeal liquidation scenario, the

Subcontracted Projects would not be completed under the Debtor's contracts and thus there would

likely be no additional recovery to the estate.  Further, in such a scenario, the creditor body would

likely be substantially augmented by claims from project owners stemming from the failure to

complete the projects as contracted, thereby diluting the recovery for each creditor.  The estate

would also not receive any financing from Vollers, and would not receive the professional fee

reimbursement from Manasquan.  Additionally, no other parties expressed interest in acquiring the

Debtor's assets, let alone on the terms offered by Vollers that will importantly allow the obligations

on the Subcontracted Projects to be fulfilled, thereby enhancing the ability to generate and collect

receivables, and provide continued employment for many of the Debtor's employees.

40.     Based on the foregoing, it is respectfully submitted that the Asset Purchase

Agreement and the sale to Vollers be approved under section 363(b) of the Bankruptcy Code as

within the Debtor's sound business judgment.

**B.     Authority to Sell Under 11 U.S.C. § 363(f)**

41.     Pursuant to section 363(f)(2) of the Bankruptcy Code, a debtor:

[M]ay sell property "under subsection (b) and (c) free and clear of
any interest in such property of an entity other than the estate, only
if –

(1) applicable nonbankruptcy law permits sale of such property free
and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to
be sold is greater than the aggregate value of all liens on such
property;

16

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f).

42.    Section 363(f) is stated in the disjunctive and thus satisfaction of any one of the five elements will warrant approval of a Debtor's proposed sale free and clear of all claims, liens, and other interests.  *See, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (noting that 363(f) authorizes the sale of a debtor's assets free and clear of all liens, claims and interests if "any one of [the] five prescribed conditions" is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002).  Additionally, creditors are deemed to have consented to a sale for purposes of section 363(f) of the Bankruptcy Code if they received notice and did not object to the sale motion.  *See In re Tabone, Inc.*¸175 B.R. 855, 858 (Bankr. D.N.J. 1994).

43.    Approval for the sale under section 363(f), and, in particular, 363(f)(2) and (5), is satisfied in this matter.  Virtually all parties holding Equipment Loans will be satisfied as part of the Vollers Transaction (to the extent Vollers is acquiring the underlying equipment and assuming the Equipment Loans).  Subject to the Manasquan Bank Settlement Manasquan Bank will consent to the Vollers Transaction, and the SBA has been provided with notice of the Motion.[6]  Moreover, all parties with secured interests, including Manasquan Bank, the SBA, and parties holding Equipment Loans, as well as the Debtor's top twenty (20) unsecured creditors, have been provided notice of this Motion.  To the extent a creditor does not object to the proposed sale, it will be

---

[6]    As noted above, once Manasquan Bank's claim is satisfied, the SBA may be entitled to any proceeds recovered to the extent it has a valid lien on the underlying asset or proceeds therefrom.  However, based on the value of the assets, the Debtor asserts that the SBA is likely fully unsecured.

deemed to having consented to the sale under section 363(f)(2).  Accordingly, the sale should be authorized free and clear of all liens, claims, and other interests pursuant to section 363(f) of the Bankruptcy Code.

## C.    Vollers Should Be Afforded Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser

44.    In connection with the sale, the Debtor requests that Vollers be afforded the protections provided by section 363(m) of the Bankruptcy Code as a good faith purchaser.

45.    Section 363(m) of the Bankruptcy Code, provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

46.    In the interest of promoting certainty and finality in bankruptcy sales, section 363(m) "prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate property if a party failed to obtain a stay of sale.  The provision's blunt finality is harsh but its certainty attracts investors and helps effectuate debtor rehabilitation." *Cinicola v. Scharffenberger*, 248 F.3d 110, 112 (3d Cir. 2001).

47.    The necessity for the protections of section 363(m) have been aptly summarized as follows:

> Section 363(m) codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved.  Without the protection of § 363(m), purchasers of bankruptcy estate assets could be dragged into endless rounds of litigation to determine who has what rights in the property.  This would not only impose unfair hardship on good faith purchasers, but would also substantially reduce the value of the estate.  An asset that

> provides a near-certain guarantee of litigation and no guarantee of
> litigation and no guarantee of ownership is likely to have a low sale
> price; by removing these risks § 363(m) allows bidders to offer fair
> value for estate property.

