McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Gary D. Bressler, Esq.
Adam R. Schwartz, Esq.
Scott A. Levin, Esq.
Virginia T. Shea, Esq.
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962-2075
Tel: (973) 993-8100
Fax: (973) 425-0161
gbressler@mdmc-law.com
aschwartz@mdmc-law.com
slevin@mdmc-law.com
vshea@mdmc-law.com
*Counsel to Creditor NGM Insurance Company*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Assuncao Bros., Inc.<br><br>                                                   Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 22-16159 (CMG)<br><br>Judge Christine M. Gravelle |

**NGM INSURANCE COMPANY'S OBJECTION TO THE *DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS TO VOLLERS EXCAVATING AND CONSTRUCTION, INC., (II) APPROVING SETTLEMENT, (III) AUTHORIZING DEBTOR TO ENTER INTO SUBCONTRACTS WITH VOLLERS FOR CERTAIN NON-BONDED PROJECTS, AND (IV) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES* [Docket No. 25].**

Creditor NGM Insurance Company ("NGM" or "Surety") through its undersigned counsel, hereby files this Objection to the *Debtor's Motion for Entry of Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement, (III) Authorizing Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases* ("Sale Motion")[Docket Entry 25].

1

INTRODUCTION

This motion and the Debtor's actions in this bankruptcy proceeding smacks of bad faith representing a scheme apparently agreed to among the Debtor (controlled by its principal) and Manasquan Bank f/k/a Manasquan Savings Bank ("Manasquan Bank") and Vollers Excavating and Construction, Inc. ("Vollers"), in which Manasquan Bank stands to get paid from proceeds of assets to be sold to Vollers which the Debtor and Manasquan Bank improperly represented to the Court and its creditors that Manasquan Bank was perfected on prior to the petition date, and for which Manasquan Bank stands to be released in return for, among other things, the Manasquan Bank's agreement to consent to the sale of the claims of the Debtor's estate against Mr. and Mrs. Assuncao (the insiders) to Vollers, which claims are then likely to vanish (given that the principal of the Debtor is in discussions to join Vollers). Furthermore, said proposed sale appears to be for a very low price after the Debtor's total marketing efforts consisted of calling three companies, under which the negotiations between the Debtor and Vollers have largely been kept secret by the Debtor by failing to produce documents that exist in connection with said negotiations based on the unfounded claim that all such negotiations are settlement negotiations and need not be produced.

**BACKGROUND**

1.  On August 3, 2022 ("Petition Date"), Assuncao Bros., Inc. ("Debtor") filed a voluntary petition of relief under chapter 11, subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). NGM is a surety who, prior to the Petition Date, issued certain performance and payment bonds ("Bonds") on behalf

2

of the Debtor, as principal, including bonds for certain public owner obligees/counterparties ("Bonded Contract Owners"), arising out of certain public works contracts ("Bonded Contracts"), which Bonds relate to, and under which such Bonded Contracts the Debtor was performing ("Bonded Projects"), as of the Petition Date. Declaration of Eli Cinq-Mars (the "Cinq-Mars Decl.") at ¶ 3.

2. The Debtor, Martin Assuncao, and Lisa Assuncao entered into agreements of indemnity in favor of NGM on or about July 20, 2012 and January 30, 2019 ("Indemnity Agreements"). Cinq-Mars Decl. at ¶ 4.

