

49 Market Street
Morristown, NJ 07960-5122
Tel 973.992.4800 Fax 973.992.9125
WWW.FOXROTHSCHILD.COM

August 21, 2022

Honorable Christine M. Gravelle
United States Bankruptcy Court
US Courthouse
402 East State Street
Trenton, NJ 08608

**Re: Assuncao Bros., Inc.**
**Case No. 22-16159-CMG**

Dear Judge Gravelle:

On behalf of Assuncao Bros., Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-referenced chapter 11, subchapter v case (the "Subchapter V Case"), please accept this letter brief in support of (i) *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing (A) Post-Petition Financing and (B) Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; and (III) Scheduling a Final Hearing* (the "Financing Motion") [D.I. 13], and (ii) *Debtor's Motion for Entry of Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement, (III) Authorizing Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "Sale Motion" and together with the Financing Motion, the "Motions") [D.I. 25], and in reply to the objections and responses filed by (a) the United States Trustee (the "US Trustee") [D.I. 60], (b) the subchapter v trustee, Scott Rever (the "Subchapter V Trustee") [D.I. 62], (c) NGM Insurance Company ("NGM") [D.I. 61], and (d) Americredit Financial Services, Inc. ("Americredit") [D.I. 70].[1]

A hearing on the Sale Motion and a final hearing on the Financing Motion are scheduled for August 22, 2022. The Court previously entered an order approving the Financing Motion on an interim basis on August 4, 2022 [D.I. 23]. Since filing the Financing Motion and the Sale Motion, the Debtor has provided various documentation to the US Trustee, the Subchapter V Trustee, and NGM, has produced its financial advisor, Jacen Dinoff of KCP Advisory Group, for a deposition conducted by NGM's counsel on August 20, 2022, and has worked diligently to

[1] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Sale Motion and/or the Financing Motion.

A Pennsylvania Limited Liability Partnership

California Colorado Delaware District of Columbia Florida Georgia Illinois Massachusetts Minnesota Missouri
Nevada New Jersey New York North Carolina Oklahoma Pennsylvania South Carolina Texas Washington



resolve objections and responses (formal and informal) to the motion.[2] As detailed below and in the *Certification of Jacen Dinoff* (the "Dinoff Certification") submitted herewith, the Debtor believes it has addressed parties' concerns with the Sale Motion and the Financing Motion, and established that the proposed transactions in those motions are fair and reasonable and a sound exercise of the Debtor's business judgment. To the extent any parties still object to either of the Motions, such objections should be overruled.

## A. Responses to Sale Motion

In their responses to the Sale Motion, the US Trustee and the Subchapter V Trustee expressed concerns regarding the treatment of the Small Business Administration's (the "SBA") secured claim and that the Debtor had not provided sufficient information to assess the fair value and reasonableness of the proposed Vollers Transaction (as defined in the Sale Motion).

### 1. Treatment of SBA's Claim

As noted in the Sale Motion, the SBA holds a secured claim that is subordinate to the secured claim of Manasquan Bank, and it is not believed that there is sufficient value in its assets above the value of Manasquan Bank's claim to provide any security for the SBA's claim. Nonetheless, the Debtor, Vollers, and the SBA, have negotiated the following terms (the "SBA Resolution" in consideration for the SBA's consent to the transactions in the Sale Motion:

(1) Within thirty (30) days of the closing of sale, Vollers shall pay $75,000 to the SBA in partial satisfaction of the SBA's secured claim.

(2) The "Kicker Provision" (as defined in the Sale Motion) shall be increased from 15% to 20% and shall be allocated as follows: 10% to the Debtor's estate and 10% to the SBA on account of its secured claim (which allocation shall not subject the SBA to surcharge under section 506(c) of the Bankruptcy Code).

The Debtor has incorporated the SBA Resolution in a revised proposed order (the "Sale Order") approving the Sale Motion. Additionally, the Debtor has revised the proposed final order (the "Final Financing Order") approving the Financing Motion to include language providing the SBA with the same Adequate Protection Liens as Manasquan Bank (although, junior to Manasquan Bank) as well as a superpriority administrative expense claim under section 507(b) of

---

[2] The materials provided by the Debtor include loan documents for the Manasquan Bank and SBA Loans, lien searches, all known certificates of title, an appraisal, equipment loan documents, and vehicle loan documents. The Debtor has also provided further documentation to NGM in response to its discovery requests such project-by-project estimations for completion percentages and accounts receivable.



the Bankruptcy Code to the extent of any diminution of the SBA's pre-petition collateral.[3] With the SBA's consent to the Vollers Transaction, the Debtor respectfully submits that approval of the sale is appropriate under section 363(f) of the Bankruptcy Code.

