| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY |
| --- |
| Caption in Compliance with D.N.J. LBR 9004-1(b) |

**FOX ROTHSCHILD LLP**
49 Market Street
Morristown, NJ 07960
Telephone:  (973) 992-4800
Fax:  (973) 992-9125
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Joseph A. Caneco, Esq.
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
jcaneco@foxrothschild.com
*Proposed Attorneys for Debtor, Assuncao Bros. Inc.*

Order Filed on August 24, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In Re:

ASSUNCAO BROS., INC.,

      Debtor.

Chapter 11, Subchapter V

Case No. 22-16159

Judge:  Christine M. Gravelle

## ORDER (I) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS TO VOLLERS EXCAVATING AND CONSTRUCTION, INC., (II) APPROVING SETTLEMENT WITH MANASQUAN BANK AS SECURED LENDER, (III) AUTHORIZING THE DEBTOR TO ENTER INTO SUBCONTRACTS WITH VOLLERS FOR NON-BONDED PROJECTS, AND (IV) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The relief set forth on the following pages, numbered two (2) through thirty-four(34)  it is hereby **ORDERED**

DATE: August 24, 2022

_____
Honorable Christine M. Gravelle
United States Bankruptcy Judge

DEBTOR:        Assuncao Brothers Inc.

CASE NO:       22-16159-CMG

CAPTION:      **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

**THIS MATTER** having been brought before the Court upon the motion (the "Motion")[1] of Assuncao Brothers Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11, subchapter v case (the "Subchapter V Case"), by and through its proposed attorneys, Fox Rothschild LLP, seeking entry of an order pursuant to 11 U.S.C. §§ 105(a), 363, and 365, Rules 6003, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure, and D.N.J. LBR 6004-1, (i) authorizing the Debtor to sell certain of its assets (the "Purchased Assets") to Vollers Excavating and Construction, Inc. (the "Buyer" or "Vollers") as more particularly set forth in sections 1.01 and 1.02 of the Asset Purchase Agreement attached hereto as Exhibit A to the Motion (the "Asset Purchase Agreement") free and clear of any and all claims, liens, rights, interests, and encumbrances, (ii) approving a settlement among Debtor, Vollers, and Manasquan Bank as secured lender to Debtor, (iii) authorizing the Debtor to enter into the Subcontracts with Vollers for Vollers to perform Debtor's remaining obligations under the Subcontracted Projects free and clear of any and all claims of Debtor's pre-petition subcontractors, vendors, suppliers and materialmen, and (iv) authorizing the Debtor to assume and assign to Vollers the Assigned Equipment Loans set forth in schedule 1.03(d) to the Asset Purchase Agreement; and due and sufficient notice of the Motion having been provided; and the Court having considered the papers submitted, including opposition, if any, as well as the arguments presented at the hearing held on August 22, 2022 (the "Sale Hearing"); and the Court

---

[1] Capitalized terms not otherwise defined shall have the same meaning as set forth in the Motion.

DEBTOR:            Assuncao Brothers Inc.
CASE NO:           22-16159-CMG
CAPTION:           **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

having jurisdiction over the Debtor's Subchapter V Case and the Motion under 28 U.S.C.

§§ 1334(b) and 157, and the *Standing Order of Reference to the Bankruptcy Court Under*

*Title 11* of the United States District Court for the District of New Jersey, dated September

18, 2012 (Simandle, C.J.); and the Court having found and determined that the relief

requested in the Motion and provided for herein is proper, lawful, necessary, appropriate,

and in the best interest of the Debtor, its estate, creditors, and all parties-in-interest; and for

the reasons set forth on the record at the Sale Hearing; and for good cause shown, it is

hereby

**FOUND AND DETERMINED THAT**:[2]

A.     The statutory predicate for the relief granted herein are sections 105(a), and

363 of the Bankruptcy Code, Bankruptcy Rule 6003, 6004, 6006 and 9019, and D.N.J.

LBR 6004-1.

B.     Good and sufficient notice of the Motion and the Debtor's proposed entry

of the Subcontracts  and assumption and assignment of the Assigned Equipment Loans and

related cure costs, if any, was given to Subcontracted Project owners and other interested

parties including, but not limited to, Debtor's pre-petition subcontractors, vendors,

suppliers and materialmen on Non-Bonded Projects, as well as counterparties to the

Assigned Equipment Loans, in accordance with the directive of the Court and as otherwise

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

DEBTOR:           Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

required by applicable law, and was fair, reasonable, and sufficient under the circumstances.

C.      The record establishes that there are (i) good, valid, and sound business purposes for the sale of the Purchased Assets[3] under the Asset Purchase Agreement, the execution of the Subcontracts, and assumption and assignment to the Buyer of the Assigned Equipment Loans free and clear of any claim or interest of any of Debtor's prepetition subcontractors, vendors, suppliers and materialmen on the Non-Bonded Projects, and (ii) compelling circumstances for the Debtor to enter into the Asset Purchase Agreement and consummation of the transactions contemplated therein (the "Sale" or "Vollers Transaction") pursuant to section 363(b) of the Bankruptcy Code prior to confirmation of a chapter 11 plan.

D.      Manasquan Bank (i) is owed at least $1,309,232.14, plus additional fees, costs, and expenses, as of the Petition Date; and (ii) has properly perfected lien rights in all of the Debtor's assets through the prepetition liens related to the Manasquan Loan and through the Adequate Protection Liens provided under the Cash Collateral/DIP Motion.

E.      Manasquan Bank has asserted that the value of its collateral, along with certain litigation rights against the Debtor, would result in the repayment in full of the Manasquan Loan, an assertion disputed by the Debtor.  In lieu of costly litigation that

---

[3] As set forth below, this Order modifies the scope of the Purchased Assets listed in section 1.01 of the Asset Purchase Agreement to remove and preserve for the Debtor's estate: (1) cash held by the Debtor, including receivables collected from completed worked on Non-Bonded Projects as of the Closing Date, and (2) Claims and Causes of Action (defined below), including avoidance actions under chapter 5 of the Bankruptcy Code.

DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

would burden the estate with substantial administrative expense and reduce recoveries to creditors, the Debtor, Manasquan Bank, and Vollers have agreed to the following settlement, the terms of which are hereby approved pursuant to Fed. R. Bankr. P. 9019 (the "Manasquan Bank Settlement"):

(1) Debtor and Vollers acknowledge that through the prepetition liens related to the Manasquan Loan and through the Adequate Protection Liens to be provided under the Cash Collateral/DIP Motion, Manasquan Bank has properly perfected lien rights in all of the Debtor's assets, and that Debtor and Vollers require the consent of Manasquan Bank to proceed with the Vollers Transaction;

(2) In settlement of the properly perfected prepetition liens and Adequate Protection Liens provided under the Cash Collateral/DIP Motion in favor of Manasquan Bank, and the other consideration to be provided by Manasquan Bank, Vollers has agreed to pay Manasquan Bank $975,000 (the "Manasquan Settlement Amount") on the Closing Date (as defined in section 2.01 of the Asset Purchase Agreement);

(3) Manasquan Bank has agreed to accept the Manasquan Settlement Amount in exchange for the release of its liens and consent to the Vollers Transaction if, and only if, the Manasquan Settlement Amount is actually paid directly to Manasquan Bank at the closing of the Vollers Transaction; Manasquan Bank will not consent to the Vollers

DEBTOR:            Assuncao Brothers Inc.
CASE NO:           22-16159-CMG
CAPTION:           **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

Transaction or the release of its liens if, for any reason, payment of the Manasquan Settlement Amount is delayed beyond, or otherwise cannot be made directly to Manasquan Bank at or before the Closing Date; Debtor and Vollers likewise acknowledge and agree that the Vollers Transaction cannot proceed absent the consent of Manasquan Bank and the Manasquan Settlement Amount being paid directly to Manasquan Bank on the Closing Date;

(4) Upon receipt of the Manasquan Settlement Amount, Manasquan Bank will immediately pay $25,000 from the Manasquan Settlement Amount to an account established by KCP Advisory Group, LLC with Bank of America for the benefit of the Subchapter V Case professionals;

(5) After payment of the Manasquan Settlement Amount to Manasquan Bank, Manasquan Bank will have an agreed upon allowed unsecured deficiency claim against Debtor of $359,232.14;

(6) Notwithstanding this settlement and its receipt of the Manasquan Settlement Amount, Manasquan Bank will continue to have the right to pursue any guarantors of the Manasquan Loan for any amounts of the Manasquan Loan remaining unpaid, including remaining principal, interest, default interest, fees, expenses, attorney's fees, and costs, and the guarantors do not waive and shall maintain any rights, claims, and defenses in connection therewith;

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

(7)  On the Closing Date, Debtor and its estate, and Vollers shall be conclusively deemed to have released any and all claims, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent or non-contingent, in law or in equity, existing from the beginning of time to the Closing Date, that may relate in any way to this Subchapter V Case,  against Manasquan Bank, its shareholders, directors, officers, parents, subsidiaries, affiliates, successors and assigns, and their respective attorneys, accountants, agents, and representatives.  On the Closing Date, subject to receipt of the Manasquan Settlement Amount, Manasquan Bank shall be conclusively deemed to have released any and all claims, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent or non-contingent, in law or in equity, existing from the beginning of time to the Closing Date, that may relate in any way to this Subchapter V Case, against Vollers, its

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
**Excavating and Construction, Inc., (II) Approving Settlement with**
**Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
**into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
**Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
**and Unexpired Leases**

shareholders, directors, officers, parents, subsidiaries, affiliates, successors and assigns, and their respective attorneys, accountants, agents, and representatives. Nothing in this paragraph, however, shall be deemed or construed to release compliance with this settlement and the releases contained in this paragraph (collectively, the "Releases"). In no event shall the releases contained in this Manasquan Bank Settlement be deemed to release any claims against any principal or related party of the Debtor, including without limitation any guarantor of the Manasquan Loan.

F.     The foregoing Manasquan Bank Settlement is fair and reasonable and falls within the range of reasonableness under Fed. R. Bankr. P. 9019 under the circumstances of this Subchapter V Case, and is approved.

G.     On the Petition Date, the U.S. Small Business Administration (the "SBA") held a pre-petition secured claim that is subordinate to the pre-petition secured claim of Manasquan Bank.

H.     The Debtor's surety, NGM Insurance Company ("NGM"), asserts secured claims, and further asserts that the Debtor may be in possession of disbursed funds or come into possession of said funds in the future generated from certain Bonded Projects that constituted trust funds for, among others, subcontractors on those projects and NGM (including, but not limited, to approximately $348,075 in trust funds that should have been paid to Shore Systems, L.L.C., in connection with the Monmouth County "Renovation of

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

Bridge U-15" bonded project (the "Shore Systems Trust Claim")) as described in the Declaration of Eli Cinq-Mars and its related exhibits filed at Docket. No. 76.

I.       To resolve the objections of the SBA to the Motion and related transactions (including the Sale, the Manasquan Bank Settlement, and the Cash Collateral/DIP Motion (as defined in the Motion)), and subject to the approval and consummation of the Manasquan Bank Settlement, the Debtor, Vollers, and the SBA have agreed as follows (the "SBA Resolution"):

(1) Within 30-days of the closing of the Sale, Vollers shall pay $75,000.00 to the SBA in partial satisfaction of the SBA's secured claim against the Debtor;

(2) The "Kicker Provision" (as defined in the Motion) shall be increased from 15% to 25% (the "Enhanced Kicker") and the Asset Purchase Agreement shall be deemed to be modified to reflect the Enhanced Kicker;

(3) The Enhanced Kicker shall be allocated as follows: 10% to the Debtor's estate, 10% to the SBA on account of SBA's secured claim against the Debtor (which allocation to SBA shall not be subject to surcharge under 11 U.S.C. § 506(c)), and 5% to NGM as part of the NGM Resolution as set forth below;

(4) The SBA consents to the Sale and related transactions.

J.       To resolve the objections of NGM to the Motion and related transactions

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

(including the Sale, the Manasquan Bank Settlement, and the Cash Collateral/DIP Motion (as defined in the Motion), and in full and final settlement of the Shore Systems Trust Claim against the Debtor, and subject to the approval and consummation of the Manasquan Bank Settlement, the Debtor, Vollers, and NGM have agreed as follows (the "NGM Resolution"):

(1) NGM hereby agrees that it will not assert a claim against the Debtor's estate that any funds being held by the Debtor's estate or any funds that come into the Debtor's estate hereafter shall be turned over to NGM in connection with the Shore System Trust Claim. This waiver shall not affect in any way and/or waive and release: (i) any other claim to trust funds in connection with funds being held or later held by the estate or any trust fund claims to accounts receivable for any other matter; (ii) any unsecured claim against the Debtor's estate on account of any amounts paid by NGM to the Shore Systems, L.L.C. as a result of the failure of the Debtor to pay Shore Systems, Inc., the $348,075 plus fees and costs incurred by NGM in connection therewith, and (iii) any claim of NGM against any other party by way of indemnity or otherwise in connection with the Shore Systems Trust Claim including but not limited any claim of a liability as a transferee of any such trust funds or any claim for failing to cause the Debtor to properly pay said trust funds to Shore Systems, Inc., except that any such claim shall be reduced by

DEBTOR:            Assuncao Brothers Inc.
CASE NO:           22-16159-CMG
CAPTION:           **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                   Excavating and Construction, Inc., (II) Approving Settlement with
                   Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                   into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                   Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                   and Unexpired Leases**

any sums paid to NGM (net of costs to NGM) as a result of the litigation

to be brought against Schiavone as described in Paragraph J(3) hereof.

Nothing herein is a waiver of any defense by NGM to any claim brought

by Shore Systems, Inc. against NGM or shall be deemed as an admission

by NGM in connection therewith.  Except as provided herein as to the

Shore System Trust Claim, nothing herein shall affect the rights, lien,

claims, and trust fund claims of NGM and its bond beneficiaries and the

priority thereof as to any assets that are not part of the Vollers

Transaction.  The rights and defenses of the Debtor, the Debtor's estate,

and third parties with respect to any rights and claims reserved for NGM

under this paragraph are preserved.

(2) NGM shall receive 5% of the Enhanced Kicker Provision as set forth in

paragraph I(3) above.

(3) Buyer shall pursue recovery of the Debtor's claims against Schiavone

Construction Co., LLC ("Schiavone") at Buyer's expense, and any

amounts recovered by Buyer from Schiavone (net of attorneys' fees and

costs in pursuing the recovery) shall be allocated as follows:  50% to

Buyer, 25% to the Debtor's estate, and 25% to NGM.  Buyer shall be

authorized to compromise the claim against Schiavone in its sole

discretion.  If Buyer determines not to pursue or to no longer pursue the

claim against Schiavone, the Buyer shall notify Debtor and NGM that

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                 Excavating and Construction, Inc., (II) Approving Settlement with
                 Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                 into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                 Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                 and Unexpired Leases**

the Buyer is no longer willing to pursue the claim. The Debtor and/or

NGM may thereafter pursue the claim at their respective costs and

expense and, to the extent Debtor and/or NGM recover on the claim,

they shall equally split the proceeds of any recovery.

(4) NGM Consents to the Sale and related transactions. To the extent that

the Buyer holds books and records relevant to any claim brought against

NGM pursuant to a Bond, Buyer shall make such book and records

available to NGM upon its request.