*In re Pursuit Capital Management, LLC*, 874 F.3d 124, 134 n. 15 (3d Cir. 2017) (*quoting In re*

*Rare Minerals*, 445 F.3d 359, 363 (4th Cir. 2006). Simply stated, section 363(m) "patently

protects, from later modification on appeal, an authorized sale where the purchaser acted in good

faith and the sale was not stayed pending appeal." *Pittsburgh Food & Bev. v. Ranallo*, 112 F.3d

645, 651 (3d Cir. 1997).

48.     With regard to a purchaser's "good faith," the Third Circuit has observed that the

inquiry "speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the

misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (*citing In re Rock Indus.*

*Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

49.     As noted, Vollers is a non-insider and the Vollers Transaction was negotiated in

good faith and at arm's length. Accordingly, Vollers should be afforded the protections of a good

faith purchaser under section 363(m) of the Bankruptcy Code.

**D.     Authorization of the Subcontracts**

50.     Under the Bankruptcy Code, a debtor "may enter into transactions, including the

sale or lease of property of the estate, in the ordinary course of business, without notice or a

hearing, and may use property of the estate in the ordinary course of business without notice or a

hearing." 11 U.S.C. § 363(c)(1). The Debtor submits that it may, in the ordinary course of

business, enter into the Subcontracts for Vollers to complete its work in exchange for collection

of all project-specific accounts receivable and unbilled amounts, subject to the Kicker Provision.

19

This is because the Debtor is not in a position, absent the assistance of Vollers, to complete projects itself.  To the extent that Vollers steps into the Debtor's shoes on several Non-Bonded Projects and performs the Debtor's obligations, the status quo and ordinary course is maintained.  In fact, there may be a benefit to the estate through payments that Vollers receives through the Kicker Provision.

51.    In particular, Vollers will assume a number of the Debtor's obligations and liabilities, including with respect to completing the Subcontracted Projects, assuming certain, in its sole discretion, vendor and subcontractor claims, hiring the Debtor's non-union employees, and paying union benefits in connections with the Subcontracted Projects.  Lastly, the estate will receive further value from the Kicker Provision, which could be significant.  The Vollers Transaction will thus allow the Debtor's obligations to be fulfilled on several of its projects, thereby minimizing potential damages claims from project owners, vendors, and subcontractors, and will provide continued employment opportunity for many of the Debtor's employees.

52.    The authorization of the Subcontracts is also appropriate under section 105(a) of the Bankruptcy Code as it will aid in the effective administration of the Debtor's estate and provide comfort to Vollers, as the Subcontract counterparty, that the Debtor has authority to enter into the Subcontracts in the ordinary course of business pursuant to section 363(c) of the Bankruptcy Code.  If the Subcontracts are not authorized Vollers will not execute them, and all of the Non-Bonded Projects will be abandoned, along with any accounts receivable associated therewith, likely leading to contentious litigation or motion practice before the Court by the various Non-Bonded Project constituencies (project owners, current subcontractors and contractors, union benefit funds, employees, etc.).

**E.    Assumption and Assignment of the Assigned Equipment Loans**

53.     Pursuant to section 365(a) of the Bankruptcy Code, a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease…"  11 U.S.C. § 365(a).

54.     In evaluating whether to approve a debtor's request to assume or reject an executory contract or unexpired lease, courts assess the assumption or rejection is supported by the debtor's reasonable business judgment.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001).  A court should approve the requested assumption or rejection if it is determined that the debtor has exercised reasonable business judgment.  *See Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  Indeed, the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (*quoting In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  More exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

55.     Pursuant to section 365(b)(1) of the Bankruptcy Code, if there has been a default in an executory contract or unexpired lease, a debtor-in-possession may not assume the contract or lease until it:[7] "(1) cures or provides adequate assurance that it will promptly cure the default; (2) compensates or provides adequate assurance of prompt future compensation for actual pecuniary

---

[7]     Pursuant to section 365(b)(2) of the Bankruptcy Code, section 365(b)(1) does not apply to a default that is a breach of a provision relating to, among other things, "the insolvency or financial condition of the debtor at any time before closing of the case" and "the commencement of a case under this title."  11 U.S.C. § 365(b)(2).

loss resulting from the default; and (3) provides adequate assurance of future performance under

the contract or lease." *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000)

(summarizing 11 U.S.C. § 365(b)(1); *see also In re Carlisle Homes, Inc.*, 103 B.R. 524, 538

(Bankr. D.N.J. 1989) (citing the factors under section 365(b)(1)).