3. The Indemnity Agreements contain identical indemnity clauses, which provide NGM with a security interest in the Debtor's equipment, and establish a trust fund with respect to payments received by the principal/contractor. In that regard, the Indemnity Agreements state in pertinent part:

> THIRD: The CONTRACTOR and INDEMNITORS **shall exonerate, hold harmless, indemnify and keep indemnified the SURETY** from and against any and all claims, demands and liability for losses, costs, and expenses of whatsoever kind or nature, including court costs, counsel fees, investigative costs, and from and against any and all other such losses and expenses which the SURETY may sustain or incur: (A) By reason of having executed or procured the execution of Bonds … (E) in prosecuting or defending any action or claim in connection with any Bond, whether SURETY at its sole option elects to employ its own counsel, or permits or requires CONTRACTOR and INDEMNITORS to make arrangements for the SURETY'S legal representation . . . .
>
> FOURTH: The CONTRACTOR, and the INDEMNITORS as their interests may appear **hereby assign, transfer and set over to SURETY the rights and property described hereafter, as collateral, to secure any and all obligations in this Agreement** and any other indebtedness or liabilities of the CONTRATOR to the SURETY, whether heretofore or hereafter incurred… (B) All the rights, title and interest of the CONTRACTORS or INDEMNITORS in and to all machinery, equipment, plant, tools, inventory and materials which are now, or may hereafter be, utilized in connection with any contract, regardless of whether they are located at a construction site, in storage elsewhere, or in transit anywhere . . . .
>
> EIGHTH: The CONTRACTOR and INDEMNITORS covenant and **agree that all**

3

> **payments received for or on account of any CONTRACT shall be held in trust as a trust fund for the payment of obligations incurred or to be incurred in the performance of any CONTRACT and for labor, materials and services furnished in the prosecution of the work in any CONTRACT** or any extension of modification thereof. It is expressly understood and declared that all monies due and to become due under any CONTRACT are also trust funds, whether in the possession of the CONTRACTOR or INDEMNITORS or otherwise. **The trust funds shall be for the benefit and payment of all obligations for which the SURETY may be liable under any bonds.** The trust shall incur to the benefit of the SURETY for all liability or loss it may have or sustain any bond, and this agreement and declaration constitute notice of such trust.

See Cinq-Mars Decl. at ¶ 4, Exhibits A and B.

4. The Debtor has received and expects payments from Bonded Contract Owners on Bonded Contracts ("Bonded Contract Proceeds"), which constitute trust funds for the benefits of the Debtor's laborers, subcontractors, suppliers and materialmen ("Trust Fund Beneficiaries") on the Bonded Contracts, and for the benefit of NGM. See Cinq-Mars Decl. at ¶ 5.

5. NGM filed a UCC with regard to NGM's security interests regarding additional assets of the Debtor. Declaration of Scott A. Levin (the "Levin Decl.") at ¶2.

6. According to the Debtor's schedules, NGM hold a disputed claim of over $500,000. However, an exhibit provided by the Debtor as to the projected outcome of bonded contracts shows a loss of over $900,000, without any consideration of any claim for union benefits as well as without consideration of the attorneys' fees, consultants' fees and other costs that will be incurred by NGM in connection with this matter. Levin Decl. at ¶ 3, Exhibit 3, referring to deposition Exhibit 8 accompanying the deposition transcript.

7. Debtor has moved to reject each of the Bonded Contracts and intends to reject the Bonded Contracts. See Motion to Reject Certain Executory Contracts and Unexpired Leases (Docket No. 57).

8. On August 5, 2022, the Debtor filed the Sale Motion (Docket No. 25). The Sale

4

Motion provides generally for the sale of certain of the Debtor's assets, equipment, and accounts receivables in non-Bonded contracts to Vollers Excavating and Construction, Inc. ("Vollers"), as well as claims against Mr. and Mrs. Assuncao (the insiders) and, among other things, that Vollers will make payment of $975,000.00 to Manasquan Bank, to partially satisfy Manasquan Bank's claims against the Debtor. The motion also provides for the release by the Debtor's estate of any claims against Manasquan Bank.

9. On August 12, 2022, NGM served a Notice of Deposition on Debtor, seeking documents and information pertinent to the Sale Motion. See Levin Decl. at ¶ 3.

10. The Notice of Deposition initially scheduled the deposition for Friday, August 19, 2022, however, due to scheduling conflicts of the parties and counsel, the deposition had to be rescheduled to Saturday, August 20, 2022. See Levin Decl. at ¶ 4.