**2. Further Analysis of Value and Reasonableness**

With respect to the fair value and reasonableness of the Vollers Transaction and related transactions in the Sale Motion, the Dinoff Certification includes a liquidation analysis, an appraisal of the Debtor's assets, further insight on the present values of the Debtor's assets and liabilities, and additional details on the overall value the estate would receive through the Vollers Transaction and related transactions. The Debtor also filed its missing schedules on August 19, 2022, fifteen (15) days in advance of the deadline set in the Court's *Order Pursuant to Bankruptcy Rule 1007(c) Granting Additional Time for Filing Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedules of Executory Contracts and Unexpired Leases* [D.I. 21].

The information included in the Dinoff Certification clearly shows that the Vollers Transaction is for fair value and is reasonably within the Debtor's business judgment. As set forth in the Sale Motion, the Dinoff Certification, and herein, the benefits and consideration the Debtor will receive from the Vollers Transaction are as follows:

- $975,000 from Vollers to Manasquan Bank so it may release its blanket lien on assets of the Debtor (which secures over $1.3 million of obligations). Manasquan provides a $25,000 carve-out for estate professionals.

- A $75,000 payment to the SBA, plus a 10% "kicker" from the profit from projects for which Vollers will be a subcontractor completing certain of the Debtor's non-bonded projects (this was estimated to be $300,000 but is subject to adjustment).

- Vollers provides a $75,000 payment for estate professionals (freeing up in the aggregate (with Manasquan Bank's carve-out) $100,000 for estate professional fees that would otherwise come out of the Debtor's estate and be paid before any unsecured creditors).

[3] The Debtor, the SBA, Vollers, and Manasquan have agreed to the revised language in the Sale Order and the Final Financing Order.

- Vollers is assuming approximately $600,000 of equipment loans, reducing the creditor body and claims of the estate.

- The estate will also receive a 10% kicker on future completed projects that Vollers collects (which could be worth as much as $300,000). If the selected projects are not continued, no such revenue would be generated.

- Vollers will pay approximately $175,000 of union benefit plan arrears. This amount would largely a priority unsecured claim and paid before any general unsecured creditors. This reduces the claims body and increases the amounts available to general unsecured creditors.

- Critically, approximately 25 workers' jobs will be preserved because they will continue to work on the subcontracted projects that are a part of the Vollers transaction.

The foregoing stands in contrast with the outcome of liquidation, which the Debtor faces if the Vollers Transaction is not approved. The creditor body will be larger, with greater secured, administrative expense, and priority unsecured claims. All of the Debtor's projects would stop and be abandoned and there will be no possibility of future income to the Debtor. In the Vollers Transaction there is a preservation of certain projects and the revenue they will generate, payment of certain employee-related and other contractual obligations, and, vitally, continued employment for the Debtor's employees. These will be lost in liquidation and there is no recovery for unsecured creditors. *See* Dinoff Certification, Exhibit A (the "Liquidation Analysis").

Traditionally, courts have held that "[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986). In this Subchapter V Case unless the Vollers Transaction occurs the *assets will be virtually valueless* to all creditors and the estate. There are no other buyers for the Debtor's business and unless work continues on the Subcontracted Projects there will be no hope of a recovery. The Vollers Transaction provides the best scenario for the Debtor, the estate, and interested parties based on its circumstances and the constraints it faces with respect to the projects and its industry.



Additionally, in its objection, the US Trustee raised the issue that this Court must make a finding of "good faith" to authorize a sale of assets under section 363(b)(1). "The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 147 (3d Cir. 1986). The US Trustee has not demonstrated that Vollers lacked good faith. The negotiations of the framework of the Vollers Transaction were arm's length and involved not only Vollers and the Debtor but Manasquan Bank as well. Following the Petition Date there were further negotiations involving the SBA that led to the SBA Resolution. All parties with an interest in the sale, and certainly Vollers as purchaser, have acted in good faith.