K.      The foregoing SBA Resolution and NGM Resolution are fair and

reasonable and fall within the range of reasonableness under Fed. R. Bankr. P. 9019 under

the circumstances of this Subchapter V Case, and is approved.

L.      Each party that claims any interest in any of the Purchased Assets to be sold

under the Asset Purchase Agreement has either consented to the Sale or could be compelled

in a legal or equitable proceeding to accept a money satisfaction of such interest pursuant

to section 363(f) of the Bankruptcy Code.

M.      The Debtor is the sole and lawful owner of the Purchased Assets.

Accordingly, the transfer of the Purchased Assets to the Buyer will be a legal, valid, and

effective transfer of the Purchased Assets, free and clear of all claims (including any

"claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claim and/or

claims for reimbursement, covenants, restrictions, judgments, and/or orders of any court,

product liability claims, successor liability, tax and other claims of any nature, causes of

DEBTOR:            Assuncao Brothers Inc.
CASE NO:           22-16159-CMG
CAPTION:           **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                   **Excavating and Construction, Inc., (II) Approving Settlement with**
                   **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                   **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                   **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                   **and Unexpired Leases**

action, and any other manner of claim, liens (including consensual and non-consensual

liens and statutory liens), security interests, rights, other interests, or encumbrances,

whether known or unknown pursuant to section 363(f) of the Bankruptcy Code and all

other applicable laws, except with respect to such liens and claims expressly assumed by

the Buyer in the Asset Purchase Agreement.

N.      Adequate assurance exists that the Buyer will fully perform all future

obligations under the Assigned Equipment Loans.  Assumption and assignment of such

executory contracts and unexpired leases is an appropriate exercise of the Debtor's

business judgment.

O.      The Buyer is not an "insider" or "affiliate" of the Debtor as those terms are

defined in the Bankruptcy Code.  The Debtor and the Buyer have at all times acted in good

faith and in accordance with applicable law.  The Buyer is acting in good faith within the

meaning of section 363(m) of the Bankruptcy Code.  The Sale of the Purchased Assets to

the Buyer pursuant to the Asset Purchase Agreement and this Order is a sale in good faith

within the meaning of section 363(m) of the Bankruptcy Code, and the Buyer is entitled to

the protections of section 363(m) of the Bankruptcy Code.  The Buyer has not violated

section 363(n) of the Bankruptcy Code by any action or inaction, and there has been no

evidence that any activity prohibited under section 363(n) of the Bankruptcy Code

occurred.

P.      The Debtor has full authority and power to execute and deliver the Asset

Purchase Agreement and related agreements and all other documents contemplated by the

DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

Asset Purchase Agreement, to perform the obligations thereunder, and to consummate the transactions contemplated therein.  No other consent or approvals are necessary or required for the Debtor to perform its obligations under the Asset Purchase Agreement and to consummate the transactions contemplated therein.

Q.    The Seller may sell the Purchased Assets to the Buyer free and clear of all liens, claims, rights, interest, and encumbrances against the Debtor, the Debtor's estate, or any of the Purchased Assets, because one or more of the requirements set forth in section 363(f)(1) through (5) of the Bankruptcy Code has been satisfied.  Those holders of liens or claims against the Debtor, the Debtor's estate, or any of the Purchased Assets, who did not object, or who withdrew their objections to the Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, *provided, however,* that secured creditor Manasquan Bank shall be deemed to have consented to the Sale only upon receipt of the settlement payment in accordance with the terms of the Manasquan Bank Settlement approved herein.  Subject to the proviso in the preceding sentence, those holders of liens or claims against the Debtor, the Debtor's estate, or any of the Purchased Assets, who did object, who did not object, or who withdrew their objections fall within one more of the other subsections of section 363(f) and are deemed adequately protected.

R.    The Buyer would not have entered into the Asset Purchase Agreement and would not have consummated the transactions contemplated therein, thus materially affecting the Debtor, the Debtor's estate, and creditors, if the Sale of the Purchased Assets and the assumption and assignment to the Buyer of certain executory contracts and

DEBTOR:           Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                  Excavating and Construction, Inc., (II) Approving Settlement with
                  Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                  into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                  Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                  and Unexpired Leases**

unexpired leases were not, as to the Debtor free and clear of all liens, claims, rights, interest,

and encumbrances, or if the Buyer would be liable for any Excluded Liabilities as such

term is defined in section 1.04 of the Asset Purchase Agreement.

S.    Except for the Assumed Liabilities as defined in section 1.03 of the Asset

Purchase Agreement, the transfer of the Purchased Assets to the Buyer, and (ii) the

assumption and assignment to the Buyer of the Assigned Equipment Loans does not and

will not subject the Buyer to any liability whatsoever with respect to the operation of the

Debtor's business before the Closing Date or by reason of such transfer under the laws of

the United States, any state, territory, or possession thereof, based on, in whole or in part,

directly or indirectly, any theory of law or equity, including, without limitation, any theory

of equitable law, including without limitation, any theory of antitrust or successor or

transferee liability.

T.    Pursuant to Bankruptcy Rule 6003, entry of this Order approving the

proposed Sale to the Buyer, approving the Manasquan Bank Settlement, approving the

SBA Resolution, approving the NGM Resolution, approving the Debtor to enter into the

Subcontracts free and clear of any lien, claim or interest of any of Debtor's prepetition

subcontractors, vendors, suppliers or materialmen on the Non-Bonded Projects, and

approving assumption and assignment of the Assigned Equipment Loans sooner than 21

days after the entry of this Order is necessary and appropriate to avoid immediate and

irreparable harm to the Debtor and the estate.

U.    This Order constitutes a final and appealable order within the meaning of

DEBTOR:                Assuncao Brothers Inc.
CASE NO:              22-16159-CMG
CAPTION:              **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
Excavating and Construction, Inc., (II) Approving Settlement with
Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
Authorizing the Debtor to Assume and Assign Certain Executory Contracts
and Unexpired Leases**

28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and (d), the Court finds

that there is no just reason for delay in the implementation of this Order.

## IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Motion is granted in accordance with the provisions of this Order.

2.      Any and all objections or responses to the Motion and the relief requested

therein that have not been withdrawn, resolved, or addressed in this Order, are overruled.

3.      The Asset Purchase Agreement attached hereto as **<u>Exhibit A</u>** and the

transactions contemplated therein including the Sale of the Purchased Assets and the

execution of the Subcontracts free and clear of any lien, claim or interest of any lien, claim,

right, interest, and encumbrance including, but not limited to any lien, claim, right, interest

and encumbrance of the Debtor's creditors, subcontractors, vendors, supplier and

materialmen are hereby approved, subject to the modifications set forth in this Order.

Pursuant to section 363 of the Bankruptcy Code, the Debtor is hereby authorized to sell, or

cause to be sold, the Purchased Assets to the Buyer.  Pursuant to section 105 and of the

Bankruptcy Code, the Debtor is authorized to execute the Subcontracts, without further

application to or order of the Court.  Pursuant to section 365 of the Bankruptcy Code the

Debtor is authorized to assume and assign to the Buyer the Assigned Equipment Loans.

4.      The scope of the Purchased Assets set forth in section 1.01 of the Asset

Purchase Agreement is hereby amended as follows:

        a.  The Purchased Assets shall not include any cash held by the Debtor,

            including any receivables collected by the Debtor from completed work

DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

on Non-Bonded Projects prior to the Closing Date, and any such funds shall not be a part of the Sale and shall remain property of the Debtor for the benefit of the Debtor's estate which shall be deposited with KCP Advisory Group LLC in a separate bank account with Bank of America for the benefit of Debtor's estate ("Debtor's Estate Account").

b. Except with respect to any amounts payable and to be paid by owners on the Non-Bonded Projects, the Purchased Assets shall not include any claims, rights, rights of credits, causes of action and rights of set-off of the Debtor (whether known or unknown, contingent or otherwise) against any third party, related to the Purchased Assets, contractual or otherwise, accruing or arising prior to the Closing, including, but not limited to any avoidance actions under chapter 5 of the Bankruptcy Code (collectively, "Claims and Causes of Actions"), and any such Claims and Causes of Action shall be retained by the Debtor's estate with no prejudice to any other parties' rights, claims or defenses. For the avoidance of doubt section 1.01(e) shall be deleted from the Asset Purchase Agreement.

5.      The terms of the Manasquan Bank Settlement, the SBA Resolution, and the NGM Resolution are hereby approved pursuant to Fed. R. Bankr. P. 9019. Buyer shall pay the Manasquan Settlement Amount (i.e., $975,000) to Manasquan Bank on the Closing Date. Upon the receipt by Manasquan Bank of the Manasquan Settlement Amount by or

DEBTOR:                Assuncao Brothers Inc.
CASE NO:               22-16159-CMG
CAPTION:               **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                       Excavating and Construction, Inc., (II) Approving Settlement with
                       Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                       into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                       Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                       and Unexpired Leases**

on the Closing Date:

    a.   Manasquan Bank shall release its liens on the Debtor's assets;

    b.   Manasquan Bank shall immediately pay $25,000 of the Manasquan

Settlement Amount to an account established by KCP Advisory Group,

LLC for the benefit of the Subchapter V Case professionals (subject to

further order of the Court) which shall be deposited with KCP Advisory

Group LLC in a Bank of America account.  The $75,000 payment by

Vollers as set forth in section 1.06(a) of the Asset Purchase Agreement

shall also be deposited in the aforementioned Bank of America account

("Subchapter V Professional Fee Account");

    c.   Manasquan Bank shall possess an agreed upon allowed unsecured

deficiency claim against Debtor of $359,232.14;

    d.   Debtor, its estate, and Vollers shall be deemed to have released

Manasquan Bank consistent with the Releases;

    e.   Manasquan Bank shall be deemed to have released Vollers consistent

with the Releases; and

    f.   In no event shall the releases contained in the preceding subparagraphs

be deemed to have released any claims against any principal or related

party of the Debtor, including without limitation any guarantor of the

Manasquan Loan.

6.    Notwithstanding its participation in the Manasquan Bank Settlement and its

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                 Excavating and Construction, Inc., (II) Approving Settlement with
                 Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                 into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                 Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                 and Unexpired Leases**

receipt of the Manasquan Settlement Amount, Manasquan Bank shall retain and continue

to possess all of its rights to pursue any guarantors of the Manasquan Loan for any amounts

remaining unpaid under the Manasquan Loan documents and guarantees, including the

deficiency claim and any remaining principal, interest, default interest, fees, expenses,

attorney's fees, and costs, with no prejudice to the purported guarantors or any other parties

reserving any rights, claims or defenses.

7.      Notwithstanding any other provision of this Order to the contrary, the relief

provided in this Order, including the approval of the Sale and the release of liens on the

Debtor's assets, shall be expressly subject to the payment of the Manasquan Settlement

Amount on or before the Closing Date.

8.      Notwithstanding any other provisions of (i) this Order to the contrary, or

(ii) the final order granting the relief sought in the Cash Collateral/DIP Motion and any

budget attached thereto, the Debtor is authorized to immediately draw down on the full

amount of the DIP Loan (as defined in the Cash Collateral/DIP Motion) and such amount

shall increase the Purchase Price set forth in section 1.06(a) of the Asset Purchase

Agreement by $200,000.00.

9.      Subject to the full payment by Buyer of the Manasquan Settlement Amount

to Manasquan Bank on the Closing Date, the transfer of the Purchased Assets, the

execution of the Subcontracts, and assumption and assignment to the Buyer of the Assigned

Equipment Loans pursuant to this Order and the Asset Purchase Agreement shall constitute

legal, valid, binding, and effective transfer, and shall vest the Buyer with good and valid

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                     **Excavating and Construction, Inc., (II) Approving Settlement with**
                     **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                     **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                     **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                     **and Unexpired Leases**

title to the Purchased Assets and with all rights under the Subcontracts and the all documents and agreement pertaining to the Assigned Equipment Loans pursuant to section 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, free and clear of all liens, claims, rights, interests, and encumbrances, except for those Assumed Liabilities as defined in section 1.03 of the Asset Purchase Agreement.

10.    Subject to the full and timely payment by Buyer of the Manasquan Settlement Amount to Manasquan Bank, on the Closing Date, all liens, claims, rights, interests, and encumbrances against or upon the Purchased Assets and all liens, claims, rights, interests, and encumbrances of any of Debtor's prepetition subcontractors, suppliers, vendors and materialmen, shall be unconditionally released, terminated, and discharged, and no person or entity may assert any liens, claims, rights, interests, and encumbrances against the Buyer in any way related (i) the Purchased Assets and incurred or otherwise arising prior to the Closing Date; (ii) the Subcontracts or the Buyer's interest in the Purchased Assets; or (iii) by reason of the Sale of the Purchased Assets to and execution of the Subcontract with the Buyer, except that the rights of the Debtor's estate, the SBA and NGM, to certain payments by Vollers, as provided by this Order, shall survive closing of the Sale of the Purchased Assets by the Debtor to the Buyer notwithstanding this paragraph or any other paragraph of the Order which could be read otherwise.

11.    The provisions of this Order (i) authorizing the Sale of the Purchased Assets by the Debtor to the Buyer free and clear of all liens, claims, rights, interests, and encumbrances, (ii) authorizing the Debtor to execute the Subcontracts, and (iii) authorizing

DEBTOR:              Assuncao Brothers Inc.
CASE NO:            22-16159-CMG
CAPTION:            **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                    **Excavating and Construction, Inc., (II) Approving Settlement with**
                    **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                    **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                    **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                    **and Unexpired Leases**

the Debtor to assume and assign the Assigned Equipment Loans to the Buyer, shall be self-

executing and neither the Debtor, the Buyer, nor any other party shall be required to execute

or file releases, termination statements, assignments, cancellations, consents, or other

instruments to effectuate, consummate, and/or implement the provisions hereof with

respect to such Sale and Subcontracts; provided, however, that this paragraph shall not

excuse such parties from performing any and all of their respective obligations under the

Manasquan Bank Settlement and Asset Purchase Agreement.

12.    To the extent necessary or appropriate, this Order shall constitute a bill of

sale of the Purchased Assets to the Buyer and authority to enter into the Subcontracts, free

and clear of all liens, claims, rights, interests, and encumbrances, and assumption and

assignment to the Buyer of the Assigned Equipment Loans as provided herein.  All persons

and entities (including, without limitation, all filing, registration, or recording officers or

agents, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental departments, secretaries of state, federal,

state, and local officials, and all others that may be required by operation of law, the duties

of their offices, or contract, to accept, file, register, or record or release any documents or

instruments, or that may be required to report or insure any title or state of title in or to any

of the Purchased Assets are hereby authorized to (i) accept this Order as sole and sufficient

evidence of the transfers of all right, title, and interest in, to, and under the Purchased

Assets, and may rely on this Order in consummating, or facilitating the consummation of,

the transactions contemplated by the Asset Purchase Agreement and this Order, including

DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

the assumption and assignment of the Assigned Equipment Loans to the Buyer and (ii) accept, file, register, and/or record all documents and instruments of transfer including, without limitation, deeds, leases, and assignments, modifications, and terminations of leases (if any), that may be filed, registered, and/or recorded under the terms of this Order or the Asset Purchase Agreement, and are forever barred, prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Buyer to transfer the Purchased Assets to the Buyer, including with respect to the assumption and assignment of the Assigned Equipment Loans to Buyer in accordance with the terms of this Order and the Asset Purchase Agreement, free and clear of all liens, claims, interests, rights and encumbrances, and from otherwise interfering with the Buyer's enjoyment of the Purchased Assets, the Subcontracts, and the Assigned Equipment Loans.