56.     Pursuant to section 365(f) of the Bankruptcy Code, a debtor-in-possession may

assign an executory or unexpired lease to a third party only if:  "(A) the [debtor-in-possession]

assumes such contract or lease in accordance with the provisions of this section; and (B) adequate

assurance of future performance by the assignee of such contract of lease is provided, whether or

not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).

57.     The Third Circuit has recognized that "[t]he [Bankruptcy] Code generally favors

free assignability as a means to maximize the value of the debtor's estate." *In re Rickel Home

Centers, Inc.*, 209 F.3d at 299; *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir.

1994) (observing that the purpose of section 365(f) is to assist in realizing the full value of the

debtor's assets).

58.     With respect to "adequate assurance of future performance," the Third Circuit has

observed that the term is "not words of art; the legislative history of the [Bankruptcy] Code shows

that they were intended to be given practical pragmatic construction…. What constitutes 'adequate

assurance of future performance' must be determined by consideration of the facts of the proposed

assumption." *In re Fleming Companies, Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (*quoting Cinicola

v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001)); *see also In re Carlisle Homes, Inc.*,

103 B.R. at 538.  For instance, satisfactory adequate insurance may be provided through

demonstrating the assignee's financial health and experience in managing the type of obligation

or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

(observing adequate assurance was present when prospective assignee has the financial resources and expressed willingness to devote sufficient funding to the business to give a strong likelihood of success).    Additionally, requisite adequate assurance of future performance under the circumstances of a proposed assumption assignment may fall "considerably short of an absolute guarantee of performance."  *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (*quoting In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 780 (Bankr. N.D. Ill. 1985)).

59.    The Debtor respectfully submits that the assumption of assignment of the Assigned Equipment Loans to Vollers is necessary and appropriate and within the Debtor's sound business judgment.  The underlying equipment for the Assigned Equipment Loans is required to finish the Subcontracted Projects.  Through taking assignment of the Assigned Equipment Loans, Vollers will assume the ongoing obligations under the Assigned Equipment Loans and utilize the underlying equipment to complete the Subcontracted Projects.  As discussed above, the completion of the Subcontracted Projects will generate further revenue, including for the estate through Kicker Provision, and reduce potential claims from project owners, subcontractors, and vendors, that would arise if the Subcontracted Projects are not completed.

60.    Additionally, upon information and belief, the Debtor is current on all of its obligations related to the Assigned Equipment Loans, and thus no cure will be needed for assumption and assignment of those loans to Vollers.  However, in the event any counterparty to an Assigned Equipment Loan asserts that an amount is due and owing, the parties, including Vollers, will negotiate with the counterparty, and Vollers will ultimately pay any cure amount that the counterparty establishes as due and owing or that is otherwise agreed to.  Vollers will also provide adequate assurance of future performance to the counterparties to the Assigned Equipment Loans.

61.     Accordingly, the Debtor submits that the implementation of the Assumption Procedures and assumption and assignment to Vollers of the Assumed Contracts is appropriate under the circumstances of this Subchapter V Case.

**F.     The Manasquan Bank Settlement Should Be Approved Under Rule 9019**

62.     Rule 9019(a) provides "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019.

63.     "The decision to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge." *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

64.     The Debtor seeks approval, pursuant to section 105 of the Bankruptcy Code and Rule 9019, of the Manasquan Bank Settlement rather than engage in costly litigation regarding full repayment of the Manasquan Loan that would burden the estate with substantial administrative expense and reduce recoveries to creditors.

65.     In *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, reh'g denied, 391 U.S. 909 (1968), the Supreme Court instructed as to those factors to be considered in determining whether to approve a settlement. The factors outlined by the Supreme Court in Anderson have been uniformly summarized as follows:

  a.  the probability of success in the litigation;

  b.  the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it;

  c.  the difficulties, if any, to be encountered in the matter of collection; and

  d.  the paramount interest of the creditors.