11. The Notice of Deposition also included a Production Demand, which sought, among other things, the Debtor's communications with Vollers and Manasquan Bank (the "Requested Communications") pertaining to the subject matter of the Sale Motion. See Levin Decl. at ¶ 5.

12. The Debtor served Responses and Objections to NGM's Production, in which it objected to producing the Requested Communications on the basis of Fed. R. Evid. 408. See Levin Decl. at ¶ 6, Ex. "4".

13. Counsel for NGM and counsel for the Debtor exchanged e-mails in which counsel for NGM indicated why the objection to NGM's request for said communications was improper, but the Debtor has held firm to its objections and failed to produce the Requested Communications. In addition, the Responses and Objections refused to produce documents relating to the Debtor's efforts to market the property as being "overly broad, unduly burdensome, and not proportional to

5

the needs of the matter", notwithstanding the fact that the testimony at the deposition was that the entire effort to market the Debtor's assets consisted of telephone calls to market the property to three companies. See Levin Decl. at ¶ 4, Exhibit 3 (59:11 – 60:7).

14. Although the debtor did produce the alleged bank documents supporting the Bank's alleged security interest claim, no documents have been produced showing that the bank has been perfected on certain of the Debtor's vehicles and equipment, notwithstanding Manasquan Bank's and the Debtor's representations to the Court to the contrary. In fact, of the numerous titles to vehicles/equipment produced in discovery, not one had the name of Manasquan Bank located on it. See *Id.* At Deposition Exhibit 2. Accordingly, it appears that Manasquan Bank did not hold a validly perfected security interest in the Debtor's vehicles/equipment at the start of this case, notwithstanding the representations of the debtor and Manasquan Bank to the contrary.

## **ARGUMENT**

### **A. The Proposed Sale Should not be Approved Because the Debtor Has Failed to Adequately Demonstrate that Vollers Is A Good Faith Purchaser for Sufficient Value.**

15. Sales made outside of the ordinary course of business are governed by 11 U.S.C. 363(b) and the Third Circuit's precedent in *In re Abbotts Diaries of Pennsylvania, Inc.*, establishing the "good faith" purchaser requirement. 788 F.2d 143, 148 (3d Cir. 1986).

16. In support of this Objection and to avoid repeating the same arguments that have been raised before this Court, NGM points to the arguments raised in the Objections filed by the United States Trustee (Docket No. 60) and the Subchapter V Trustee (Docket No. 62) to the Debtor's Sale Motion, pertaining to the insufficiency of Debtor's evidence to support that the sale is made to a good faith purchaser for sufficient value.

17. NGM also alleges the following reasons why the Court should not approve the sale:

18. The agreement of sale provides a sweetheart deal for the Debtor's principal by

providing for the sale of any and all claims of the Debtor's estate against Mr. and Mrs. Assuncao, including but not limited to Chapter V claims.[1] Rather than highlighting this provision within the asset purchase agreement in the motion, the motion makes absolutely no mention of this asset being sold but rather one has to search through the asset purchase agreement to find this provision. In addition, it was testified to during the 8/20 deposition that Vollers is currently talking to Mr. Assuncao about his possible employment. See Levin Decl. at ¶ 4, Exhibit 3 (138:19 – 139:20). Nowhere in the motion are these discussions highlighted as they should be, although it is mentioned that Vollers may hire non-union employees.

19. The testimony at the deposition showed that, rather than making any sincere marketing effort to sell the debtor's assets at the best price, the entire "marketing effort" to sell the debtor's assets consisted of Mr. Assuanco contacting three parties to see if they would be interested in purchasing the assets. See Levin Decl. at ¶ 4, Exhibit 3 (59:11 – 60:7).