The US Trustee also states that the Debtor has not demonstrated a sound business reason for the Vollers Transaction. Generally, it is required "that a judge determining a § 363(b) application expressly find from the evidence presented before [her] at the hearing a good business reason to grant such an application." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). The Debtor has been clear from and after the Petition Date about its business reasons for entering into the Vollers Transaction: to maximize a potential recovery for creditors and save jobs and projects if they can be saved. The Vollers Transaction represents the only way to maximize recovery and save workers' jobs. As set forth in the Liquidation Analysis, if the Sale Motion is not approved there will be a smaller recovery for secured creditors, a loss of jobs, and no recovery for unsecured creditors. The Vollers Transaction represents a sound business judgment of the Debtor.

Clearly, the estate would be significantly disadvantaged in the event that the Vollers Transaction is not approved. Most notably, Manasquan would retain its first position secured lien against most of the Debtor's asset for over $1.3 million, rather than having its secured claim against the Debtor satisfied for $975,000 as part of the Vollers Transaction and related Manasquan Settlement. The SBA would also have its second position secured lien in the approximate amount of $523,000. Consequently, the claims of unsecured creditors would be more impaired absent approval of the Vollers Transaction, the Manasquan Settlement, and the SBA Resolution. Furthermore, Vollers has agreed to hire the Debtor's employees and assume certain of the Debtor's accrued employee obligations as well as all accrued union benefit plan obligations (such union benefit plan obligations have been estimated to be approximately $175,000).[4] Absent approval of

[4] The fact that the Vollers Transaction will provide continued employment opportunity for the Debtor's employees should be favored as in the interest of good public policy. As demonstrated by the priority status granted employee wage and benefits claims. *See In re Trump Ent. Resorts*, 810 F.3d 161, 174 (3d Cir. 2016) ("Congress has recognized that "[i]t is more economically efficient to reorganize rather than to liquidate, because it preserves jobs and assets."); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1082 (11th Cir. 2015) (stating that one of the purposes of the Bankruptcy Code include preserving jobs in the community); *In re Catalina Sea Ranch, LLC*, No. 2:19-BK-24467-



the Vollers Transaction, the Debtor lacks the resources to pay these obligations, and thus the Debtor's employees and the unions would have claims against the estate, including priority claims under sections 507(a)(4) and (5) of the Bankruptcy, that they would not have if the Vollers Transaction is approved and consummated. Additionally, the Vollers Transaction presents the only scenario that several of the Debtor's Non-Bonded Projects (the "Subcontracted Projects" as defined in the Sale Motion) will be completed and generate further revenue, including for the estate through the Kicker Provision (which now through the SBA Resolution, ensures 10% of the profit to the estate). It is estimated that the future collections could total up to $3,000,000, which would result in a recovery of up to $300,000 to the estate through the Kicker Provision. Moreover, should the Subcontracted Projects not be completed, the claims body would be increased through claims from the project owners and subcontractors and vendors on the projects.

The US Trustee also requested more details on the Debtor's marketing efforts. As set forth in the Dinoff Certification, the Debtor engaged two other construction firms regarding a potential acquisition of the Debtor's business and/or assets. Vollers is the only firm that expressed serious interest. Importantly, Vollers is willing to continue several of the Debtor's projects, extend employment to the Debtor's employees, and address certain employee-related and other contractual obligations. The Debtor does not believe these are terms that can be exceeded or replicated with another party. Indeed, if the Vollers Transaction is not approved, none of the Debtor's projects could be resumed at this point, and the Debtor's employees will soon be unemployed and there would be no further collections generated from continuation of the Debtor's projects.

All told, should the Vollers Transaction not be approved, the unsecured creditor pool would be larger and subordinated to the full secured claims of Manasquan and the SBA, as well as the priority claims of employees and the unions, and meanwhile, there would be diminished prospects for recovery. Absent the Vollers Transaction being approved, there is no alternative or other means for the Debtor to complete the Subcontracted Projects; there will simply be no income and claims and damages for all abandoned projects will mount. However, if the Vollers Transaction is approved, employees' jobs will be preserved and claims on their behalf and to other creditors (including those of project owners, subcontractors, and vendors) will be reduced or eliminated as certain projects are completed and there will be a greater recovery for creditors.