13.    Except with respect to the Assumed Liabilities as defined in section 1.03 of the Asset Purchase Agreement, and subject to the full payment by Buyer of the Manasquan Settlement Amount to Manasquan Bank on the Closing Date, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, subcontractors, vendors, suppliers, materialmen, litigation claimants and other creditors holding any liens, claims, rights, interest, or encumbrances of any kind or nature whatsoever against or in all or any portion of the Purchased Assets and Subcontracts (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated or subordinate), arising under or out of, in connection with, or in any way

DEBTOR:          Assuncao Brothers Inc.

CASE NO:         22-16159-CMG

CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

relating to the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting, against the Buyer, any of its affiliates, successors or assigns, their property, owners on any of the Non-Bonded Projects or their sureties, or the Purchased Assets, such persons' or entities' liens, claims, rights, interest, or encumbrances, other than with respect to any Assumed Liabilities, in and to the Purchased Assets, including, without limitation the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, any of its affiliates, successors, assets or properties or any owner or surety on any Non-Bonded Project; (ii) enforcing, attaching, collecting or recovery in any manner any judgment, award, decree or order against the Buyer, any of its affiliates, successors, assets or properties or any owner or surety on any Non-Bonded Project; (iii) creating, perfecting or enforcing any lien or claim against the Buyer, or any of its affiliates, successors, assets or properties or any owner or surety on any Non-Bonded Project; (iv) asserting any setoff or right of subrogation of any kind against any obligation of the Buyer, any of its affiliates or successors; (v) commencing or continuing any action in any manner or place, that does not comply or is inconsistent with the provisions of this Order other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the business operated with the Purchased Assets.

DEBTOR:             Assuncao Brothers Inc.
CASE NO:            22-16159-CMG
CAPTION:            **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

14.    Subject to the full payment by Buyer of the Manasquan Settlement Amount to Manasquan Bank on the Closing Date:

a.    The sale of the Purchased Assets, execution of the Subcontracts, and assumption assignment to the Buyer of the Assigned Equipment Loans, with the exception of any liens, claims, rights, and interests held by any counterparties to the Assigned Equipment Loans, shall be free and clear of all liens, claims, rights, and interests, and encumbrances pursuant to section 363(f) and 105 of the Bankruptcy Code;

b.    The holders of any liens, claims, rights, and interests, and encumbrances that did not object, or that withdrew their objections, to the Motion are hereby deemed to have consented to the Sale of the Purchased Assets, the execution of the Subcontracts, and the assumption and assignment of the Assigned Equipment Loans (except for counterparties to the Assigned Equipment Loans as noted above) free and clear of their liens, claims, rights, interests, and encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

c.    To the extent the consideration to be received under the Asset Purchase Agreement exceeds the value of all liens, claims, rights, interests, and encumbrances in the Purchased Assets, section 363(f)(3) is satisfied.

d.    Section 363(f)(5) is satisfied because, among other things, under applicable state law, the holders of liens, claims, rights, interests, and

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                 **Excavating and Construction, Inc., (II) Approving Settlement with**
                 **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                 **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                 **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                 **and Unexpired Leases**

encumbrances could be compelled in a legal or equitable proceeding to

accept money satisfactions of their interests.

15.    All persons and entities that are presently, or on the Closing Date may be,

in possession of some or all of the Purchased Assets are hereby directed at such person's

or entity's sole expense, to surrender possession of the Purchased Assets prior to the

Closing Date, or as otherwise directed by the Buyer and in accordance with the Asset

Purchase Agreement.

16.    Except for the Assumed Liabilities as defined in section 1.03 of the Asset

Purchase Agreement, the consummation of the transactions contemplated by the Asset

Purchase Agreement, including, without limitation, the transfers of the Purchased Assets,

the execution of the Subcontracts, and the assumption and assignment of the Assigned

Equipment Loans, shall not subject the Buyer or their respective affiliates, successors, and

assigns to any liability or responsibility for any liability or other obligation of the Debtor

or the Debtor's estate arising prior to the Closing Date, including, without limitation,

liabilities arising, accruing, or payable under, out of, in connection with, or in any way

relating to the Purchased Assets, the Non-Bonded Projects, the Assigned Equipment Loans,

or other assets, operations, activities, or businesses of the Debtor, except that (i) Buyer

shall be responsible for payment to Manasquan Bank of the Manasquan Settlement Amount

on the Closing Date, and (ii) subject to the procedures set forth in the following paragraph

in the event of a disputed cure amount with respect to any of the Assigned Equipment

Loans, Buyer shall cure any outstanding balances due on any of the Assigned Equipment

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
                     Excavating and Construction, Inc., (II) Approving Settlement with
                     Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
                     into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
                     Authorizing the Debtor to Assume and Assign Certain Executory Contracts
                     and Unexpired Leases**

Loans prior to the assumption and assignment of any such Assigned Equipment Loan to

the Buyer, and the Buyer shall thereafter be responsible for all ongoing and future

obligations arising under any of the Assigned Equipment Loans.

17.    In the event of a disputed cure amount (a "Cure Dispute") with respect to

any of the Assigned Equipment Loans, Buyer shall pay any undisputed portion to the

respective counterparty and place in escrow the amount in dispute subject to further

discussions between Buyer and the counterparty to resolve the dispute.  An Assigned

Equipment Loan subject to a Cure Dispute under this paragraph may still be assumed and

assigned to Buyer on the Closing Date notwithstanding the pending Cure Dispute.  In the

event that Buyer and the counterparty to an Assigned Equipment Loan subject to a Cure

Dispute are unable to mutually resolve the Cure Dispute, either party may make a request

to the Court in writing and on notice to the other party that the Court hold a hearing to

address the Cure Dispute.

18.    Buyer shall pay Komatsu Financial Limited Partnership ("Komatsu") a cure

payment of $7,774.74 in connection with the Debtor's assumption and assignment to the

Buyer of an Assigned Equipment Loan by and between Debtor and Komatsu, pursuant to

which Komatsu maintains a perfected, first-priority security interest in and lien on one (1)

2021 Komatsu PC138USLC-11 Hydraulic Excavator (S/N 59033), together with a 36"

HDP Bucket, Set Bucket Pins for Coupler, MPLR4 Hydraulic Coupler with Pins and Kit,

and such payment shall cure any and all amounts due or asserted to be due from the Debtor

to Komatsu under such Assigned Equipment Loan as of the Closing Date.

DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

19.     The Debtor is authorized to assume and assign to Buyer certain material supply contracts (the "Ralph Clayton Contracts") between the Debtor and Ralph Clayton & Sons, Inc. ("Ralph Clayton"), and in connection therewith, Buyer shall pay a cure payment of $100,000 to Ralph Clayton (the "Ralph Clayton Cure Payment"), and such payment shall cure any and all amounts due or asserted to be due from the Debtor to Ralph Clayton under the Ralph Clayton Contracts as of the Closing Date.  The Ralph Clayton Cure Payment shall be due within five (5) days from when Buyer receives the first payment from the respective general contractor or respective project owner, as the case may be.

20.     The Debtor is authorized to assume and assign to Buyer a certain material supply contract (the "PJ Concrete Contract") between the Debtor and Pennsylvania Jersey Concrete Products, Inc. ("PJ Concrete"), and in connection therewith, Buyer shall pay a cure payment of $76,955.64 to PJ Concrete (the "PJ Concrete Cure Payment"), and such payment shall cure any and all amounts due or asserted to be due from the Debtor to PJ Concrete under the PJ Concrete Contract as of the Closing Date.  The PJ Concrete Cure Payment shall be due the earlier of five (5) days from when Buyer receives any payment from the general contracted on the applicable project (regardless of the amount paid by the general contractor), or October 5, 2022.  In the event Buyer fails to timely make payment by the deadlines set forth herein, PJ Concrete may file a proof of claim in the Subchapter V Case for the full balance it asserts to be owed of $222,190.04.

21.     The Debtor is authorized to assume and assign to Buyer certain material supply contracts on certain of the Non-Bonded Projects (as such term is defined in

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                     **Excavating and Construction, Inc., (II) Approving Settlement with**
                     **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                     **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                     **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                     **and Unexpired Leases**

Schedule 1.01(a) of the Asset Purchase Agreement) (collectively, the "JM Ahle Contracts")

between the Debtor and J.M. Ahle Co., Inc. ("JM Ahle"), and in connection therewith,

Buyer shall pay a cure payment of $49,845.51 to JM Ahle (the "JM Ahle Cure Payment"),

and such payment shall cure any and all amounts due or asserted to be due from the Debtor

to JM Ahle under the JM Ahle Contracts as of the Closing Date.  The JM Ahle Cure

Payment shall be due within five (5) days from when Buyer receives the first payment from

the respective general contractor or respective project owner, as the case may be. This JM

Ahle Cure Payment does not affect any of JM Ahle's rights, contracts, or claims relating to

certain contracts with Debtor on any of the bonded projects.

22.     Notwithstanding anything herein or the Asset Purchase Agreement to the

contrary, in resolution of the objection of AmeriCredit Financial Services , Inc., d/b/a GM

Financial ("GM Financial") to the Motion, titles for any of the Debtor's vehicles subject to

equipment financing loans with GM Financial shall not be transferred to Buyer in

connection with the Sale until Buyer has either (i) agreed to execute new loan terms with

GM Financial or, (ii) Buyer pays any outstanding amounts due on such loans or any other

amount agreed to between Buyer and GM Financial, and such payment or payments has or

have cleared.

23.     To the extent that the consideration described in Section 1.06(e) of the Asset

Purchase Price is payable, Buyer is authorized to pay such amounts directly to the Debtor's

Subchapter V Case professionals which shall be deposited in KCP Advisory Group LLC's

bank account with Bank of America.

DEBTOR:              Assuncao Brothers Inc.
CASE NO:             22-16159-CMG
CAPTION:             **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                     **Excavating and Construction, Inc., (II) Approving Settlement with**
                     **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                     **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                     **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                     **and Unexpired Leases**

24.    Beginning with the close of the first full quarter after the Closing Date, the
Buyer shall deliver to the Debtor and NGM quarterly reports no later than 30 days after
close of each quarter regarding revenue and expenses relating to the Non-Bonded Projects.
In addition, the Buyer will provide the Debtor or NGM with responses to reasonable
requests for information regarding the status of Debtor's claims against Schiavone

25.    To the greatest extent available under applicable law, the Buyer shall be
authorized, as of the Closing Date, to operate under any transferred license, permit,
registration and governmental authorization or approval of the Debtor with respect to the
Purchased Assets, and all such licenses, permits, registrations and governmental
authorizations and approvals are deemed to have been, and hereby are, directed to be
transferred to the Buyer as of the Closing Date.

26.    Consummation of the Asset Purchase Agreement does not effect a de facto
merger of the Debtor and the Buyer, nor does it result in the continuation of the Debtor's
businesses under the Buyer's control.  Except to the extent the Buyer assumes the Assumed
Liabilities pursuant to the Asset Purchase Agreement, the Buyer shall not be deemed a
"successor" or alter-ego of the Debtor or the Debtor's estate by reason of any theory of law
or equity, and except as expressly provided in the Asset Purchase Agreement or this Order,
the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any
liability or obligation of the Debtor and/or the Debtor's estate including, but not limited to,
any bulk sales law, successor liability, liability or responsibility for any liens, claims,
rights, interests, or encumbrances against the Debtor or against an insider of the Debtor, or

Page 30 of 34

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

similar liability except as otherwise expressly provided in the Asset Purchase Agreement, provided that Buyer provides payment to Manasquan Bank of the Manasquan Settlement Amount on the Closing Date.

27.     As of the Closing Date, the Buyer shall have any and all rights, claims, defenses, and offsets held by the Debtor or the Debtor's estate with respect to the Assumed Liabilities under the Asset Purchase Agreement.

28.     Any provision in any of the Assigned Equipment Loans purporting in any way to restrict, condition, or prohibit the Debtor's ability to assume and assign such contract or lease to the Buyer or to impose any similar restraints on alienation is unenforceable and no such provision shall prevent or in any way impair the Debtor's ability to assume and assign such Assigned Equipment Loans to the Buyer or interfere with the Buyer's enjoyment of the Debtor's rights thereunder following such assignments.

29.     Subject to the terms of the Manasquan Settlement and the Asset Purchase Agreement, all requirements and conditions under sections 363 and 365 of the Bankruptcy Code are satisfied.  The Debtor is authorized to assume and assign to the Buyer the Assigned Equipment Loans pursuant to and in accordance with sections 105 and 365 of the Bankruptcy Code without further application to or order of the Court, and upon the Closing (as defined in section 2.01 of the Asset Purchase Agreement), the Assigned Equipment Loans shall be assumed by the Debtor and assigned to and vested in the Buyer.  Such assignments shall be free and clear of all liens, claims, rights, interests, and encumbrances, except for the Assumed Liabilities set forth in section 1.03 of the Asset Purchase

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement with Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases**

Agreement, with all such liens, claims, rights, interests, and encumbrances deemed unconditionally released, terminated, and discharged and, following assignment, the Buyer shall be fully and irrevocable vested with all such assigned executory contracts and unexpired leases. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of an executory contract and unexpired lease assigned to the Buyer pursuant to this Order and the Asset Purchase Agreement occurring after the effective date of the applicable assignment.

30.     The counterparties to any of the Assigned Equipment Loans assigned to the Buyer pursuant to this Order and the Asset Purchase Agreement shall be obligated to perform under their respective lease or contract, subject to the terms thereof. Any provision in any executory contract or unexpired lease assumed and assigned to the Buyer pursuant to this Order and the Asset Purchase Agreement that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtor is unenforceable, and all such assumed and assigned executory contracts and unexpired leases shall remain in full force and effect, subject only to payment of the appropriate cure amount, if any. No sections or provisions of any executory contract or unexpired lease assumed and assigned to the Buyer pursuant to this Order and the Asset Purchase Agreement that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, charges or any other fees charged to the Buyer or the Debtor as a result of the assumption and the assignment of any such executory contract or unexpired lease shall not have any force and effect with respect to the transactions contemplated by

DEBTOR:             Assuncao Brothers Inc.
CASE NO:            22-16159-CMG
CAPTION:            **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
Excavating and Construction, Inc., (II) Approving Settlement with
Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
Authorizing the Debtor to Assume and Assign Certain Executory Contracts
and Unexpired Leases**

the Asset Purchase Agreement and as authorized by this Order, and such provisions

constitute unenforceable anti-assignment provisions under Section 363(f) of the

Bankruptcy Code. The Buyer shall not be required, pursuant to section 365(l) of the

Bankruptcy Code or otherwise, to provide any additional deposit or security with respect

to any assumed and assigned executory contract or unexpired lease to the extent not

previously provided by the Sellers.

31.     The Buyer has satisfied all requirements under sections 365(b)(1) and (f)(2)

of the Bankruptcy Code to provide adequate assurance of future performance under the

Assigned Equipment Loans to be assumed and assigned to the Buyer.

32.     The Asset Purchase Agreement may not be modified, amended, or

supplemented by the parties thereto without further order of the Court, provided that

Manasquan Bank has consented to any such modification, amendment, or supplement, and

that it is either (a) not material or (b) not less favorable to the Debtor than existing

applicable provisions.