*See Martin*, 91 F.3d at 393 (3d Cir. 1996); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re Pa. Truck Lines, Inc.*, 150

24

B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broad. of Philadelphia*, *Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

66.     Rule 9019 authorizes this Court to approve the Manasquan Bank Settlement, which will be made effective through the Asset Purchase Agreement and the Court's order granting the relief requested herein, such form of order being submitted herewith.

67.     The settlement need not be the best that a debtor in possession could have achieved, but must only fall "within the reasonable range of litigation possibilities." *See In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979).

68.     In making its determination, a court is not to substitute its own judgment for that of the trustee. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

69.     The Manasquan Bank Settlement was carefully considered and by the Debtor the Debtor believes, in its business judgment, that it will be the best outcome for the estate.  It will lead to the release of the Manasquan Bank lien and avoid costly litigation; it enables some recovery to the estate and creditors through the operation of the Asset Purchase Agreement; and it provides certainty to parties in the case.  Manasquan Bank would not consent to the DIP/Cash Collateral Order absent the Manasquan Bank Settlement and such settlement is an integral part of the Vollers Transaction.  Accordingly, the Court should approve the Manasquan Bank Settlement pursuant to Rule 9019.

**G.     Immediate Relief is Necessary and Appropriate**

70.     Bankruptcy Rule 6003 provides, in relevant part: "Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after filing of the petition, issue an order granting the following …. (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate…"  Fed.R.Bankr.P. 6003(b).

71.     The Debtor respectfully submits that entry of an order authorizing the relief requesting in the within Motion be granted sooner than 21 days after the Petition Date, as such is necessary to avoid immediate and irreparable harm to the Debtor and the estate.  In particular, the Debtor requires approval of the relief request herein in order to continue to operate until the closing date.  The greater the passage of time, the more difficult it will be for the Debtor to assume and assign the Subcontracted Projects for Vollers, which will ultimately diminish the recovery for the estate, perhaps significantly so, and increase claims from project owners.  It is therefore respectfully requested that the Court enter an order approving the proposed sale and assumption and assignment of executory contracts and unexpired leases sooner than 21 days after the Petition Date.

## **WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)**

72.     The Debtor further requests a waiver of any stay of the effectiveness of the order approving this Motion to the extent such order is entered.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authoring the [debtor] to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed.R.Bankr.P. 6006(d).

73.     The Debtor submits that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), as promptly closing the sale to Vollers is critically important to maximize income for the estate and proceed in this Subchapter V Case.  It is there respectfully requested that an order approving the proposed sale and assumption and assignment of executory contracts and unexpired leases be effective immediately.

26

## RESERVATION OF RIGHTS

74.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code.

## WAIVER OF MEMORANDUM OF LAW

75.     The Debtor represents that the facts and circumstances set forth herein do not present novel questions of law, and, as such, respectfully requests that this Court waive the requirement of filing a memorandum of law in accordance with D.N.J. LBR 9013-1.

## NO PRIOR REQUEST

76.     The Debtor has not previously sought the relief requested herein from this Court or any other court.

## NOTICE

77.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for Region 3; (ii) the holders of the twenty (20) largest unsecured claims against the Debtor; (iii) counsel for Manasquan Bank; (iv) the United States Small Business Administration; (v) NGM; (vi) parties holding Equipment Loans; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the District of New Jersey; and (ix) those persons who have formally appeared in Subchapter V Case and requested service pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order with respect hereto will be served in accordance with Local

Rule 9013-5(b), (c), and (f). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary under the circumstances.

## <u>CONCLUSION</u>

**WHEREFORE**, based on the foregoing, it is respectfully requested that the Court enter an order (i) authorizing the Vollers Transaction as set forth in the Asset Purchase Agreement pursuant to sections 363(b) and (f) of the Bankruptcy Code free and clear of any and all claims, liens, rights interests, and encumbrances; (ii) authorizing the Debtor to enter into Subcontracts with Vollers in connection with the sale; and (iii) approving the Manasquan Bank Settlement; and (iv) authorizing the Debtor to assume and assign to Vollers the Assigned Equipment Loans pursuant to section 365 of the Bankruptcy Code.

DATED: August 5, 2022                    **FOX ROTHSCHILD LLP**

Proposed Counsel for the Debtor and Debtor-in-Possession

By:      */s/ Joseph J. DiPasquale*
         Joseph J. DiPasquale, Esq.

135879570