20. It appears from the motion and the fair market value appraisal provided by the Debtor that the entire sum being given by Vollers as consideration is approximately equal to the value of the equipment being sold so that in effect Vollers is getting the accounts receivable related to non-bonded contracts plus the contracts which Vollers indicates in its motion will net $3,000,000 for no additional consideration. See Levin Decl. at ¶ 4, Exhibit 3, Deposition Exhibit 7. Furthermore, nowhere in the motion or any declaration filed to date has the Debtor attempted to show the fair market value of the additional $3,000,000 Vollers is projected to receive.

21. NGM refers this Court to the Debtor's responses to NGM's Production Demands,

---

1 While the statements and schedules show payments to Martin Assuncao within 90 days of the bankruptcy filing, in response to the question on the statements and schedules of whether insiders received payments within one year of the bankruptcy, the Debtor indicates that they have not and fails to disclose what payments Martin Assuncao or any other insider may have received within that time frame, which cannot be accurate.

7

and email between counsel, in which the Debtor baselessly objects to avoid producing relevant information regarding Vollers's purchase of the assets. See Levin Decl. at ¶6, Exhibit 4, and ¶ 7, Exhibit 5.

22. The communications between the Debtor and Vollers are especially relevant in allowing the parties and this Court to determine whether this sale meets the standards established in *Abbotts*. See *Id.*

23. The Debtor baselessly asserts that these communications, as well as other requested documents, are non-discoverable because they are settlement discussions protected under Fed. R. Evid. 408, however, Federal Courts throughout the country have recognized that Fed. R. Evid. 408 is not a privilege that can be raised in response to discovery requests. *See Computer Associates Int. v. Am. Fundware*, 831 F.Supp. 1516, 1531 (D. Colo. 1993) ("Rule 408 is a preclusionary rule, not a discovery rule. It is meant to limit the introduction of evidence of settlement negotiations at trial and is not a broad discovery privilege."); *NAACP Legal Defense Fund v. United States Dept. of Justice,* 612 F.Supp. 1143, 1146 (D.D.C.1985) ("Although the intent of FRE 408 is to foster settlement negotiations, the sole means used to effectuate that end is a limitation on the admission of evidence produced during settlement negotiations for the purpose of proving liability at trial. It was never intended to be a broad discovery privilege."); *Manufacturing Systems, Inc. of Milwaukee v. Computer Technology*, 99 F.R.D. 335, 336 (W.D.Wis. 1983) (holding that a party's claim that evidence is inadmissible under Fed. R. Evid. 408 is irrelevant for the consideration of whether the evidence is discoverable). Moreover, it can hardly be said that communications between a debtor and a potential purchaser of assets are the type of communications which constitute inadmissible settlement discussions, but rather are negotiations over the sale price of the assets. If said documents concerning these negotiations were produced and NGM sought to introduce them in

connection with the sale motion, they would not be for the purpose of proving the amount of the claim between Vollers and the Debtor, and would clearly have been admissible. Having hidden these documents from NGM, the Debtor should not be permitted to go forward with its sale motion.

24. Documents showing the Debtor's marketing efforts with regard to any potential purchases also were not produced and were objected to on the basis that they were "overly broad, unduly burdensome, and not proportional to the needs of the matter". See Levin Decl. at ¶ 6, Exhibit 4. These documents are equally relevant to any motion to sell assets, in determining, among other things, whether the assets were properly marketed. The debtor's refusal to turn over these documents as well stand as another ground for denying the sale.

25. Furthermore, the testimony at the deposition was that the accounts receivable were being sold because it is easier for someone continuing on the jobs to collect said receivables. See Levin Decl. at ¶ 4, Exhibit 3 (101:1 – 103:12). However, this hardly explains why the Debtor is also seeking to sell the accounts receivable on completed jobs.