Further, as noted, the Vollers Transaction was negotiated in good faith and at arm's length. It should be noted that the Vollers Transaction and the Manasquan Settlement are inexorably linked. If the Vollers Transaction is not approved, the Manasquan Settlement will be negated.

---

NB, 2020 WL 1900308, at *9 (Bankr. C.D. Cal. Apr. 13, 2020) (benefits that the Bankruptcy Code was enacted to provide include saving jobs).

"To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). Courts examine "four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id*. Here, where Manasquan Bank is (i) compromising on its claim against the estate, (ii) foregoing wasteful litigation that could occur within this Subchapter V Case, and (iii) enabling a transaction that provides (a) preservation of some aspects of the Debtor's business and the preservation of jobs, (b) carve-outs to administration so as to mitigate against depletion of the estate, and (iii) provide hope of future recoveries (because of the Kicker Provision), then it is clear that the Manasquan Settlement is in the best interest of the estate. Upsetting it by not approving the Sale Motion would be extremely detrimental to creditors.

Accordingly, the Debtor respectfully submits that the Vollers Transaction and related Manasquan Settlement and SBA Resolution are fair and equitable and should be approved as within the Debtor's sound business judgment and in the best interests of the estate and parties-in-interest.

**3. Americredit**

Vollers is engaging Americredit directly to discuss the assumption and assignment of Americredit's Equipment Finance Loans, or alternatively, the terms of Vollers paying off the loan obligations.

**4. Other Revisions to Sale Order**

The Debtor expects to make the following other revisions to the proposed Sale Order based feedback from parties since originally submitting the order:

- The following language will be added to the Sale Order providing for a procedure to address cure disputes with respect to the Assigned Equipment Loans to be assumed and assigned to Vollers: "In the event of a disputed cure amount (a "Cure Dispute") with respect to any of the Assigned Equipment Loans, Buyer shall pay any undisputed portion to the respective counterparty and place in escrow the amount in dispute subject to further discussions between Buyer and the counterparty to resolve the dispute. An Assigned Equipment Loan subject to a Cure Dispute under this paragraph may still be assumed and assigned to Buyer on the Closing Date notwithstanding the pending Cure Dispute. In the event that Buyer and the counterparty to an



Assigned Equipment Loan subject to a Cure Dispute are unable to mutually resolve the Cure Dispute, either party may make a request to the Court in writing and on notice to the other party that the Court hold a hearing to address the Cure Dispute."

- The Debtor and Komatsu Financial Limited Partnership, a counterparty of an Assigned Equipment Loan, have agreed to add the following language to the Sale Order: "Buyer shall pay Komatsu Financial Limited Partnership ("Komatsu") a cure payment of $7,774.74, in connection with its assignment and assumption of an Assigned Equipment Loan by and between Debtor and Komatsu, pursuant to which Komatsu maintains a perfected, first-priority security interest in and lien on one (1) 2021 Komatsu PC138USLC-11 Hydraulic Excavator (S/N 59033), together with a 36" HDP Bucket, Set Bucket Pins for Coupler, MPLR4 Hydraulic Coupler with Pins and Kit, and such payment shall cure any amounts due to Komatsu under such Assigned Equipment Loan as of the Closing Date."

- The Debtor, Vollers, and Ralph Clayton & Sons, Inc. ("Clayton") have reached an agreement whereby the Debtor will, in conjunction with the Vollers Transaction, assume and assign contracts between the Debtor and Clayton to Vollers for the supply of concrete on Subcontracted Projects. Clayton asserts that the Debtor owes it $260,000, but has agreed to accept $100,000 in satisfaction of such balance, to be paid by Vollers.

- The Debtor, Vollers, and Pennsylvania Jersey Concrete Products, Inc. ("PJ Concrete") have reached an agreement whereby the Debtor will, in conjunction with the Vollers Transaction, assume and assign contracts between the Debtor and PJ Concrete to Vollers for the supply of concrete on Subcontracted Projects. PJ Concrete asserts that the Debtor owes it $219,873.25, but has agreed to accept $76,955.64 in satisfaction of such balance, to be paid by Vollers.