33.     This Court shall retain exclusive jurisdiction to (a) enforce this Order, the

Asset Purchase Agreement, any and all amendments or modifications to any of the

foregoing, and any and all waivers or consents under or in connection with any of the

foregoing, (b) compel delivery of the Purchased Assets to the Buyer, payment of the

Manasquan Settlement Amount to Manasquan Bank, and assignment of the Assigned

Equipment Loans, (c) resolve any disputes arising under or relating to this Order or the

Asset Purchase Agreement, (d) enjoin and adjudicate the assertion of any lien, claim, right,

Page 33 of 34
DEBTOR:            Assuncao Brothers Inc.
CASE NO:          22-16159-CMG
CAPTION:          **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers**
                  **Excavating and Construction, Inc., (II) Approving Settlement with**
                  **Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter**
                  **into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)**
                  **Authorizing the Debtor to Assume and Assign Certain Executory Contracts**
                  **and Unexpired Leases**

interest, or encumbrance against or in respect of the Buyer, or any assignee of the Buyer, the Purchased Assets, or any of the Assigned Equipment Loans, and (e) otherwise interpret, implement, and enforce the provisions of this Order and the Asset Purchase Agreement.

34.    Unless otherwise expressly agreed by the Buyer or Manasquan Bank in writing, nothing contained in any subsequent order of this Court or in any plan of reorganization or liquidation confirmed in this Subchapter V Case shall alter, conflict with, or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

35.    The Buyer is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code, including, without limitation, the transfer of the Purchased Assets and the assignment of executory contracts and unexpired leases in connection therewith, as provided in this Order and the Asset Purchase Agreement.

36.    The failure to include specifically any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.

37.    The terms of this Order and the Asset Purchase Agreement shall in all respects be binding upon and enforceable against all persons and entities, including, without limitation, the Debtor and the Debtor's estate, any and all trustees thereof, any committees appointed in the Debtor's bankruptcy proceedings, all creditors of the Debtor, and all other parties in interest and their respective successors and assigns, including but

DEBTOR:          Assuncao Brothers Inc.
CASE NO:         22-16159-CMG
CAPTION:         **Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers
Excavating and Construction, Inc., (II) Approving Settlement with
Manasquan Bank as Secured Lender, (III) Authorizing the Debtor to Enter
into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV)
Authorizing the Debtor to Assume and Assign Certain Executory Contracts
and Unexpired Leases**

not limited to any creditor asserting any lien, claim, right, interest, or encumbrance against any of the Purchased Assets.

38.     This Order shall be effective immediately upon entry and any stay of execution pursuant to Bankruptcy Rules 6004(h) or 6006(d) is hereby waived.

39.     No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Asset Purchase Agreement or this Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtor relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtor.

40.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of this Subchapter V Case, or the consummation of the transaction contemplated by the Asset Purchase Agreement.

41.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its rights or remedies under or in connection with the Asset Purchase Agreement.

135951287

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of August 3, 2022, is entered into between Assuncao Bros., Inc., a New Jersey company ("**Seller**"), and Vollers Excavating and Construction, Inc., New Jersey company ("**Buyer**").

WHEREAS, Seller is engaged in, among other things, the business of site work contracting and construction and providing related services (the "**Business**");

WHEREAS, on August 3, 2022, ("**Petition Date**") Seller filed a voluntary petition under Chapter 11 of title 11, United States Code ("**Bankruptcy Code**") thereby commencing its bankruptcy case (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the District of New Jersey ("**Bankruptcy Court")** bearing case No 22-16159-CMG;

WHEREAS, Buyer desires to purchase from Seller in a sale transaction to be approved by the Bankruptcy Court under applicable provisions of the Bankruptcy Code, as proposed in *Debtor's Motion For Entry of Order (i) Authorizing The Sale of Certain of The Debtor's Assets To Vollers Excavating And Construction, Inc., (ii) Approving Settlement, (iii) Authorizing Debtor To Enter Into Subcontracts With Vollers For Certain Non-Bonded Projects, And (iv) Authorizing The Debtor To Assume And Assign Certain Executory Contracts And Unexpired Leases* (the "**Sale Motion**") and the proposed order filed therewith (the "**Sale Order**") filed by Seller in its Bankruptcy Case, and Seller desires to sell to Buyer, substantially all of the assets of Seller used in the Business, subject to the terms and conditions of this Agreement and the Sale Order;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### PURCHASE AND SALE

**Section 1.01.  Purchase and Sale of Assets.**  Subject to the other terms and conditions of this Agreement and the Sale Order, at the Closing (as defined below), Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all liens, encumbrances and security interests of any kind (collectively, "**Encumbrances**") other than Permitted Exceptions as set forth in Schedule 1.01, and Buyer shall purchase and accept from Seller, all of Seller's right, title and interest in and to all assets of every kind, character or description, whether real, personal or mixed, tangible or intangible (other than the Excluded Assets as defined herein), owned, leased or licensed by Seller on the Closing Date that are held for use or used in the Business (collectively, the "**Purchased Assets**"), including but not limited to:

(a)    the inventory related to the Business as of the close of business on the date immediately preceding the Closing Date for the construction projects set forth Schedule 1.01(a) (**"Non-Bonded Projects"**) hereto;

(b)     the equipment, tooling, furniture, fixtures, motor vehicles, computer hardware and other data processing equipment, supplies, prepaid expenses and other tangible personal property of Seller related to the Business, including that set forth in Schedule 1.01(b) hereto;

(c)     All accounts receivable and rights to payment including retainage arising out of or relating to the provision of services by Seller or the sale of goods by Seller at any time prior to the close of business on the date immediately preceding the Closing Date (as defined below) on the Non-Bonded Projects, regardless of whether invoiced by Seller before, on or after the Closing Date (collectively, the "**Non-Bonded Accounts Receivable**"); All Seller's rights to payment for all work to be performed under the Non-Bonded Projects after Closing Date;

(d)     except as otherwise provided in this Agreement, any claims, rights, rights of credits, causes of action and rights of set-off of Seller (whether known or unknown, contingent or otherwise) against any third-party related to the Purchased Assets, contractual or otherwise, accruing or arising prior to the Closing; and

(e)     All Seller's right to assert any claim including, but not limited to, any claim under Chapter 5 of the Bankruptcy Code against Martin and Lisa Assuncao.

**Section 1.02.  Excluded Assets**.    Notwithstanding anything herein to the contrary, the following assets of the Seller are excluded from the Purchased Assets and shall be retained by the Seller (the "Excluded Assets"):

(a)     all accounts receivable and rights to payment including retainage arising out of or relating to the provision of services by Seller or the sale of goods by Seller at any time prior to the close of business on the date immediately preceding the Closing Date (as defined below) on the projects set forth in Schedule 1.02(b) (**"Bonded and Rejected Non-Bonded Projects"**), regardless of whether invoiced by Seller before, on or after the Closing Date (collectively, the "**Bonded and Rejected Non-Bonded Accounts Receivable**");

(b)     Seller's cash, cash equivalents, bank deposits or similar cash items as of the Closing Date from Bonded and Rejected Non-Bonded Accounts Receivable;

(c)     all rights to any Employee Retention Credit with the United States Internal Revenue Service relating to the operation of the Business prior to the Closing Date;

(d)     Seller's certificate of formation, corporate formation and other governing documents, taxpayer and other identification numbers and other documents relating to the organization, maintenance and existence of Seller as a business entity; and

(e)     any real property (together with all buildings and other improvements located thereon and all appurtenances thereto) owned by Seller.

**Section 1.03.  Assumption of Liabilities.**  Subject to the other terms and conditions of this Agreement, at the Closing, Buyer will not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or

hereinafter created, except Buyer shall assume only the following liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(a)　Year to date accrued paid time off ("**PTO**") including holiday, vacation, sick leave and similar time accrued by Seller's non-union employees that are hired by the Buyer as of the Closing Date;

(b)　The principal amount of Seller's outstanding health and welfare obligations to unions but only with respect to sums due and owing by Sellers as of the Closing Date on Non-Bonded Projects; provided, however, if a Non-Bonded Project owner objects or refuses to permit Buyer to complete Seller's obligations under the applicable Non-Bonded Project pursuant to the Buyer Subcontracts (as defined below) or Buyer decides, in its sole discretion, not to enter into Buyer Subcontract, Seller shall not assume any outstanding health and welfare obligations to unions related for such Non-Bonded Projects and shall not pay any penalties, interest or other charges related to Seller's unpaid union benefits;

(c)　All Seller's obligations to repay the Debtor-in-Possession financing approved by the Bankruptcy Court to permit the Seller to continue to perform work on the Non-Bonded Projects between the Petition Date and the Closing Date ("**DIP Loan**"); and

(d)　The Seller's obligations under the equipment and vehicle financing agreements and/or loan documents as set forth on Schedule 1.03(d) hereof.

**Section 1.04. Excluded Liabilities**.  Notwithstanding anything herein to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming and shall not become liable for the payment or performance of any other Liability of the Seller (collectively, the "Excluded Liabilities").  The Excluded Liabilities are and shall remain Liabilities of the Seller.  Without limiting the generality of the foregoing, the term "Excluded Liabilities" includes any Liability:

(a)that is not arising out of or related to Seller, the Business or the Purchased Assets;

(b)pertaining to any Excluded Asset or the ownership, operation, use, or benefit thereof, including, for the avoidance of doubt, any liability with respect to those contracts and permits which constitute Excluded Assets;

(c)of Seller to any governmental entity arising from any violations of law as a result of any conduct of such Seller;

(d)relating from Seller's negligence, product liability, workers compensation, employment discrimination and employment-related liabilities, business or other contractual disputes or general liability claims for acts or failures to act (including all related reserves recorded on the Seller's financial statements);

(e)arising as a result of any violation of law or default by any Seller under any employee benefit plan, collective bargaining agreement or any contract related thereto and all liabilities arising as a result of any violations of law or default of Seller under any employee benefit plan;

(f)for claims asserting breach of contract, tort, infringement, or other violation of law whether pre- or post-Closing Date, in each case, of any kind or nature whatsoever and whether related to the Purchased Assets or the Business or otherwise and regardless of when commenced, including, without limitation, with respect to any lease to which the Seller is party;

(g)arising in connection with the employment by Seller, or the termination of any employment by Seller, of any persons, whether as full-time employees, part-time employees, consultants or temporary workers, and including liabilities for compensation, claims for workers' compensation or OSHA, or claims or other grievances by employees asserting wrongful termination, breach of contract, tort, or other violation of law by Seller or any of its affiliates arising from any fact, event or circumstance whether pre or post-Closing Date;

(h)constituting indebtedness (other than any Assumed Liabilities);

(i)under any contracts for any contractual obligations of Seller including but not limited to, any subcontract or supplier agreement related to any Non-Bonded Project incurred prior to the Petition Date, guarantees, warranties, non-disclosure agreements, confidentiality agreements, or non-solicitation agreements, or non-competition agreements;

(j)for taxes, including payroll taxes, if any, and any bulk sales liabilities;

(k)notwithstanding anything to the contrary and unless otherwise expressly assumed by Buyer hereunder, any and all obligation to repay, refund or otherwise return any funds or any liability for Taxes or any other Liability, in each case, in connection with any relief program or Coronavirus legislation, whether pertaining to, or accruing or arising during, the pre-Closing or post-Closing period;

(l)all severance and post-termination obligations and other employment-related liabilities with regard to any employee who does not become an employee of Buyer, and all liabilities arising out of any non-wage or benefit liabilities related to employment (or the termination of employment including claims related to disputes or litigation), employee benefits or other employment-related liabilities other than as set forth in Section 1.03(b);

(m)relating to any Seller 401(k) plan;

(n)relating to a breach of any certification, representation or non-compliance with any covenant made by Seller with respect to or relating to obtaining any funds from any federal or state government during the COVID-19 pandemic, including, without limitation, pursuant to any relief program; or

(o)for transaction expenses incurred by Seller, including commissions, fees or other compensation to brokers or investment bankers arising out of this Agreement.

**Section 1.05**.  **Risk of Loss**.  Seller shall bear the risk of loss of, and all obligations to insure, the Business and the property of any third parties in the possession, custody or control of Seller or for which Seller is responsible, prior to the Closing Date, and such risk of loss and obligation to insure with respect to the Purchased Assets shall transfer from Seller to Buyer at the Effective Time on the Closing Date.

**Section 1.06**. **Consideration**. The aggregate purchase price ("Purchase Price") consideration for the Purchased Assets shall equal the following:

(a) Nine Hundred Seventy-Five Thousand Dollars ($975,000.00), plus

(b) The assumption by Buyer of the Assumed Liabilities; plus

(c) An amount equal to the gross amount Buyer receives from all the owners on the Non-Bonded Projects including, but not limited to, Non-Bonded Accounts Receivable less Buyer's costs to complete all Seller's remaining obligations under the Non-Bonded Projects including, but not limited to, Buyer's payment of Seller's union obligations and the amount Buyer assumes pursuant to the DIP Loan, less Buyer's overhead allocation equal to 15% of Buyer's costs to complete the Non-Bonded Projects multiplied by 15% (for example, if the amount under this formula equals $100,000, then the Debtor's estate would be entitled to $15,000 and the Buyer would be entitled to $85,000); plus

(d) Buyer's agreement to complete the Seller's remaining obligations under the Non-Bonded Projects.

(e) Seventy-Five Thousand Dollars ($75,000.00), payable to the Seller's Bankruptcy Case professionals, when Buyer has collected such amounts with respect to the Non-Bonded Accounts Receivable that are equal to the amount of liabilities described in Section 1.03(b) and (c) such that they are repaid in full.

**Section 1.07**. **Purchase Price Allocation**.  The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets in the sole discretion of the Buyer.

**Section 1.08**. **Pro-Rations**. At Closing, the Parties shall pro-rate personal property lease payments, and personal property taxes and other assessments, and all other items of income and expense that are normally pro-rated upon a sale of assets of a going concern, if any.