26. This Court should not grant the Debtor's Sale Motion based on the foregoing.

**B.     The Debtor Should not be able to Sell the Four Pieces of Equipment at Bonded Locations or They Should be Sold Subject to the Rights of NGM and its Bond Beneficiaries**

27. The Debtor's representative testified that there are four pieces of equipment located on the site of two Bonded Contracts: a Magnum Pro Generator and a Komatsu 270 loader on the U-15 Monmouth County contract, and a Kobelco 270 excavator and 1995 Bomag dirt roller on the Kingsland contract. See Levin Decl., Exhibit 3 (7:12 – 15:12). The Debtor's representative testified he did not have first-hand information regarding whether or not there was in fact equipment on any Bonded Contract, and that he was only reading from notes that were repeated to him from others. *Id.*

9

28. The Indemnity Agreements provide specific rights to NGM with respect to the Debtor's equipment:

> Fourth: The Contractor, and the Indemnitors as their interests may appear hereby assign, transfer and set over to Surety the rights and property describer hereafter, as collateral, to secure any and all obligations in this Agreement and any other indebtedness or liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred . . . (B) All the rights, title and interest of the Contractor or Indemnitors in and to all machinery, equipment, plant, tools, inventory and materials which are now, or may hereafter be, utilized in connection with any contract, regardless of whether they are located at a construction site, in storage elsewhere, or in transit anywhere.

See Indemnity Agreements, Cinq-Mars Decl., ¶ 4, Exhibits A and B.

29. NGM is also subrogated to the rights of the obligees on the bonded contracts, including but not limited to all of the obligees' rights to the Debtor's equipment. By way of example, Monmouth County, within is August 4, 2022, Declaration of Default letter to the Debtor, indicated that "[t]he County has the right to appropriate any and all materials or equipment within the Project Limits to complete the Contract." See Levin Decl., ¶ 4, Exhibit 3, Deposition Exhibit 5.

30. While the Debtor has dragged its feet to produce entire Bonded Contracts with all provisions and specifications, by way of example, the specifications for the Monmouth County Bonded Contract incorporate The State of New Jersey Department of Transportation Standard Specifications for Road and Bridge Construction (2019) that provide in Section 108.14 that when a contractor defaults on a construction contract, the owner " has the right to appropriate any or all materials and equipment within the Project Limits to complete the Contract".

31. In *Travelers Indem. Co. v. W. Georgia Nat. Bank*, 387 F. Supp. 1090, 1096 (N.D. Ga. 1974), the indemnity agreement and the bond covering the indemnity agreement provided that

10

in the event of a default by the indemnitor, all the machinery and equipment located at the construction site is assigned and transferred to the Plaintiff. Thus, upon the default (which here was the principal's financial inability to complete the job), the principal's equipment, including that attached by the defendant bank, became the property of the Surety and the subsequent state court attachment was ineffective as against the Surety's title. Surety was not a party to the attachment proceedings. *Id.*

32. As a surety that issued bonds on behalf of the Debtor, NGM has become subrogated to the rights of the Bonded Contract Owners. *See Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 136 (1969)

33. "Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise[.]" *Id.*

34. "And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed . . . [t]his rule [is] widely applied in this country and [is] generally known as the right of subrogation[.]" *Id.* at 136-37.

35. As a subrogee, NGM is permitted to "step into the shoes" of the Bonded Contract Owners to enforce the relevant provisions of the Bonded Contracts against the Debtor.

36. Accordingly, NGM is entitled to the equipment under the Indemnity Agreements and/or as subrogee to the rights of the Bonded Contract Owners. Furthermore, any lien granted to Vollers on the equipment or as adequate protection to Manasquan Bank on the equipment under the financing order was subject to any rights of NGM and/or its beneficiaries.

37. Accordingly, the Debtor should not be permitted at this point to sell the four pieces of equipment at issue, or any other equipment on the Bonded Contracts. If said equipment is sold,

the proceeds of the sale which may be allocated to said equipment should not be paid over to Manasquan Bank, until the interests of various parties in said equipment is determined.