**B. Responses to Financing Motion**

In its objection, the US Trustee expressed concern with Vollers obtaining a first priority DIP Lien on all of the Debtor's unencumbered equipment and vehicles, and asserted that "Vollers should not receive this lien until the Debtor has proven that the Sale Motion satisfies the business judgment test." *US Trustee Objection*, ¶ 24. The DIP Lien only arises in the event the Sale Motion



is not approved because, at the closing of the Vollers Transaction, Vollers will assume the DIP Loan thereby obviating the need for such a lien. As discussed above, the Debtor believes it has satisfied the business judgment test for approval of the Sale Motion, and therefore the Trustee's concern regarding the DIP Lien is moot. Nonetheless, the DIP Lien was necessary for Vollers to provide the Debtor with needed financing to reach this point in the case and to protect Vollers in the event that the Sale Motion is not approved. Such liens are typically afforded to parties providing post-petition financing to offset the risk they undertake. *See, e.g., In re Fillit, Inc.*, Case No. 20-23140 (CMG) (Bankr. D.N.J. Jan. 11, 2021); In re CTE 1 LLC, Case No. 19-30256 (VFP) (Bankr. D.N.J. Feb. 6, 2020); *In re Icon Eyewear, Inc.*, Case No. 18-34902 (JKS) (Bankr. D.N.J. Mar. 7, 2019); *In re Amboy Group, LLC*, Case No. 17-31653 (CMG) (Bankr. D.N.J. Dec. 15, 2017); *In re E Z Mailing Services, Inc.*, Case No. 16-10615 (SLM) (Bankr. D.N.J. Nov. 10, 2016).

With respect to NGM, the Debtor has incorporated the language requested by NGM in the revised proposed Final Financing Order. In its recently filed objection to the Sale Motion [D.I. 75], NGM asserts to have a perfected lien in the Debtor's assets through a UCC-1 financing statement recorded on June 9, 2022. The UCC-1, however, lists the "debtors" as Lisa Assuncao and Martin Assuncao. The Debtor is only listed as an "additional debtor" and does not appear in the certified UCC search for the Debtor attached as <u>Exhibit C</u> to the Dinoff Certification. As such, NGM would not have superior rights in collateral such as equipment over the rights a lienholder that properly perfected their security interest pursuant to the UCC. *See Aetna Casualty and Surety Co. v. Brunken & Son, Inc.*, 357 F.Supp. 290 (D.S.D. 1973) (standing for the proposition that, under the UCC and even considering equitable principles, an unrecorded indemnity agreement cannot have priority over a security interest in equipment properly perfected under the UCC); *see also In re Merts Equip. Co.*, 438 F. Supp. 295, 298 (M.D. Ga. 1977) (same). A bankruptcy opinion from Court in this district is informative:

> A security interest under Article 9 of the U.C.C. must be created by agreement and attach to a specific item of collateral in which the debtor has rights. N.J.S.A. 12A:9–204(1). While the agreement creates the priority of the secured party as to the debtor with whom he has contracted, the filing of a financing statement serves to put third parties on notice that the collateral is encumbered. Upon filing, no third party can acquire from the debtor rights greater than those of the secured party. See generally N.J.S.A. 12A:9–301 *et seq*. None of the concerns addressed by the U.C.C. filing requirements are implicated in the surety context. A construction surety is "secured" not by collateral per se, but rather by the opportunity, on default, to finish the job and apply any available funds against its cost of completion.

*In re Alcon Demolition, Inc.*, 204 B.R. 440, 447 (Bankr. D.N.J. 1997) (internal case citations omitted). Even if NGM did properly perfect a lien under its 2019 security agreement with the



Debtor, such agreement was four years after the Debtor's agreement with Manasquan Bank and therefore any such lien would be subordinate to Manasquan Bank.

Even if NGM's UCC-1 is against the Debtor, it is subordinate to the UCC-1 recordings of both Manasquan Bank (recorded on August 25, 2015 and continued on July 21, 2020), and the SBA (recorded on May 17, 2021). Moreover, NGM's UCC-1 was recorded within the 90 days prior to the Petition Date and may be avoided under sections 544 and 547 of the Bankruptcy Code.

Based on the foregoing, the Debtor respectfully requests that the Court enter the Sale Order approving the Vollers Transaction, the Manasquan Settlement, the SBA Resolution, and related transactions, and that the Court enter the Final Financing Order approving the terms of the DIP financing and use of cash collateral on a final basis.

Respectfully submitted,

*/s/Michael R. Herz*
Joseph J. DiPasquale
Michael R. Herz
Joseph A. Caneco