**ARTICLE II**
**CLOSING**

**Section 2.01.  Closing.**  Subject to entry of the Sale Order, and the other terms and conditions of this Agreement, the closing of the purchase and sale of the Purchased Assets and the other transactions contemplated by this Agreement and the Sale Order (the "**Closing**") shall take place on the effective date which shall be the date that the Sale Order becomes final and non-appealable (the "**Closing Date**") at the offices of Buyer; provided, however, that the Closing may occur through the delivery of executed documents by facsimile or by email transmission of scanned copies, in each case to be held in escrow pending authorization of their release by the parties, and the physical attendance of the parties at the Closing shall not be required.  The Closing shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 2.02.  Closing Deliveries.**

(a)     At the Closing, Seller shall deliver to Buyer the following:

5

    (i)  a Bill of Sale and Assignment and Assumption Agreement in the form attached as **Exhibit A** hereto (the "**Bill of Sale**") executed by Seller, under which Seller transfers to Buyer all of the Purchased Assets (free and clear of all Encumbrances other than Permitted Encumbrances) and Assumed Liabilities;

    (ii)  with respect to any Purchased Assets that are motor vehicles, trailers or other equipment for which ownership is evidenced by a certificate of title, the certificates of title evidencing Seller as the owner of such Purchased Assets, free and clear of all Encumbrances, and properly endorsed for transfer to Buyer;

    (iii)  a certificate executed by an executive officer of Seller certifying (A) that attached thereto are the resolutions of the directors of Seller's ultimate parent entity, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the documents to be delivered hereunder and the transactions contemplated hereby, and (B) as to the names and signatures of the executive officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder;

    (iv)  a certificate of the New Jersey Secretary of State as to the existence of Seller and the good standing of Seller, each dated not more than five (5) days prior to the Closing Date;

    (v)  to the extent Seller received any relief program funds to which it is not entitled to retain including second round Payroll Protection Program funding, Seller shall have repaid or refunded all such funds and provided evidence of such payments or forgiveness;

    (vi)  written evidence that Seller is not a "foreign person" under the Foreign Investment in Real Property Tax Act of 1980 ("**FIRPTA**");

    (vii)  Subcontracts for the Non-Bonded Contracts in a form attached hereto as **Exhibit B** ("**Subcontracts**");[1]

    (viii)  A final non-appealable Sale Order issued by the United States Bankruptcy Court for the District of New Jersey authorizing the transactions contemplated by this Agreement free and clear of all liens, claims and encumbrances;

    (ix)  Any consent required by the owners of the Non-Bonded Projects related to the Subcontracts contemplated pursuant to this Agreement; and

    (x)  such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

  (b)  At the Closing, Buyer shall deliver the following:

    (i)  the Purchase Price to Manasquan Bank, as set forth in the Sale Order;

---

[1] Parties to sign form of subcontract, whether individual or master for all Non-Bonded Projects.

(ii)     to Seller, a counterpart of the Bill of Sale, executed by Buyer, under which Buyer accepts from Seller the Purchased Assets (subject to Permitted Encumbrances) and assumes and agrees to perform the Assumed Liabilities;

(iii)    to Seller, a certificate executed by an executive officer of Buyer certifying (A) that attached thereto are the resolutions of the directors of Buyer's ultimate parent entity, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the documents to be delivered hereunder and the transactions contemplated hereby, and (B) as to the names and signatures of the executive officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder;

(iv)    to Seller, a certificate of the New Jersey Secretary of State as to the existence and good standing of Buyer, dated not more than 5 days prior to the Closing Date;

(v)     to Seller, such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement; and

(vi)    Countersigned Subcontracts.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this **Article III** are true and correct on and as of the Closing Date.  For purposes of this **Article III**, "Seller's Knowledge," "knowledge of Seller" and any similar phrases shall mean the actual knowledge of Martin Assuncao, any other Person or Persons with management or operational knowledge over the item or matter to which the definition of "Seller's knowledge," "knowledge of Seller" and similar phrases as used herein, corresponds, and in all cases after due inquiry and reasonable investigation.

**Section 3.01.  Organization and Authority; Enforceability.**  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey. The respective shareholders of Seller are listed on Schedule 3.01.  Seller has full corporate power and authority to enter into this Agreement and the documents to be delivered by it hereunder, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered by it hereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and the documents to be delivered by Seller hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and the documents to be delivered by Seller hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**Section 3.02.  No Conflicts.**  The execution, delivery and performance by Seller of this Agreement and the other documents to be delivered by it hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the certificate of formation or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller; (c) require any approval or permit of, or filing or registration with, other action by, any governmental entity other than approval from the Bankruptcy Court; or (d) will not conflict in any material respect with or result in any violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation or acceleration of any obligation, lien or loss of a benefit under, or permit the acceleration of any obligation or result in the creation of any Encumbrance (other than a Permitted Exception) upon the Purchased Assets under any contract, any law applicable to the Business or any of the Purchased Assets. Schedule 3.02 contains a list of all permits and licenses required to operate the Business.

**Section 3.03.  Title to Purchased Assets.**  Seller owns and has good and marketable title to the Purchased Assets, which shall be free and clear of all Encumbrances other than Permitted Encumbrances following the release by Manasquan Bank of its liens upon its receipt of the Purchase Price on the Closing Date, pursuant to the Sale Order.  Upon the consummation of the Closing pursuant to this Agreement and the Sale Order, Buyer will own and have good title to the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances.

**Section 3.04.  Legal Proceedings.**  There is no claim, action, suit, proceeding, governmental investigation, injunction or order (each, an "**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller or any member or Affiliate of Seller(a) relating to or affecting the Purchased Assets or the Business; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the conduct of any portion of the Business or the transactions contemplated by this Agreement.  Attached is Schedule 3.04 with known pending Actions against the Seller

**Section 3.05.  Insurance**.  Schedule 3.05 lists all insurance policies maintained by Seller as of the date of this Agreement covering the ownership and operation of the Business, Except as described on Schedule 3.05, all of such policies are now and will be until the completion of the Owner's Contracts remain in full force and effect.  Seller has not received notice of default under any such policy or notice of any pending or threatened termination or cancellation, coverage limitation or reduction or material premium increase with respect to any such policy.

**Section 3.06.  Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.07**.  Schedule 1.01(a) sets forth an accurate account of the adjusted contract balance including any approve changes order, the amount billed to date, the amount collected by Seller to date, the amount of any disputed change orders, and the amount of any claimed or threatened back-charges by any owner on the Non-Bonded Projects as of the Closing Date.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct on and as of the Closing Date.  For purposes of this **Article IV**, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual knowledge of any executive officer of Buyer.

**Section 4.01.   Organization and Authority; Enforceability.**  Buyer is a New Jersey company duly organized, validly existing and in good standing under the laws of the State of New Jersey. Buyer has full power and authority to enter into this Agreement and the other documents to be delivered by it hereunder, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and the other documents to be delivered by it hereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the other documents to be delivered by Buyer hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and the other documents to be delivered by Buyer hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency or similar laws affecting creditors' rights and remedies generally and to the effect of general principles of equity.

**Section 4.02.   No Conflicts.**  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the certificate of formation, the limited liability company agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.

**Section 4.03.   Legal Proceedings.** There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.04.   Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

# ARTICLE V
## ADDITIONAL COVENANTS

**Section 5.01.   Access to Information and Employees**.  Between the date of this Agreement and the Closing Date, Seller shall provide Buyer (i) access, during normal business

hours and upon reasonable prior notice, to and the right to inspect, the books and records, litigation materials and other documents and information relating to the Business, the Purchased Assets, and the Assumed Liabilities; (ii) access, during normal business hours and upon reasonable prior notice, to the Seller's employees and shall furnish Buyer and its Representatives with such additional financial and operating data and other information of the Seller in their possession, custody or control relating to the Business, the Purchased Assets, and the Assumed Liabilities as Buyer or its Representatives may from time-to-time reasonably request; and (iii) with contact information and introductions and facilitate in any discussions at Buyer's request, with vendors and customers of the Business with respect to the Purchased Assets and Assumed Liabilities.

**Section 5.02. Operations**. From the date hereof until the Closing Date, the Seller shall, with respect to the Business (unless prior written consent of Buyer is received, which consent shall not be unreasonably withheld, conditioned or delayed):

(a)    carry on the Business in substantially the same manner as it has heretofore and not make any material change in personnel, operations, finance or accounting policies (unless required under GAAP) of the Purchased Assets;

(b)    maintain the Purchased Assets, and all parts thereof, in good working order and condition as currently operated;

(c)    perform its obligations under Non-Bonded Projects consistent with its ordinary course of business;

(d)    keep in full force and effect present insurance policies on the Business or if a policy is canceled or terminated in the ordinary course of Business, it will be concurrently replaced with a policy or arrangement with comparable similar coverage, with no gap in coverage, as such coverage existed as of the date hereof;

(e)    (i) maintain and preserve the business organization with respect to the Non- Bonded Projects and the Purchased Assets intact, and (ii) use commercially reasonable efforts to retain present Employees of the Business and maintain its relationships with suppliers, customers and others having business relations with the Business;

(f)    permit and allow reasonable access by Buyer to make offers of post-Closing employment to any of the Seller's personnel related to the Business;

(g)    timely file or cause to be filed all reports, notices and tax returns relating to the Business required to be filed with any governmental entity, pay all required taxes as they come due;

(h)    comply in all material respects with all laws (including Environmental Laws) applicable to the conduct of the Business;

(i)    maintain all material approvals, permits and environmental permits relating to the Business and Assumed Liabilities in good standing;

(j)       notify Buyer within two (2) Business Days of any materially adverse change to the condition of the Business, or to the business or operations thereof, including any material adverse development; and

(k)      afford Buyer and its Affiliates an opportunity to provide to Seller input with respect to other significant or material matters pertaining to the Business.

**Section 5.04.  Bankruptcy Court Approval**.  Seller shall promptly apply for and use commercially reasonable efforts to obtain approval of the Sale Order, the form and content of which shall be acceptable to Buyer. If the Sale Order and entry into the Agreement is not approved by the Bankruptcy Court, then the Agreement shall be null and void.

**Section 5.05.  Employee Matters**.

(a)      At Closing, Buyer shall offer employment to each non-union employee of Seller on such terms (including salary and employee benefits) that are, in each case, no less favorable to such employee than the terms on which such employee was employed with Seller immediately prior to Closing. All employees who accept such offer of employment must: (i) have maintained, in good standing, all required prerequisites associated with their positions, and (ii) pass Buyer's reasonable (or as mandated by applicable Law) drug and background check requirements as determined by Buyer in its sole discretion and shall hereinafter be referred to as the "Transferred Employees" and will be hired by Buyer as of the Closing Date.

(b)      Buyer will not assume, before, on or after the Closing Date, any Seller employee benefit plan, or any rights, duties, obligations or liabilities thereunder, nor shall it become a successor employer or be responsible in any way for Seller or a controlled group member's participation in or obligations or responsibilities with respect to any Seller plan.

(c)      On and after the Closing Date, Seller shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA any similar law, including comparable state law ("COBRA"), or otherwise provided by Seller prior to the Closing Date to all employees and former employees of the Seller who are not Transferred Employees (and other "qualified beneficiaries," as defined under Section 607(3) of ERISA, under COBRA with respect to such employees) who have or have had a COBRA or other qualifying event (due to termination of employment with Seller or otherwise) prior to or as a result of the Closing.

(d)      Subject to this Article 5, nothing contained in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee.  No provision of this Agreement shall create any third party beneficiary or other rights in any party, including, without limitation, any current or former employee (including any beneficiary or dependent thereof) of Seller in respect, as applicable, of continued employment (or resumed employment) with either the Business or Buyer, and no provision of this Agreement will create any such rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Seller plan or any plan or arrangement which may be established or maintained by Buyer.  No

11

provision of this Agreement will constitute a limitation on rights to amend, modify or terminate any Seller plan, or on the right of Buyer to amend, modify or terminate any Buyer employee benefit plan.

(e)     As a condition to Buyer's obligation to Close, the senior employees of the Seller to be identified by Buyer no later than ten (10) days prior to Closing (the "Key Employees") shall continue their employment with Buyer and execute a ratification, amendment or new employment agreement with Buyer in the sole discretion of Buyer on or prior to the Closing Date.

**Section 5.06.  Accounts Receivable**.

(a)     From and after the Closing Date, Buyer shall use commercially reasonable efforts to assist Seller with invoicing and collecting the Non-Bonded Accounts Receivable, including without limitation providing to Seller such information as Seller may reasonably require (to the extent such information is in Buyer's possession or control) with respect thereto and assisting Seller in submitting to customers (including via Buyer's employees' email addresses) invoices, reminders and other communications relating to such Non-Bonded Accounts Receivable.

(b)     If, after the Closing, Buyer receives any funds, proceeds, payments or receipts that are attributable to Bonded and Rejected Non-Bonded Accounts Receivable, then Buyer shall remit or cause to be remitted any of the foregoing to Seller within three (3) business days after receipt.

(c)     If, after the Closing, Seller receives any funds, proceeds, payments or receipts that are attributable to Non-Bonded Accounts Receivable, then Seller shall remit or cause to be remitted any of the foregoing to Buyer within three (3) business days after receipt.

**Section 5.07. Further Assurances.**  Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

**Section 5.08.  Seller Release of Buyer**.  On the Closing Date, Seller for itself, and its past and present owners, governing bodies, trustees, directors, officers, members, agents, successors (by merger or otherwise), predecessors, assignees, assignors, affiliates, related entities, corporate parents, subsidiaries, employees, insurers, attorneys, shareholders, partners, and representatives of any and all kinds (each a "Seller Releasor," and, collectively, the "Seller Releasors") agree to unconditionally and irrevocably gives up and releases, to the full extent permitted by law the Buyer, individually and collectively, and their respective past and present owners, governing bodies, trustees, directors, officers, members, agents, successors (by merger or otherwise), predecessors, heirs, estates, legatees, assignees, assignors, Affiliates, related entities, corporate parents, subsidiaries, employees, insurers, attorneys, shareholders, partners, financial advisors, consultants, and representatives of any and all kind (each a "Buyer Released Party"), jointly and severally, of and from any and all claims, actions, suits, debts, sums of money, accountings, covenants, controversies, agreements, damages, judgments, default, disputes, demands, or causes

of action, direct or indirect, derivative, known or unknown, accrued or unaccrued, from the beginning of time until the Closing Date. The foregoing general release shall extend to all claims for litigation expenses, attorneys' fees, injunctive relief, specific performance, compensatory damages of any kind, liquidated or statutory damages, punitive damages, and any and all other damages whatsoever except for Seller's rights under this Agreement. Each Seller Releasor covenants and agrees not to file a claim or suit against any Buyer Released Party, or any other person or entity covered by this release. Nothing herein shall restrict Seller's ability to enforce this Agreement, including, but not limited to Buyer's requirements under section 1.06(d) herein.

**Section 5.09. Post Closing Access and Use; Migration**. For a period of six (6) months following the Closing, (i) each Party shall, and shall cause its respective Affiliates to, provide the other Party and its employees access to and use of the accounting software system and any other software used by the Seller such that following the Closing, both the Seller and Buyer are able to operate in substantially the same manner as they did prior to the Closing, including, without limitation, by the Seller maintaining its same user rights, and (ii) in furtherance thereof, each Party agrees to provide the other Party and its and its Affiliates' employees and any applicable third-party service providers or subcontractors, reasonable access to the facilities, assets, and books and records of such Party. Following the Closing, the Parties shall cooperate to complete the migration of the Seller's data from physical servers and associated data as expeditiously as practicable. To the extent Buyer incurs any costs associated with the migration of the Seller's data, such costs shall be borne by Buyer.

## ARTICLE VI
### MISCELLANEOUS

**Section 6.01. Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 6.02. Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

If to Seller, to:
Assuncao Bros. Inc.
29 Wood Avenue

13

Edison, New Jersey 08820
Attention: Martin Assuncao
Email: marty@assuncaobrothers.com

With a copy to:
Fox Rothschild, LLP
49 Market Street
Morristown, NJ 07960
Attention: Joseph J. DiPasquale, Esq.
Email: jdipasquale@foxrothschild.com

If to Buyer, to: Vollers Excavating and Construction, Inc.
3311 US Highway 22
North Branch, New Jersey 08876
Attention: Brendan Murray
Email: bmurray@vollers.cc

Section 6.03. **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 6.04. **Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 6.05. **Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter; provided, however, that the Confidentiality Agreement between Buyer and Seller shall remain in full force and effect with respect to information disclosed pursuant thereto in accordance with the terms thereof.