### C. The Proposed Payment to Manasquan Bank and Release are Premature.

38. In addition to objecting to the sale from the Debtor to Vollers, NGM also objects to the proposed payment of $975,000.00 to Manasquan Bank and a release of the bank.[2]

39. To be secured against vehicles and equipment that are titled, the secured party must have its name appear on the titles. R.S. 39-10-8 and R.S. 39-10-9. [3]

40. A substantial part of the assets being sold are titled vehicles and equipment. Although the loan documents in favor of Manasquan Bank were sent by counsel for the Debtor to counsel for NGM, no such certificates of title that were supplied contain Manasquan Bank's name on them. See Levin Decl. at ¶ 4, Exhibit 3, Deposition Exhibit 2. Therefore, it appears that Manasquan Bank did not have a perfected security interest on the vehicles/equipment at the time of the petition.

41. While Vollers was granted a security interest in the vehicles and equipment as part of a post-petition loan, the testimony at the deposition was that enough money has come in to pay off the amount of the current loan and the Debtor intends to do so. See Levin Decl. at ¶ 4, Exhibit 3 (135:1 – 136:14).

42. In addition, while Manasquan Bank was granted a replacement lien in the equipment and vehicles among other assets for the use of cash collateral, the testimony at the

---

[2] Of course, the principals of the debtor would love to see Manasquan Bank receive these funds, whether such payment to Manasquan Bank is appropriate or not, in light of the fact that the principal and his wife provided a mortgage to Manasquan Bank to secure the Debtor's obligations to the bank. See Levin Decl. at ¶ 8, Exhibit 6, for mortgage documents that were produced by the Debtor.

[3] The US Trustee says in is objection that to obtain a perfected security interest in a vehicle, a certificate of ownership together with a financing statement must be filed with the division of motor vehicles. Even if the US Trustee is correct, as the US Trustee points out, there has been no evidence that this was done by Manasquan Bank.

deposition was that the debtor is only currently performing its contracts which are profitable, so that it is unlikely that any use of cash in which Manasquan Bank has a first position is not being satisfied through the creation of new accounts receivable (and certainly there has not been a loss of $975,000 in the use of cash collateral). See Levin Decl. at ¶ 4, Exhibit 3 (136:23-137:22).

43. In addition, the proceeds of bonded receivables are trust funds, not available to Manasquan Bank. *See* Indemnity Agreements, Cinq-Mars Dec., ¶ 4, Exhibits A and B, at ¶ 8. *See also* New Jersey Trust Fund Act, N.J.S.A. 2A:44-148.

44. It appears that the debtor and its President, Martin Assuncao, may have diverted public construction trust funds, in violation of N.J.S.A. Section 2A:44-148 and contrary to the terms of the Indemnity Agreements, prior to the Debtor having filed its petition. For example, on the bonded County of Monmouth construction contract involving the "Renovation of Bridge U-15," NGM has been advised by the Debtors subcontractor, Shore Systems Group, L.L.C. ("Shore Systems"), that Shore Systems furnished "Steel-H Pile" to the Debtor and submitted applications for payment for that item to the Debtor in, among other things, the amount of $354,900. In response, according to Shore Systems, the Debtor invoiced the County of Monmouth for this work of Shore Systems, and the Debtor was paid for this work of Shore Systems. However, it appears that the Debtor failed to pay these trust funds to Shore Systems under Pay Certification No. 4 from the Debtor to the County of Monmouth under which the Debtor was paid $348,075.00 by the County of Monmouth under Item No. 38 furnished "Steel H-Pile" for work completed by Shore Systems contrary to New Jersey statutory trust fund laws, as well as the terms of the Indemnity Agreements. See Cinq-Mars Decl. at ¶6, Exhibit C. Therefore, to the extent that the Debtor is using cash post-petition, at least some of it may be the proceeds of trust funds to which NGM would have a replacement claim and not Manasquan Bank.

45. Furthermore, the creditors have not had an opportunity to explore whether the Debtor's estate has any claims against Manasquan Bank such that the release of Manasquan Bank by the Debtor's estate would be premature.