Section 6.06. **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, except that (a) either party may, without obtaining the other party's consent, assign its rights and obligations hereunder to the Buyer of all or substantially all of the assigning party's assets and (b) Seller may, without obtaining Buyer's consent, assign its rights and obligations hereunder to an Affiliate in the event of Seller's dissolution or termination of existence. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 6.07. **No Third-party Beneficiaries.** Except as provided in Section 2.02(b)(i), Section 5.07 and **Article VI**, this Agreement is for the sole benefit of the parties hereto and their

respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 6.08. Amendment and Modification.** This Agreement may be amended, modified or supplemented only by an agreement in writing signed by each party hereto.

**Section 6.09. Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 6.10. Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New Jersey.

**Section 6.11. Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Agreement or the documents to be delivered hereunder is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement, any document executed or delivered in connection herewith or the transactions contemplated hereby.**

**Section 6.12. Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail of scanned copies, DocuSign or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 6.13. Non-Recourse**. This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against, the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, affiliate, agent, attorney or other representative of any party hereto or of any affiliate of any party hereto, or any of their successors

or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim or action based on, in respect of or by reason of the transactions contemplated hereby.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

BUYER:**Vollers Excavating and Construction, Inc.**

By: _____

Name: Brendan Murray

Title: President


SELLER:**Assuncao Bros. Inc.**


By: _____

Name:  Martin Assuncao

Title:   President

**Asset Purchase Agreement**

**Signature Page**

By _____

Name: Brendan Murray

Title: President

SELLER:

Assuncao Bros. Inc.

By _____

Name: Martin Assuncao

Title:    President

☐

Asset Purchase Agreement
Signature Page

### Exhibit A

Form of Bill of Sale

*See attached.*

☐**Exhibit B**
Form of Subcontract
☐**Schedule .01(a)**
Non-Bonded Projects

| Owner | Project | Adjusted Contract Balance | Billed to date | Paid to date | Disputed Change Orders | Back Charges |
|---|---|---|---|---|---|---|
| Conti Construction | EWR - Newark Airport | 895,300 | 701,357 | 58,272 | none | none |
| Konkus Corporation | Route 206 Doctors Wy | 2,206,156 | 56,657 | - | none | none |
| Kyle Conti Construction | Rt 577 | 339,800 | 112,040 | 8,492 | none | none |
| Ritacco Construction Inc. | Route 3 Bridge over North Second | 1,161,640 | 585,441 | 56,808 | none | none |
| Ritacco Construction Inc. | River Road CR 6220 Bridge | 762,185 | - | - | none | none |
| Schiavone Construction | Bridge Deck Reconstruction | 3,599,140 | 1,666,482 | 1,05,948 | none | none |
| South State, Inc. | Route 295 - Curb | 6,404,020 | 1,458,016 | 82,972 | none | none |
| South State, Inc. | Adams Lane over Amtrak DP 21134 | 772,073 | - | - | none | none |
| Union Paving | Route 3, Route 46 | 2,415,646 | 1,131,022 | 82,662 | none | none |
| Schiavone Construction | Pulaski Skyway 2 | 4,201,932 | 4,201,932 | 3,814,917 | none | none |
| Schiavone Construction | SC 15-0123 Rt 72 | 1,023,616 | 1,023,616 | 1,00,740 | none | none |
| Anselmi & DiCicco, Inc | Route 22 | 922,296 | 922,296 | 90,759 | none | none |

☐

**Schedule 1.01(b)**
**Equipment and Vehicles**

# **Exhibit A**

**Form of Bill of Sale**

*See attached.*

## BILL OF SALE

This Bill of Sale (this "***Bill of Sale***") is entered into as of this _____ day of August 2022 by and between Assuncao Bros., Inc., ("***Seller***"), and Vollers Excavation and Construction, Inc., ("***Buyer***").

Upon the terms and subject to the conditions of the Asset Purchase Agreement, dated as of August_____, 2022 (the "***Asset Purchase Agreement***"), by and between Buyer and Seller, Seller has agreed to sell, and Buyer has agreed to purchase, all right, title and interest in, to and under the Purchased Assets.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller, intending to be legally bound, hereby agree as follows:

1. <u>Defined Terms; Interpretation</u>. Except as otherwise set forth herein, capitalized terms used in this Bill of Sale shall have the meanings assigned to them in the Asset Purchase Agreement.

2. <u>Transfer of Purchased Assets</u>. Pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, Seller hereby sells, assigns, transfers, and conveys to Buyer and its successors and its assigns, and Buyer hereby does purchase from Seller, all of Seller's right, title and interest in, to and under the Purchased Assets, subject only to any existing equipment financing or lease agreement. The right, title and interest in and to the Purchased Assets that is sold, transferred, conveyed, assigned and delivered by Seller to Buyer hereunder collectively constitutes the entire right, title and interest in and to the Purchased Assets and upon the Closing, Buyer shall have all right, title and interest in and to the Purchased Assets.

3. <u>Effective Time</u>. This Bill of Sale shall be effective as of the Closing.

4. <u>Binding Effect; Amendments</u>. This Bill of Sale shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and permitted assigns. Neither this Bill of Sale, nor any term or provision hereof, may be amended, modified, superseded or cancelled except by an instrument in writing signed by each party hereto.

5. <u>Headings</u>. The headings used in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6. <u>Governing Law</u>. This Agreement shall be governed by and interpreted and construed in accordance with the substantive laws of the State of New Jersey without regard to applicable choice of law provisions thereof.

7. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which taken together shall constitute one and the same agreement, it being understood that all of the parties hereto need not sign the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed and delivered as of the date first written above.

Vollers Excavation and Construction, Inc.

By: _____

Name:   Brendan Murray

Title:   President


Assuncao Bros., Inc., a debtor in possession

By: _____

Name:   Martin Assuncao

Title:   President

**Exhibit B**
**Form of Subcontract**

Job No. _____
Subcontract No. _____

**S U B C O N T R A C T**

This Subcontract, made this _____ day of August, 2022 by and between Assuncao Bros., Inc., a New Jersey Corporation ("Contractor"), and Vollers Excavating & Construction Company, Inc., dba Vollers, 3311 U.S. Highway 22, P.O. Box 5297, North Branch, NJ 08876 ("Subcontractor"),

**W I T N E S S E T H:**

WHEREAS, on August _____, 2022, ("Petition Date") Seller filed a voluntary petition under Chapter 11 of title 11, United States Code ("Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court") bearing case No 22-_____ (_____) ("Petition");

WHEREAS, the Contractor and Subcontractor contemplate an Asset Purchase Agreement dated as of August___, 2022, between Contractor, as seller, and Subcontractor, as buyer for certain assets of Contractor subject to Bankruptcy Court approval ("Asset Purchase Agreement").

WHEREAS, the Asset Purchase Agreement requires the parties to enter into a mutually agreeable subcontract for the completion of certain Non-bonded Projects as defined in the Asset Purchase Agreement.

In consideration of the mutual promises and covenants herein contained, the Subcontractor and the Contractor agree as follows, intending to be legally bound:

The Subcontractor covenants, promises and agrees to furnish all material and personal property and to diligently and fully perform all remaining work hereinafter described for the construction of _____, hereinafter called the Project, located at _____ for the use and benefit of _____, hereinafter designated the Owner; in accordance with the Prime Contract between the Contractor and the Owner entered into on _____ and hereby incorporated by reference and made a part of this Subcontract.

## Article 1.    Subcontract Documents and Subcontract Work

1.1    The Subcontract Documents consist of: (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein, including without limitation general conditions, supplemental and/or other conditions if any, drawings, and specifications (a list of the drawings and specifications is included as Exhibit A – List of Drawings and Specifications); (3) if Contractor does not hold the prime contract with the owner, then the Prime Contract between the Owner and general contractor and the contract between the general contractor and Contractor, as well as the other Contract Documents enumerated in such contracts, including without limitation general conditions, supplemental and/or other conditions if any, drawings, and specifications (a list of the drawings and specifications is included as Exhibit A – List of Drawings and Specifications); (4) written

modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement; (5) other documents listed in Article 39 of this Agreement; and (6) written modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. In the event of a conflict, the terms of this Agreement will prevail.

1.2     The Subcontract may be amended or modified only by a written modification. The Subcontract Documents shall not be construed to create a contractual relationship of any kind between any persons or entities other than the Contractor and Subcontractor.

1.3     Generally, the specifications describe work which cannot be indicated on the drawings and indicate types, qualities and methods of installation of the various materials and equipment required for the work.  It is not intended to mention every item of work in the specifications which can be adequately shown on the drawings nor to show on the drawings all items of work described or required by the specifications even if they are of such nature that they could have been shown thereon.  All materials or labor for work which is shown on the drawings or is reasonably inferable therefrom as being necessary to produce a finished job shall be provided by the respective subcontractors whether or not the work is expressly covered in the specifications. Subcontractor shall give Contractor written notice of any condition or omission in the Contract Documents that Subcontractor believes is or may be a design error or deficiency.

1.4     Subcontractor agrees to furnish all necessary management, supervision, labor, materials, machinery, tools, scaffolding, supplies, equipment, engineering, testing, all transportation, cartage, handling and hoisting, models, surveys, field measurement, shop drawings, protection of work and labor for winter conditions, and/or any other act or thing required to diligently and fully perform and complete those portions of the work described in Exhibit B – Scope of Work, attached hereto and hereby made a part of this Subcontract, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others, together with all other obligations set forth in this Agreement (the "Subcontract Work"). It is expressly agreed upon by the parties that Subcontractor is a completion contractor. Nothing contained herein shall obligate Subcontractor to undertake or assume any liability to Contractor or Owner for any existing work in place or anything outside of the Scope of Work.

## Article 2.     Duties of the Subcontractor

2.1     The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and by the provisions of the Prime Contract.  With respect to the Subcontract Work, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor that the Owner, under such documents, has against the Contractor, and the Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract.  Subcontractor shall be required to do all things and is bound by all rulings of the Owner, and any agent of the Owner, including but not limited to extensions of time, to the same degree as the Contractor is bound.  The Subcontractor shall enter into similar agreements with its subcontractors.

2.1.1    The Subcontractor shall, at all times, carefully study and compare the Subcontract Documents with each other and shall immediately report to the Contractor errors, inconsistencies, and/or omissions discovered.   In the event of a conflict and/or inconsistency between the specifications and the plans, or in the event of an error and/or omission in the specifications and/or plans, the Subcontractor shall request in writing a clarification from the Contractor before proceeding with the work.

2.1.2    The Subcontractor, by executing this Agreement, represents that the Subcontract Documents are sufficient to have enabled Subcontractor to determine the cost of the Subcontract Work to enter into this Agreement, and sufficient to enable it to construct the Subcontract Work and otherwise to fulfill all its obligations hereunder.

2.2    The Subcontractor shall supervise and direct the Subcontract Work, and Contractor shall not interfere in scheduling and performing the Subcontract Work to avoid conflict, delay in or interference, the Owner, or separate contractors.   The Subcontractor shall cooperate with the Contractor, other subcontractors, the Owner, and separate contractors whose work might interfere with the Subcontract Work. The Subcontractor shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, specifically noting and advising the Contractor of potential conflicts between the Subcontract Work and the work of the Contractor, other subcontractors, the Owner, or separate contractors.

2.3    The Subcontractor shall furnish to the Contractor periodic progress reports on the Subcontract Work as directed by Owner, including information on the status of man-hours expended, materials and equipment that may be in the course of preparation, manufacture, or transit.

2.4    The Subcontractor shall pay for all materials, equipment, and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

2.5    Subcontractor herby represents and warrants that Subcontractor is experienced in performing the type, quality, and quantity of work required for performance of this Subcontract, is financially solvent with sufficient capital, and has sufficient management, supervision, and labor capacity to properly perform this Subcontract.

## Article 3.    Integration

3.1    The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior proposals, negotiations, representations or agreements, either written or oral.   Except as otherwise provided for herein, no changes, amendments or modifications of the terms hereof shall be valid unless reduced to writing and signed by the parties hereto.   The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.

## Article 4.    Payment

4.1    The Contractor agrees to pay the Subcontractor all amounts due to Contractor pursuant to Prime Contract. Contractor acknowledges that it is not entitled to retain any amounts

due to Contractor under the Prime Contract and all amounts received, including any amounts collected must be passed through to Subcontractor.

4.2    The Contractor will make partial payments to the Subcontractor based on the AIA G702 and G703 forms furnished by Subcontractor, or other forms acceptable to Owner, in an amount equal to the  amount otherwise due and owing to the Contractor under the Prime Contract during such billing period, less the aggregate of previous payments.  Retainage shall be the retainage percentage reflects in the Prime Contract, and will not be paid until such time as the Owner reduces the retainage for the Project including for the Subcontract Work and the retainage for the Subcontract Work is paid to Subcontractor pursuant to the terms hereof.  As an express condition precedent to any payment (progress, retainage, and/or final) to Subcontractor, Subcontractor shall: (i) furnish applicable release/lien waiver forms required by the Contractor and/or required by the Subcontract Documents, including without limitation those lien waiver forms required by Owner and/or Owner's lender, if any, (ii) provide satisfactory evidence that Subcontractor has paid all amounts owed in connection with the Subcontract Work, and (iii) provide other documentation required by the Owner and/or Contractor, including without limitation certified payrolls, and/or O&M manuals, if applicable and (iv) provide documentation in a form acceptable to Contractor and Owner which reflects the amount of man-hours expended by Subcontractor for the time period reflected on the pay application.

4.2.1    Payments will be made on the basis of payment applications that are to be submitted on or before the twenty-fifth (25th) of each month.  Each payment application shall be accompanied by such invoices, vouchers, waivers, certifications, and affidavits as may be required by the Owner and/or the Contractor.

4.2.4    Payment applications will not be accepted without an appropriate waiver of liens (partial or final), which lien waivers are attached as Exhibits D and E.

4.3    Partial payment shall constitute acceptance by the Contractor of the work or material for which the partial payment is made.  Contractor shall promptly advise the Subcontractor if the Owner disapproves of or is withholding all or any of a request for payment, including change orders.  Even if Subcontractor disagrees with such disapproval, Subcontractor shall continue to perform all work under this Subcontract including that in dispute.  The Subcontractor shall also take all reasonable steps necessary to ensure that there will be no work stoppage or delay on account of such disapproval.  Both parties agree to endeavor to promptly resolve such disputes on an ongoing basis.

4.4    Contractor shall have the no right to setoff against any monies due or to become due Subcontractor under this Subcontract any claim or claims against Subcontractor, whether arising under the Subcontract or any other subcontract(s) or agreements between the Contractor and Subcontractor.

4.4.1    The Contractor may not withhold funds from any progress payment to the Subcontractor, from retainage, or from final payment, for any reason.

4.5    All payments from the Owner shall be made via joint checks payable to the Contractor and Subcontractor. Pursuant to the Order of the Bankruptcy Court, Contractor has assigned all accounts receivable and amounts due under the Prime Contract to Subcontractor. Contractor acknowledges and agrees that the Contractor's assignment of any accounts receivable

and prior amounts due to Contractor has served as a material inducement for Subcontractor to enter into this Agreement. Contractor waives any right to receive any amounts previously due from Owner. Subject to the terms of the Asset Purchase Agreement, Contractor waives any right to receive any portion of any amounts not yet due from Owner. In no event shall any direct or joint payment be construed to create any contract between Subcontractor and Owner.