46. Time should also be allowed to explore whether there might be equitable subordination claims against Manasquan Bank, including among other things, through telling this Court that it had a validly perfected security interest in the titled equipment/vehicles as of the petition date without a valid claim thereto, and if it received proceeds from the Debtor of trust funds.

47. Accordingly, the proposed payment to Manasquan Bank should not be approved, Manasquan Bank should not get a release at this time, and the proposed settlement with Manasquan Bank should be denied. If, notwithstanding the forgoing, the Court does approve a payment to Manasquan Bank, the Court should indicate that it is subject to disgorgement.

### D. The Debtor's Books and Records

48. Based on the Debtor's Sale Motion, it appears that the assets to be sold to Vollers will include the Debtors books and records.

49. Debtor's books and records may contain information relating to claims that are brought against the Bonds.

50. If this Court is inclined to grant the Debtor's Sale Motion, NGM requests that the Court include language within its order that permits NGM to access and make copies of any books and records in Vollers' possession relating to any claims brought against the Bonds.

### RESERVATION OF RIGHTS

51. The submission of this Objection by NGM is not intended as, and shall not be construed as: (a) NGM's admission of any liability or waiver of any defenses or limitation of any

rights of NGM with respect to any claims against any one or more of the bonds or under any indemnity agreements in favor of NGM; (b) NGM's waiver or release of any right to exoneration it may have against anyone with respect to any of the bonds; (c) NGM's waiver or release of its right to be subrogated to the rights of one or more of the parties paid in connection with the bonds; (d) an election of remedy; or (e) consent to the determination of the Debtor's liability to NGM by an particular court, including, without limitation, the Bankruptcy Court.

52. NGM reserves the rights to object and put forth any argument in relation to any amended financing proposed by the Debtor, and to raise any arguments by any other party in their objection(s) to the Sale Motion or any future financing.

53. NGM reserves the right to object and put any argument in relation to any motion filed by the Debtor for the Bankruptcy Court's authorization of assumption and assignment of the executory contracts and unexpired leases, and to raise any arguments by any other party in their objection(s) to the Financing Motion.

54. NGM expressly reserves, and does not waive, any and all of its rights, claims, defenses, limitations, and/or exclusions in connection with the Debtor's rights and obligations under the Indemnity Agreements, the bonds, applicable law, or otherwise. NGM further reserves all rights to assert any and all such rights, claims, defenses, limitations and/or exclusions in any appropriate manner or forum whatsoever (including, without limitation, any of its rights to have any non-core matter relating to the interpretation of its contractual rights and Debtor's contractual obligations adjudicated by the United States District Court).

55. NGM further reserves all of its rights to raise any issues contained in this Objection and any other related issues in any procedurally appropriate contested matter and/or adversary proceeding, including, without limitation, (i) objections to confirmation of any plan; (ii) a separate

adversary proceeding requesting any appropriate declaratory and/or injunctive relief; (iii) or an objection to any subsequent motion seeking approval of any asset sale to any prospective asset purchaser with respect to any contractual rights that may be adversely affected by a sale motion or the confirmation of any plan.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, NGM Insurance Company respectfully requests that the Court deny the Debtor's Sale Motion, and the Court grant such further relief as is just and equitable.

                                                **McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

Dated: August 21, 2022                  /s/ *Gary D. Bressler*

                                                Gary D. Bressler, Esq.
                                                Adam R. Schwartz, Esq.
                                                Scott A. Levin, Esq.
                                                Virginia T. Shea, Esq.
                                                1300 Mount Kemble Ave.
                                                Morristown, NJ 07960
                                                Phone: 973-993-8100
                                                Facsimile: 973-425-0161
                                                gbressler@mdmc-law.com
                                                aschwartz@mdmc-law.com
                                                slevin@mdmc-law.com
                                                vshea@mdmc-law.com