## Article 5.    Payment to Suppliers and Sub-Subcontractors

5.1    Upon receipt of fund from Contractor, Subcontractor shall pay for all materials and supplies furnished and for all work, labor, and services performed as required under this Subcontract. Subcontractor shall execute partial and final releases of liens, and if required by Contractor, Subcontractor shall provide partial and final releases of liens acceptable to Contractor for Subcontractor's subcontractors and/or suppliers.

## Article 6.    Final Payment

6.1    Final payment will be made within thirty (30) days after the Subcontractor Work has been completed to the satisfaction of the Owner, the Subcontractor has performed all obligations under the Subcontract, and the Contractor has received from the Owner written acceptance thereof.

6.1.1    The Subcontractor, as a condition precedent to the making of final payment hereunder, shall furnish to the Contractor a full and complete release and discharge, in a form satisfactory to the Contractor, of all liens, claims, and demands arising out of or relating to the Subcontract Work and any and all materials furnished, work done, and equipment used in connection therewith. Furthermore, if, prior to final payment, the Owner or any party providing financing for the Project requests a release of liens from the Subcontractor, the Subcontractor shall execute and deliver such release of liens in a form satisfactory to the Owner or such other party.

6.3    Final payment shall constitute acceptance by the Contractor of the work or material for which the final payment is made.

## Article 7.    Assignment

7.1    The Subcontractor will make no assignment of the proceeds of this Subcontract without prior written consent of the Contractor.

## Article 8.    Unit Price Basis

8.1    If the terms of this Subcontract provide for the payment of work performed on a unit price basis, the use of unit prices shall be in accordance with the terms and conditions of the Contract Documents. If the Contract Documents do not specify the terms and conditions associated with the use of unit prices, then the unit of measurement for payment shall be one for work certified. Verification of weights or quantities will be furnished at the time of installation or delivery (or accepted by Owner). In the event the parties fail to agree on the actual quantity performed, Contractor shall have the right to measure the quantity of work in place and make final settlement on the basis of such measurement. Unit prices shall be the same for both additions and deductions.

## Article 9.     Equipment and Facilities

9.1    Simultaneously herewith, Subcontractor has acquired certain tools, material and equipment from the Contractor pursuant to the Asset Purchase Agreement approved by the Bankruptcy Court.  The Subcontractor shall provide at its own expense whatever tools, machines, hoisting, equipment, plant, utilities, services' storage sheds, workshops, offices, first aid or emergency treatment facilities, drinking water, temporary facilities and toilets, and any other facility he may deem necessary for the complete performance of all work required under this Subcontract.  The Subcontractor shall remove any such installations, and restore the site and premises at the completion of the Subcontract Work.

## Article 10.     Submittals

10.1    The Subcontractor agrees to submit, in sufficient number, all shop or fabrication drawings, design and performance data, test, samples, operating and/or maintenance manuals for use in the performance of this Subcontract as required under the Prime Agreement.

## Article 11     Intentionally Omitted

## Article 12.     Cutting, Patching and Blocking

12.1    The Subcontractor shall do any cutting, patching, fire-proofing, and blocking necessary to complete this work hereunder, and such work shall be performed to the same standards and shall match any work performed pursuant to the Subcontract Documents.

## Article 13.     Maintenance of Site/Temporary Protection

13.1    Subcontractor agrees to keep the premises and all finished work clean at all times and to remove from the site all scrap and waste materials arising out of or relating to the Subcontract Work.

13.2    Subcontractor shall properly cover and protect the work and the property of others (on or off the site) from damage due to the performance of the work required under this Subcontract.

## Article 14.     Course of Conduct

14.1    Subcontractor expressly agrees that no course of conduct or dealing between the parties: (a) shall be construed as a waiver of any of the Owner's or the Contractor's rights and/or remedies under the Subcontract Documents; and/or (b) shall serve, in whole or in part, as the basis of any claim by Subcontractor for additional costs and/or additional time.

## Article 15.     Warranties

15.1    The Subcontractor warrants and guarantees the work, materials, and/or equipment which it performs or furnishes under this Subcontract and agrees to make good, at its own expense, any defect in materials, equipment, and/or workmanship which may occur or develop prior to Contractor's release from responsibility by the Owner.

15.1    The Subcontractor warrants to the Owner that materials and equipment furnished under this Subcontract will be of good quality and new unless the Subcontract Documents require or permit otherwise, and fit and suitable for the purpose intended.

## Article 16.    <u>Time of Performance</u>

16.1    Subcontractor agrees to keep himself thoroughly informed as to the overall progress of the Project; to commence and to prosecute the work undertaken hereunder in a prompt and diligent manner whenever such work, or any part of it, becomes available, or at such time or times as the Owner may direct, so as to promote the general progress of the entire Project; and Subcontractor shall not delay, obstruct, or otherwise interfere with or hinder the work or progress of the Contractor or any other subcontractor.

16.2    The Subcontractor shall participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Subcontract Work providing information for the scheduling of the times and sequence of operations required for its Subcontract Work to meet Owner's overall schedule requirements, shall continuously monitor the project schedule so as to be fully familiar with the timing, phasing and sequence of operations of the Subcontract Work and of other work on the Project, and shall execute the Subcontract Work in accordance with the requirements of the project schedule including any revisions thereto.

## Article 17.    <u>Changes in Work</u>

17.1    The Owner may make changes in the work by issuing modifications to the Prime Contract. Upon receipt of such a modification issued subsequent to the execution of the Subcontract, the Contractor shall promptly notify the Subcontractor of the modification. Unless otherwise directed by the Contractor, the Subcontractor shall not thereafter order materials or perform work that would be inconsistent with the changes made by the modification to the Prime Contract.

17.2    Contractor may not unilaterally make changes in the work under the Subcontract, consisting of additions, deletions, or other revisions, without the consent of the Subcontractor. If said changes cause an increase or a decrease in the cost of performance or in the time required for performance, an equitable adjustment shall be made and this Subcontract shall be modified in writing accordingly.

17.3    The Subcontractor, prior to the commencement of such changed or revised work, shall submit to the Contractor written copies of a claim for time extension and/or additional costs for such revised work.

17.3.1  The Subcontractor shall submit written notice and request for Change Order within fifteen (15) days (after the first occurrence of the event giving rise to the claim which is the subject of the request, whether for extra work, an extension of time, or otherwise.  The notice and request for change order shall state the basis for the relief requested, include the amount of time or additional costs requested, and include all backup information and documentation to permit Contractor to make an evaluation and decision on the Subcontractor's request.

17.3.2  A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be

made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims must be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made.

17.3.3   No additions or deductions or other changes shall be made in the work, nor shall there by any charges for premium time, except upon prior written order of Contractor. All invoices including time and material performance of the work or premium time shall be accompanied by documentation detailing the dates, times, persons working and work performed and shall be signed by an authorized representative of Contractor.  The authorized representative's signature only verifies the quantity of the work and does not indicate acceptance by Contractor of a modification to the sum of the Subcontract.

17.4   In accepting any change order, the Subcontractor agrees that the adjustment contained in the change order constitutes full and complete compensation and time for the change, including any delays, disruptions, inefficiencies, escalations, impacts, or other consequences or costs, direct or indirect, that result from the change, and the Subcontractor waives the right to any further adjustment relating to that change.

17.5   In the event the Subcontractor disagrees with the Owner's decision regarding the Subcontractor's request for Change Order on (a) the entitlement to an extension of time and/or additional costs, and/or (b) the amount of any such time extension or additional costs, the Subcontractor shall provide to the Contractor, within three (3) days of receipt of Contractor's decision, written notice of a claim that identifies the Subcontractor's disagreement with such decision, the basis for the disagreement, and the Subcontractor's intention to pursue a claim.  If Subcontractor timely preserves such claim, the claim will be processed as a dispute, as set forth in Article 19.

**Article 18.**   **Claims for Extra Work, Changed Conditions, Etc.**

18.1   The Subcontractor agrees to make any claims to the Contractor for damages or additional compensation based on alleged extra work, changed conditions, or any other grounds within five (5) days of the discovery of the condition causing the need for additional compensation or damages or within sufficient time to permit Contractor to advise the Owner in the manner provided in the Prime Contract for like claims. The Contractor will not be liable to the Subcontractor on account of any claim until it is allowed by the Owner.

**Article 19.**   **Disputes**

19.1   Disputes involving the Owner, other prime contractors, or the Prime Contract.  In case of any dispute between Contractor and Subcontractor, which, arises out of or relates to any act or omission of the Owner, any act or omission of other prime contractors (if applicable), or involves the Contract Documents, Subcontractor agrees to be bound to the dispute resolution provisions set forth in the Prime Contract to the same extent that Contractor is bound to the Owner, by the terms of the Prime Contract, and by any and all preliminary and final decisions or determinations made thereunder by the party, board, arbitrator(s), or court so authorized in the Prime Contract or by law, whether or not Subcontractor is a party to such proceedings.  In case of such dispute, Subcontractor shall first pursue and fully exhaust the dispute resolution procedures in the Prime Contract before commencing any other action or claim.  Subcontractor agrees to stay any other action or claim, including but not limited to an action or claim against Contractor's

bonding company, if any, and/or Contractor, pending the complete and final resolution of the Prime Contract's dispute resolution procedures. Subcontractor shall comply with all provisions of the Prime Contract, including without limitation, allowing a reasonable time for Contractor to analyze and forward to the Owner any required communications or documentation. Contractor will further invoke on behalf of Subcontractor, or allow Subcontractor to invoke, those provisions in the Prime Contract for determining disputes.

19.1.1  In the event of a dispute between the Owner and the Contractor arising out of or relating to an act or omission of the Subcontractor, this Agreement, and/or the Subcontract Work, Contractor may join Subcontractor to any proceeding in which such dispute is pending. Subcontractor acknowledges and agrees that it has expressly consented to such joinder.

19.2  Claims and/or disputes shall be decided by litigation or arbitration at the sole discretion and choice of Subcontractor. If Subcontractor chooses arbitration, arbitration shall be in accordance with Section 19.3 below. If Contractor chooses litigation, the Bankruptcy court shall have sole and exclusive jurisdiction. Subcontractor hereby consents to jurisdiction and venue in such courts. DUE TO THE SPECIALIZED NATURE OF CONSTRUCTION LITIGATION, EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY.

19.3  Arbitration. If the Subcontractor has selected arbitration as the method of binding dispute resolution in Section 19.2 any claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. A demand for arbitration shall be made in writing, delivered to the other party to the Subcontract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded.

19.4  A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the claim would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the claim.

19.5  If the Subcontractor shall undertake litigation, arbitration, or other dispute resolution process to enforce any of the covenants or agreements with the Subcontractor, the cost and expense pertaining to such proceeding, including without limitation attorneys' fees incurred by the Subcontractor, shall be charged to the Contractor. The fees and costs incurred by the Subcontractor shall be included in any judgment, decree, or award that may be obtained against the Contractor. In the event the Subcontractor is made a party to any lawsuit, arbitration, or other legal proceeding, arising out of or relating to any obligation due or alleged to be due from Contractor, Contractor shall defend, indemnify, and hold harmless the Subcontractor from any liability, costs, and/or expenses in connection thereto (including without limitation attorneys' fees) and shall assume all costs and/or legal expenses incurred (including without limitation attorneys' fees) by the Subcontractor.

19.6  Contractor expressly waives any claim against Subcontractor and its agents for consequential damages arising out of or relating to this Subcontract.

**Article 20.**   **Default**

20.1    In the event the either party fails to comply with any of the provisions of this Subcontract and such failure, inability or deficiency is not corrected within fourteen (14) days after written demand the parties may pursue such remedies available under this Agreement or the Asset Purchase Agreement.

**Article 21.**   **Intentionally Omitted.**

**Article 22.**   **Termination for Default**

22.1    If the Subcontractor is in default as set forth in Article 20 and fails within a fourteen (14)-day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor only after first been required to do so under the Prime Agreement,   provide written notice to the Subcontractor and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontract Work by whatever method the Contractor may deem expedient.

22.2    Upon receipt of written notice of termination, the Subcontractor shall

.1      cease operations as directed by the Contractor in the notice;

.2      take actions necessary, or that the Contractor may direct, for the protection and preservation of the work;

.3      except for work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Sub-subcontracts and purchase orders and enter into no further Sub-subcontracts and purchase orders; and

.4      assign all Sub-subcontracts and purchase orders to Contractor, provided Contractor accepts such assignment.

22.3    In the event the employment of the Subcontractor is terminated by the Contractor for cause under this Article, and it is subsequently determined by a court of competent jurisdiction or an arbitrator/panel of arbitrators that such termination was without cause, such termination shall thereupon be deemed a termination for convenience under Article 23 and the provisions of Section 23.1 shall apply.

**Article 23.**   **Termination for Convenience**

23.1    The Contractor may not terminate this Subcontract in whole or in part for the Contractor's convenience and without cause unless the Prime Contract has been terminated for convenience by Owner.  Termination by the Contractor under this paragraph shall be by notice of termination delivered to the Subcontractor specifying the extent of termination and the effective date of such termination.  The Subcontractor shall recover as its sole remedy payment for all work properly performed in connection the Prime Contract

## Article 24.    Collective Bargaining Agreements

24.1    Subcontractor accepts all responsibility to maintain labor harmony with all trades working on this Project during the performance of the Subcontract Work.  Furthermore, Subcontractor will endeavor to provide all contacts, coordination, and agreements with such local labor organizations as are required to ensure such harmony and without

## Article 25.    Permits and Compliance with Law

25.1    The Subcontractor shall give notices and comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on performance of the Subcontract Work.  Subcontractor shall also comply with applicable requirements regarding various business enterprises (MBE, WBE, DBE, etc.).

25.1.1  Subcontractor shall notify Contractor seven (7) days in advance of any testing and shall cooperate with Contractor, Owner, Architect, and Engineer, to make any adjustments that may be required for final testing.

25.1.2  Subcontractor shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts, and workers' compensation acts insofar as applicable to the performance of this Subcontract.

## Article 26.    Independent Contractor

26.1    The Subcontractor certifies that he is "an independent Contractor" subject, as an employer, to all applicable statutes and regulations with respect to such status.  Subcontractor shall exercise full control of and supervision over its employees.  Subcontractor acknowledges that its personnel (if any) performing Subcontract Work are agents, employees, or subcontractors of the Subcontractor and are not employees or agents of the Contractor.

## Article 27.    Employees

27.1    The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ any unfit, uncooperative, or disruptive person, or anyone not skilled in the task assigned.  The Subcontractor shall not employ any person in performance of this Subcontract whose employment might be reasonably objected to by the Contractor or Owner and hereby agrees to promptly remove from the Project any such person or party.

## Article 28.    Safety and Specific Working Conditions

28.1    The Subcontractor shall take all necessary safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract.

**Article 29.**    **Superintendent**

29.1    The Subcontractor shall at all times maintain a qualified and skilled superintendent or foreman at the site of the work who shall be satisfactory to the Owner, the Owner's authorized agent and/or the Contractor. Such superintendent or foreman shall be duly and legally authorized to represent and act for the Subcontractor with respect to all matters in connection with or arising out of work under this Subcontract. Important communications shall be confirmed in writing.

**Article 30.**    **Subcontractor's Dealing with Owner**

30.1    It is agreed that all of Subcontractor's dealings with the Owner's authorized agent, the Owner, or any other party named in the Contract Documents may be direct to the Owner.

**Article 31.**    **Intentionally Omitted.**

**Article 32.**    **Coordination**

32.1    The Subcontractor agrees to perform the work called for in this Agreement in such a manner that he will not injure or damage any other work performed by any other subcontractor.

32.2    The Subcontractor further agrees to cooperate with the Contractor and other subcontractors whose work might interfere with the Subcontractor's work and to prepare sketches and drawings as directed, and/or to participate in the preparation of coordinated drawings in areas of congestion, specifically noting and advising the Contractor of any such interference.

**Article 33.**    **Insurance**

33.1    The Subcontractor is required to maintain the insurance coverage set forth in Exhibit F, which is incorporated herein. The Subcontractor is also bound by the Waiver of Rights of Recovery and Waiver of Subrogation set forth in Exhibit G.

**Article 34.**    **Intentionally Omitted.**

**Article 35.**    **Indemnification**

35.1    The Subcontractor shall defend, indemnify, and hold harmless Owner, Contractor, and any others required by the Prime Contract, and their parent, subsidiary, and affiliated companies, and each of their respective agents, officers, directors, shareholders, members, employees, and assigns, as applicable (individually, an "Indemnified Party," collectively, "Indemnified Parties"), from and against any and all liabilities (including but not limited to contractual liabilities), claims (even if such claims are groundless, false or fraudulent), losses, damages, penalties, fines, settlements, costs, and/or expenses (including but not limited to court costs and reasonable attorneys' fees), attributable to injury (including but not limited to sickness, disease, or death) to any person (including but not limited to Subcontractor's employees) and/or damage to any property of whatsoever kind or nature, arising out of or relating to the execution of the Subcontract Work, or preparation for the Subcontract Work, or any extension, modification, or amendment to the Subcontract Work by change order or otherwise, or other directives from Contractor, or the design, manufacture, delivery, installation, use, misuse, maintenance, erection, repair, operation, or failure of any part of all of the goods, materials, machinery, and/or equipment

(even if such was furnished, rented, or loaned by any of the Indemnified Parties), based solely on the Subcontractor's sole gross negligence.

35.2    In the event and to the extent that a claim is made by an employee of Subcontractor against an Indemnified Party hereunder, the intent of this Article is that Subcontractor shall and it hereby agrees to defend, indemnify, and hold harmless the Indemnified Party to the same extent as if the claim was made by a non-employee of Subcontractor.  Accordingly, in addition to the above provisions, and in order to render the parties' intent and this indemnity agreement fully enforceable, Subcontractor, in an indemnification claim hereunder, hereby expressly and without reservation waives any defense or immunity it may have under any applicable Worker's Compensation Laws or any other statute or judicial decision disallowing or limiting such indemnification, and consents to a cause of action for indemnity.

## Article 36.    <u>Applicable Law</u>

36.1    The law of the State of New Jersey (without regard to its choice of law principles) shall be applicable to this Subcontract and shall be used to decide any dispute related to this Subcontract.

## Article 37.    <u>Effective Date</u>

37.1    The effective date of this Subcontract is intended by both parties to be the date upon which the Bankruptcy Court issues an order approving the Asset Purchase Agreement ("Court Order").  Any dates appearing by the signatures at the end of this document merely indicate the dates that the signatures were affixed.  Prior to the issuance of the Court Order, Subcontractor may terminate this Agreement for any or no reason.

## Article 38.    <u>Miscellaneous</u>

38.1    Each party represents that it has had an opportunity to consult an attorney regarding this Agreement. Each party agrees that this Agreement shall not be construed against any party as the drafter of the Agreement.

## Article 39.    <u>Exhibits</u>

The below listed exhibits are incorporated by reference and made a part of this Subcontract:

Exhibit A – List of Drawings and Specifications

Exhibit B – Scope of Work

Exhibit C – Required Reports

Exhibit D – Partial Release of Liens and Claims

Exhibit E – Final Release of Liens and Claims

Exhibit F – Contractor's Safety Manual

Exhibit G – Insurance Requirements, Waiver of Rights of Recovery and Waiver of
Subrogation

**CONTRACTOR**                                    **SUBCONTRACTOR**

_____          _____
**(Signature)**                                      **(Signature)**

Brendan Murray, President                        _____
**(Printed Name and Title)**                        **(Printed Name and Title)**

Exhibit A – List of Drawings and Specifications
Exhibit B – Scope of Work
Exhibit C – Required Reports
Exhibit D – Partial Release of Liens and Claims
Exhibit E – Final Release of Liens and Claims
Exhibit F – Contractor's Safety Manual
Exhibit G – Insurance Requirements, Waiver of Rights of Recovery and Waiver of Subrogation

| CONTRACTOR | SUBCONTRACTOR |
|---|---|
| | |
| (Signature) | (Signature) |
| | |
| Brendan Murray, President | Martin Assuncao President |
| (Printed Name and Title) | (Printed Name and Title) |

**Schedule 1.01(a)**
**Non-Bonded Projects**

| Owner | Project | Adjusted Contract Balance | Billed to date | Paid to date | Disputed Change Orders | Back Charges |
|---|---|---|---|---|---|---|
| Conti Construction | EWR - Newark Airport | 895,300 | 701,357 | 586,272 | none | none |
| Konkus Corporation | Route 206 Doctors Way | 2,206,156 | 56,657 | - | none | none |
| Kyle Conti Construction | Rt 577 | 339,800 | 112,040 | 89,492 | none | none |
| Ritacco Construction Inc. | Route 3 Bridge over North Second | 1,161,640 | 585,441 | 563,808 | none | none |
| Ritacco Construction Inc. | River Road CR 6220 Bridge | 762,185 | - | - | none | none |
| Schiavone Construction | Bridge Deck Reconstruction | 3,599,140 | 1,666,482 | 1,055,948 | none | none |
| South State, Inc. | Route 295 - Curb | 6,404,020 | 1,458,016 | 829,972 | none | none |
| South State, Inc. | Adams Lane over Amtrak DP 21134 | 772,073 | - | - | none | none |
| Union Paving | Route 3, Route 46 | 2,415,646 | 1,131,022 | 828,662 | none | none |
| Schiavone Construction | Pulaski Skyway 2 | 4,201,932 | 4,201,932 | 3,814,917 | none | none |
| Schiavone Construction | SC 15-0123 Rt 72 | 1,023,616 | 1,023,616 | 1,003,740 | none | none |
| Anselmi & DiCicco, Inc | Route 22 | 922,296 | 922,296 | 904,759 | none | none |
| | | | | | | |

**Schedule 1.01(b)**
**Equipment and Vehicles**

|  | Vehicle Number | Year | Make | License Plate |
|---|---|---|---|---|
| Pick-up Truck Sierra 1500 | 103 | 2012 | GMC | X47KYT |
| Pick-up Truck Sierra 1500 | 101 | 2012 | GMC | XFLV93 |
| Z 71 Silverado | 104 | 2018 | Chevy | XFBH44 |
| Mechanic Utility Silverado | 130 | 2017 | Chevy | XFBH42 |
| Tahoe |  | 2021 | Chevy | A80MSL |
| Silverado Crew 4WD 3500 Crew | 131 | 2017 | Chevy | XFBH43 |
| Pick-Up Truck Sierra 2500 | 122 | 2008 | GMC | XR637T |
| Chevy Colorado | 100 | 2016 | Chevy | XDRK37 |
| Chevy Colorado | 105 | 2020 | Chevy | XJFU18 |
| GMC Sierra |  | 2020 | GMC | C58NAN |
| Silverado 3500 -crew | 127 | 2015 | Chevrolet | XCGX76 |
| Silverado 3500-crew | 129 | 2015 | Chevrolet | XCGX99 |
| Van/Box E -350 | 128 | 2014 | Ford | XDAK45 |
|  |  |  |  |  |
|  |  |  |  |  |
| Van  3500 Express utility | 121 | 2008 | Chevrolet | XP712G |
|  |  |  |  |  |
| 3500 Crew Cab 2WD | 126 | 2015 | GMC | XBZX44 |
|  |  |  |  |  |
| Form truck-4700  - Red (white) | 220 | 1996 | International | AN438A |
| Tow truck-4900 - tow truck | 228 | 2003 | International | AN439A |
| Form Truck 4700 - red | 222 | 1995 | International | AN440A |
|  |  |  |  |  |
|  |  |  |  |  |
| 750 dump truck - sterling | 224 | 2008 | Sterling | AS543N |
| International 4900 - red | 226 | 1999 | International | AN442A |
| Mack RD series | 234 | 2000 | Mack | XCJC38 |

| | | | | |
|---|---|---|---|---|
| Mack RD series | 238 | 1999 | Mack | AT261S |
| Western Star 4700 SB | 236 | 2016 | WS | AS208X |
| Mack GU713 Granite | 240 | 2015 | Mack | XKJC58 |
| Mason Dump - 444 | 113 | 1995 | International | XCJB84 |
| Mason Dump F350 - red | 116 | 2000 | Ford | X4239A |
| Mason Dump C-5500 blue | 117 | 2006 | GMC | XBLE89 |
| Mason dump-Kodiak 4500 | 115 | 2007 | Chevrolet | XP711G |
| International Rack Body 444E | 112 | 1995 | International | XCJB85 |
| Ford F350 Rack | 123 | 2008 | Ford | XP428M |
| Trailer | 402 | 1981 | Tonco | 751TGR |
| EAGER TRAILER | 403 | 2002 | EAGER | TJU90J |
| Eager Beaver - low boy | 406 | 2014 | lowboy | TMC54B |
| Trailer | 405 | 1992 | ditchwitch | TNW58C |
| Magnum | 408 | 2005 | Magnum | In Transit |
| Interstate 50DLA | 409 | 2019 | Interstate | TVP48N |
| Rammex Walker RTSC2 | 407 | | | |
| 410J BACKHOE | 305 | 2011 | JOHN DEERE | |
| 310SJ BACKHOE | 302 | 2010 | JOHN DEERE | |
| John Deere 410 E | 301 | 2000 | John Deere | |
| John Deere 410 G | 303 | 2004 | John Deere | |
| 410 L John Deere | 314 | 2015 | john deere | |
| PC 138 Excavator | | 2021 | Komatsu | |
| PC 138 Excavator | 313 | 2006 | Komatsu | |
| PC 138 Excavator | 307 | 2011 | Komatsu | |
| PC 55 MR03 | 308 | 2013 | Komatsu | |
| SVL95-2S Skid Steer | | 2020 | Kubota | |
| Kobelco Excavator SK85CS-7 | | 2020 | Kobelco | |
| Kobelco Excavator SK270SRLC-5 | | 2020 | Kobelco | |
| Forklift | 506 | 2003 | Yale | |
| Dirt Roller | 310 | 2001 | Bomag | |
| Air Compressor Sullivan 185 | 404 | 1995 | Sullivan | |

| | | | | |
|---|---|---|---|---|
| Power Curber - slipform | 501 | 2006 | 5700-b | |
| Loader WA-270 | 315 | 2014 | WA-270 | |
| Air Compressor P185WJD | 405 | 2013 | IR/Dooson | |
| Sweeper - Ride On 8' | | 2013 | Lay-Mor | |
| Vermeer RT55 Trencher | | 2011 | Ditch Witch | |
| Magnum Pro Generator 35KW | | 2014 | Magnum | 1403675 |
| 6" Curb Clamp | | | | |
| 8" Curb Clamps | | | | |
| 6" Radius Curb Clamps | | | | |
| Sifter Bucket for 270 Excavator | | | | |
| 8" x 20" x 1" Steel Plates | | | | |
| 8" x 20" x 3/4" Steel Plates | | | | |
| Various Sizes of John Deere Backhoe Buckets | | | | |
| Morrison Vibrator Screed | | | | |
| Big Kenco Barrier Clamps | | | | |
| Small Kenco Barrier Clamp | | | | |
| 20 YD Dumpster | | | | |
| 15 YD Dumpster | | | | |
| Container Boxes | | | | |
| Diesal Tanks | | | | |
| Overhang Brackets | | | | |
| Various Sizes of Symons Forms | | | | |
| Various Sizes of Concrete Barrier/Parapet Forms | | | | |
| Appendix A -  Tools | | | | |
| Barrier metal forms | | | | |

Schedule 1.03(d)
Equipment Financing to be Assumed

| Lender Name | Model/Type | Year | Make | Loan Number | Monthly Payment |
|---|---|---|---|---|---|
| GM Financial | Z 71 Silverado | 2018 | Chevy | 211006041522 | 770.33 |
| GM Financial | Mechanic Utility Silverado | 2017 | Chevy | 211005369692 | 943.60 |
| GM Financial | Tahoe | 2021 | Chevy | 211038721588 | 1,450.87 |
| GM Financial | Silverado Crew 4WD 3500 Crew | 2017 | Chevy | 211005369658 | 881.76 |
| GM Financial | Chevy Colorado | 2020 | Chevy | 211038971710 | 579.41 |
| GM Financial | GMC Sierra | 2020 | GMC | 211042027986 | 1,066.81 |
| Komatsu Financial | PC 138 Excavator | 2021 | Komatsu | Quote 139875 | 3,887.37 |
| Kubota Credit Corp | SVL95-2S Skid Steer | 2020 | Kubota | 79822342 | 1,291.43 |
| Wells Fargo | Kobelco Excavator SK85CS-7 | 2020 | Kobelco | 450-0018868-001 | 2,104.38 |
| Wells Fargo | Kobelco Excavator SK270SRLC-5 | 2020 | Kobelco | 450-0018868 | 4,083.04 |

Schedule 3.04
Legal Proceedings

- American Express National Bank v. Martin Assuncao and Assuncao Bros Inc a/k/a Assuncao Brothers, NJ Superior Court, Somerset County, SOM-L-637-22

- Black Rock Enterprises, LLC v. Assuncao Brothers, Inc. d/b/a Assuncao Bros. Inc.; Martin Assuncao; NGM Insurance Company; John Does 1 – 5; and ABC Corporations 1 – 5, NJ Superior Court, Middlesex County MID-L-3010-22

- NGM Insurance Company v. Assuncao Bros., Inc.; Martin Assuncao and Lisa Assuncao, NJ Superior Court, Middlesex County MID-L-3042-22

- Diamond Sand and Gravel, Inc. d/b/a Sparta Redimix v. Assuncao Brothers, Inc. and Martin Assuncao, NJ Superior Court, Morris County MRS-L-2649-21

- Eastern Concrete Materials, Inc. Assuncao Brothers, Inc.; Martin Assuncao; Lisa Assuncao, NJ Superior Court, Bergen County BER-L-4076-22

Schedule 3.05
Insurance Policies

Penn National Security Insurance Company
Policy No. CX90758148
General Liability Insurance
Term: June 7, 2022 – June 7, 2023

Pennsylvania National Mutual Casualty Insurance Company
Policy No. AU90756148
Automobile Liability Insurance
Term: June 7, 2022 – June 7, 2023

New Jersey Manufacturers Insurance Company
Policy No. W38305921
Workers Compensation Insurance
Term (renewing): August 23, 2022 – August 23, 2023

Pennsylvania National Mutual Casualty Insurance Company
Policy No. UL90756148
Umbrella Liability/Excess Liability Insurance
Term: June 7, 2022 – June 7, 2023