# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FOX ROTHSCHILD LLP**
49 Market Street
Morristown, NJ 07960
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Joseph A. Caneco, Esq.
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
jcaneco@foxrothschild.com
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
*Counsel to the Debtor and Debtor in Possession*

In Re:

ASSUNCAO BROS., INC.,

               Debtor.

Chapter 11 (Subchapter V)

Case No. 22-16159-CMG

Judge: Hon. Christine M. Gravelle

## DEBTOR'S SUBCHAPTER V PLAN OF REORGANIZATION

This Plan of Reorganization is presented to you to inform you of the proposed Plan of Reorganization for Assuncao Bros., Inc., the debtor and debtor-in-possession ("ABI" or the "Debtor"), and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY  FEBRUARY 28 , 2023.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY  FEBRUARY 28 , 2023. THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS:**

**Fox Rothschild LLP**
**Attn: Joseph J. DiPasquale, Esq.**
**49 Market Street**
**Morristown, NJ 07960**

A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR
__MARCH 7__, 2023 at 2:00 P.M,  IN COURTROOM No. 3 AT THE CLARKSON
S. FISHER U.S. COURTHOUSE, 402 EAST STATE STREET, TRENTON, NJ 08608.

Your rights may be affected by this Plan. You should consider discussing this document with
an attorney.

DATED: January 30, 2023          **FOX ROTHSCHILD LLP**
*Counsel for the Debtor and Debtor-in-Possession*


By:     _/s/ Joseph J. DiPasquale_____
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
49 Market Street
Morristown, NJ 07960
Phone: (973) 992-4800
Fax: (973) 992-9125

Case 22-16159-CMG   Doc 89-1   Filed 03/06/23   Entered 03/06/23 16:40:25   Desc Main
Exhibit A - To Proposed Order Page 4 of 49

Case 22-16159-CMG   Doc 82-10   Filed 01/30/23   Entered 01/30/23 14:00:25   Desc Main
Document   Page 4 of 48

## TABLE OF CONTENTS

DEBTOR'S SUBCHAPTER V PLAN OF REORGANIZATION ........................................ 1

SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS ........................... 1

ARTICLE 1 HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR .......... 3

    1.1    Nature of the Debtor's Business. .................................................................... 3

    1.2    History of Business Operations of the Debtor .............................................. 3

    1.3    Filing of the Debtor's Chapter 11 Case. ...................................................... 3

    1.4    Legal Structure and Ownership. ................................................................... 3

    1.5    Debtor's Assets. ............................................................................................ 3

    1.6    Debtor's Liabilities. ...................................................................................... 4

    1.7    Current and Historical Financial Conditions. .............................................. 6

    1.8    Events Leading to the Filing of the Bankruptcy Case. ................................ 7

    1.9    Significant Events During the Bankruptcy Case. ......................................... 7

    1.10    Projected Recovery of Avoidance Actions .................................................. 11

ARTICLE 2 THE PLAN ............................................................................................... 11

    2.1    Unclassified Claims. ..................................................................................... 12

    2.2    Classes of Claims and Equity Interests. ....................................................... 15

    2.3    Estimated Number and Amount of Claims Objections. ................................ 25

    2.4    Treatment of Executory Contracts and Unexpired Leases. .......................... 25

    2.5    Means for Implementation of the Plan and Debtor's Future Management. ....... 26

    2.6    Payments. ....................................................................................................... 27

    2.7    Tax Consequences of the Plan. ..................................................................... 27

    2.8    Projections in Support of Debtor's Ability to Make Payments Under the
Proposed Plan. ........................................................................................................ 27

ARTICLE 3 FEASIBILITY OF PLAN ........................................................................ 28

    3.1    Ability to Initially Fund Plan. ....................................................................... 28

    3.2    Ability to Make Future Plan Payments And Operate Without Further
Reorganization. ...................................................................................................... 28

ARTICLE 4 LIQUIDATION ANALYSIS. ................................................................... 28

i

ARTICLE 5 DISCHARGE OF DEBTOR. ......................................................................... 28

    5.1    Discharge.  If the Plan is confirmed under § 1191(a), on the Confirmation Date of the Plan, the Debtor will be discharged from any debt that arose before the confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or........................................................ 28

ARTICLE 6 GENERAL PROVISIONS. ............................................................................ 29

    6.1    Title to Assets. ............................................................................................ 29

    6.2    Binding Effect. ........................................................................................... 29

    6.3    Severability. ............................................................................................... 29

    6.4    Retention of Jurisdiction by the Bankruptcy Court. .................................. 29

    6.5    Captions. .................................................................................................... 30

    6.6    No Waiver. .................................................................................................. 30

    6.7    Modification of Plan. ................................................................................. 30

    6.8    Final Decree. .............................................................................................. 30

ARTICLE 7 ATTACHMENTS ......................................................................................... 30

ARTICLE 8 FREQUENTLY ASKED QUESTIONS ...................................................... 31

ARTICLE 9 DEFINITIONS ............................................................................................. 33

EXHIBIT A – Cash on hand on the Effective Date of the Plan

EXHIBIT B - Cash Flow Projects

EXHIBIT C – Liquidation Analysis

ii

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Debtor has determined that the highest and best return to creditors will be through continuing operations and making Distributions to creditors over the course of a five (5) year plan (equal to 60 months). In particular, the Debtor believes it has the potential for a bright future, particularly in light of its status as a Disadvantaged Business Enterprise ("DBE"), a certification that enables the Debtor to competitively bid for state construction contracts in the State of New Jersey.[1] The Debtor's bankruptcy and Plan will enable the Debtor to shed its economic burdens so that it can pay creditors through the Plan and grow.

The Plan is to be funded through several sources, including: (i) cash on hand; (ii) the Debtor's 10% interest in recoveries of net profits in connection with the Debtor's subcontracts with Vollers Excavating and Construction, Inc. ("Vollers") as previously approved by the Court (defined below as the "Kicker Provision"); (iii) the Debtor's 25% interest in any net recovery on a claim against Schiavone Construction Co. ("Schiavone"); (iv) the first $500,000 of future net profits from new projects followed by 51% of any future net profits generated thereafter over the five year period of the Plan; and (v) any recoveries from Avoidance Actions.

Each Secured Claim will receive treatment as set forth more fully in section 2.2(A) below.

Each Administrative Expense Claim will be paid in full on the later of (i) the Effective Date of the Plan, (ii) the date on which such Administrative Expense Claim is Allowed by the Court, or (iii) such later date as an administrative expense claimant consents to receive payment.

Priority Unsecured Claims shall be paid in full over the life of the Plan, with annual payments not to exceed the aggregate sum of $100,000 except for year 5 as necessary to pay the remaining balance of Priority Unsecured Claims.

All Allowed General Unsecured Claims will be eligible for a pro rata Distribution from available funds after payment of Administrative Expenses, Allowed Priority Tax Claims, and Allowed Priority Unsecured Claims. At this time, it is not possible to estimate what the Distribution to General Unsecured Creditors will be because the Debtor is still accruing Administrative Expenses and it is unclear at this point what the Debtor's projected

---

[1] The Debtor's DBE status has been in place and preserved continuously since the Petition Date (defined below) with respect to each of the Debtor's contracts with each Non-Bonded Project (as defined herein) owner. Section 362 of the Bankruptcy Code and the Sale Order (as defined herein) approving the transactions with Vollers also preserved all obligations of the Debtor since the Petition Date including any obligation to provide any and all commercially useful functions. On December 6, 2022, the State of New Jersey, Department of Transportation (the "DOT"), issued a Notice of Intent to Remove the Debtor's DBE certification due to a minor discrepancy in its application to continue to the DBE status. The Debtor has timely submitted corrected materials to the DOT. The DOT thereafter issued a notice that pending further review, the Debtor's DBE status remains in place. The Debtor reserves the right to challenge any cancellation or suspension of its DBE certification as a violation of the automatic stay and the Sale Order.

1

disposable income will be because (i) the Debtor is investigating causes of action which may bring assets into its estate through judgments or settlements, including potential Avoidance Actions; (ii) as set forth in greater detail below, it is presently unclear what recoveries the Debtor's estate will realize from its interest in subcontracts with Vollers (defined below) under the Kicker Provision (defined below), its interest in any recovery on the Schiavone Claim (defined below), and from Avoidance Actions; (iii) the Debtor may object to certain claims; and (iv) Distributions to General Unsecured Creditors will be contingent on the Debtor's net revenue less costs from new projects during the life of the Plan.  Therefore, the amount available for Distributions to Allowed General Unsecured Claims may increase or decrease prior to a final distribution based on the foregoing and based upon what value the Debtor can realize from the various sources of recoveries.

142291815.1

# ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1    Nature of the Debtor's Business.

The Debtor is a contractor and subcontractor specializing in concrete work, including, but not limited to, curb, sidewalk, bridge, barriers, and slabs. At the time of its bankruptcy filing, the Debtor had bonded and non-bonded projects throughout the State of New Jersey.

### 1.2    History of Business Operations of the Debtor

The Debtor is a multi-generational family-run business that was founded in 1958 by brothers, Diamantino Assuncao and Manuel Assuncao, that began by installing foundations for homes and performing all facets of masonry work. By the mid-1960's, the Debtor served as a general contractor that submitted bids for public contracts, mostly focused on road construction projects. In 1994, Manuel Assuncao sold his interest in the Debtor to his nephew and Diamantno Assuncao's son, Martin Assuncao. Since 1994, Martin Assuncao has been serving as the Debtor's President and sole owner.

### 1.3    Filing of the Debtor's Chapter 11 Case.

On August 3, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). The Chapter 11 Case is pending in the United States Bankruptcy Court for the District of New Jersey in the Trenton Vicinage (the "Bankruptcy Court" or the "Court").

### 1.4    Legal Structure and Ownership.

The Debtor is a New Jersey Corporation with a single shareholder: Martin Assuncao. The Debtor operates as a New Jersey Disadvantaged Business Enterprise ("DBE"). DBEs are for-profit small business concerns where socially and economically disadvantaged individuals own at least a 51% interest and control management and daily operations. The Debtor is also a Small Business Enterprise ("SBE").

### 1.5    Debtor's Assets.

On the Petition Date, the Debtor's assets consisted of: (i) various vehicles, trailers, and construction, equipment; (ii) accounts receivable; (iii) cash; (iv) contracts for active projects for the Debtor to provide concrete-related services, including 19 non-bonded projects and 14 bonded projects; (v) inventory; (vi) leasehold interests; (vii) intellectual property; and (viii) miscellaneous assets, including office furniture and equipment

On the Debtor's Official Form 206A/B ("Schedule A/B") [Docket No. 74] the Debtor listed the approximate book value of its assets as follows:

3

| Asset Description | Value | Schedule Item |
|---|---|---|
| Cash in Bank Accounts | $45,840.00[2] | 3 |
| Accounts Receivable | $2,429,116.00[3] | 11 |
| Contracts in Process | $559,417.00[4] | 20 |
| Office Furniture | $0 | 39 |
| Office Fixtures | $0 | 40 |
| Office Equipment | $0 | 41 |
| Vehicles and Equipment | $2,373,552.00 | 50 |
| Leasehold Interest for Office Space | $0 | 55 |

The basis for the valuation of the assets is cost, with depreciation for reasonable use or depletion, where applicable.

For a complete list of all assets, please refer to the Debtor's amended Schedules A/B [Docket No. 74].

### 1.6 Debtor's Liabilities.

For a complete list of the Debtor's debts, please refer to the Debtor's Official Form 206D and 206E/F ("Schedule D" and "Schedule E/F," respectively) [Docket No. 74].

**a. Secured or Asserted Secured Claims on Petition Date:** On the Petition Date, the Debtor had the following secured or asserted secured liabilities:

**i. Manasquan Bank:** The Debtor had a secured line of credit with Manasquan Bank pursuant to a promissory note, loan agreement, security agreements, mortgages, pledge agreements, collateral assignments, guarantees, and other agreements, instruments, certificate, and documents, dated August 24, 2015 (the "Manasquan Loan"). The Debtor pledged substantially all its assets as security for the Manasquan Loan. Since August 2019, the limit on the Manasquan Loan was $1.3 million, and, as of the Petition Date, the balance due Manasquan Bank, inclusive of principal and interest, was approximately $1,309,232.14, plus additional fees, costs, and expenses that may be due. The Debtor was in default on the Manasquan Loan on the Petition Date. Manasquan Bank's secured claim, the extent it was actually secured, was addressed in connection with the Debtor's post-petition financing and the Vollers Transaction (defined below). Manasquan Bank filed a general unsecured proof of claim (claim number 43-1) for $359,232.14, constituting its deficiency

---

[2] This figure included $39,647.00 in the Debtor's payroll account.

[3] The face amount of the accounts receivable on the Petition Date was approximately $2,836,510.00, but included approximately $407,394.00 in doubtful or uncollectible amounts. Furthermore, accounts receivable on bonded projects are subject to offset. Collection of the balance of receivables on unbonded projects is predicated upon completion of the projects and payments to the various subcontractors.

[4] This was the approximate net book value.

4

claim following the Vollers Transaction.

      **ii.**    **Small Business Administration:** In May 2021, the Debtor executed a Loan Authorization and Agreement with the U.S. Small Business Administration (the "SBA") for an Economic Disaster Loan in the principal amount of $500,000 with an annual interest rate of 3.75% (the "SBA Loan"). The SBA Loan was secured by a subordinate lien on substantially all the Debtor's assets. As of the Petition Date, the balance due the SBA, inclusive of principal and interest, was approximately $523,000. The SBA filed a secured proof of claim for $523,270.55 (claim number 25-1). As set forth below, a portion of the SBA's claim was addressed in connection with the Vollers Transaction, including a payment of $75,000 to the SBA from Vollers and a 10% interest in the net profits collected from subcontracts between the Debtor and Vollers under the Kicker Provision. Following the Vollers Transaction, the Debtor is not holding nor is expecting to receive any further collateral of value securing the SBA's claim.

      **iii.**    **NGM Insurance Company:** Prior to the Petition Date, NGM Insurance Company ("NGM" or the "Surety"), executed certain performance and payment bonds (the "Bonds") on behalf of the Debtor, including Bonds bearing bond numbers for certain obligees of and for the Debtor's 14 active bonded projects on the Petition Date. In order to induce NGM to execute the Bonds on behalf of the Debtor, the Debtor and certain individuals entered into an Agreement of Indemnity with the Surety. Pursuant to a consent order entered by the Court on August 29, 2022 [Docket No. 95], proceeds from bonded projects were either turned over or are to be paid directly to NGM. NGM also asserted to have perfected a lien in the Debtor's assets through a UCC-1 financing statement recorded on June 9, 2022. The UCC-1, however, listed the "debtors" as Lisa Assuncao and Martin Assuncao. To the extent NGM asserts the UCC-1 financing statement is valid against the Debtor, any related secured interest was addressed in connection with the NGM Rejection Order (defined below), Debtor's post-petition financing, and the Vollers Transaction. Additionally, as set forth below, a portion of NGM's claim was addressed in connection with the Vollers Transaction, including NGM shall receive 5% of the net profits collected under the Kicker Provision, and 25% of any recovery on the Schiavone Claim.

      **iv.**    **Vehicle and Equipment Liens:** As set forth more fully in Schedule D, on the Petition Date, the Debtor had secured obligations with respect to several vehicles and pieces of operating equipment totaling approximately $650,000 (the "Equipment Loans"). Several of the Equipment Loans were assumed by the Debtor and assigned to Vollers as part of the Vollers Transaction. To the extent any Equipment Loans were not addressed in connection with the Vollers Transaction, the Debtor has surrendered or will surrender the underlying collateral to the counterparty to an Equipment Loan.

      **v.**    **Mechanics and Charging Liens:** As set forth more fully in section 2.2(A) below, several claimants have filed proofs of claim asserting mechanics' liens with respect to amounts allegedly owed under subcontracts with the Debtor. Additionally, one claimant has asserted an attorney charging lien with respect to services related to receivables due to the Debtor on certain projects. Any such secured claims for mechanics liens, to the extent valid and perfected before the Petition Date, would have been subordinate to the

secured claims of Manasquan Bank and the SBA, and would still be subordinate to the secured claim of the SBA. The Debtor is not holding nor is expecting to receive any collateral of value that might be subject to any asserted mechanics or charging liens. Further, the attorney charging lien claim is asserted with respect to proceeds on bonded projects. Such proceeds have been turned over or are to be paid directly to NGM as surety pursuant to the NGM Rejection Order.

   **b.       Priority Tax Claims:**  As of the Petition Date, the Debtor owed before penalties and interest approximately $130,000 to the State of New Jersey with respect to payroll taxes and unemployment insurance, and approximately $153,000 to the U.S. Department of Treasury for payroll taxes. Total Priority Tax Claims are estimated as approximately $240,000.

   **c.       Priority Unsecured Claims:**  There is approximately $819,000 in filed Priority Unsecured Claims not inclusive of Priority Tax Claims. These claims include union claims. The Debtor expects that the Allowed priority amount of Priority Unsecured Claims after payment by Vollers for certain union benefit plan obligations as part of the Vollers Transaction will not exceed $140,000.

   **d.       General Unsecured Claims:**       The Debtor listed approximately $5,803,568.14[5] in general unsecured claims in Schedule E/F of its petition, which largely consists of various trade and operational-related claims, as well as NGM's claim. General unsecured proofs of claim in the aggregate amount of approximately $14,239,000 have been filed and remain subject to review. The filed proofs of claim include a claim filed by Wiggins Plastics, Inc. ("Wiggins Plastics") for $11,053,938.63 (claim number 56-2) and a claim filed by Knickerbocker Bed ("Knickerbocker Bed") for $267,772.49 (claim number 57), which the Debtor believes can be resolved through applicable insurance in lieu of a claim against the estate. After the anticipated resolution of the Wiggins Plastics' and Knickerbocker Bed's claim, the amount of General Unsecured Claims, not including potential deficiency claims and NGM's claim, will be approximately $3,838,916.

   **1.7       Current and Historical Financial Conditions.**

   On August 10, 2022, the Debtor filed a cash flow statement for the years 2020 and 2021 [Docket No. 43], balance sheet (as of the Petition Date) [Docket No. 44], statements of operations and retained earnings for the years 2020 and 2021 [Docket No. 45], and 2020 federal and state tax returns [Docket No. 48]. On September 21, 2022, the Debtor filed its Monthly Operating Report ("MOR") for the period from the Petition Date through August 31, 2022 [Docket No. 123]. On October 21, 2022, the Debtor filed its Monthly Operating Report for the Period of September 1, 2022, through September 30, 2022 [Docket No. 145]. On November 21, the Debtor filed its Monthly Operating Report for the Period of October 1, 2022, through October 31, 2022 [Docket No. 156]. On December 19, 2022, the Debtor filed its Monthly Operating Report for the Period of November 1, 2022 through November 30,

---

[5] This figure included certain claims for past due union dues and benefits which have or will be paid by Vollers in connection with the Vollers Transaction.

2022 [Docket No. 167]. On January 23, 2022, the Debtor filed its Monthly Operating Report for the Period of December 1, 2022 through December 31, 2022 [Docket No. 186].

The Debtor continues to operate its business as the subcontractor on the projects whereby the Debtor entered into sub-subcontracts with Vollers for Vollers to complete work on certain projects pursuant to the Vollers Transaction as described in greater detail below, and has benefitted from the application of the automatic stay against collection/enforcement efforts against the Debtor or its property. The Debtor has the potential for a bright future, particularly due to its DBE status. However, the Debtor's liabilities remain too large to sustain its business as is, and therefore, its current financial condition dictates an orderly restructuring of the Debtor's business so that it can successfully emerge from bankruptcy as a DBE and SBE contractor and obtain new projects.

### 1.8    Events Leading to the Filing of the Bankruptcy Case.

On August 24, 2022, the Debtor filed the *Declaration of Martin Assuncao in Support of Voluntary Petition and First Day Motion* (the "Assuncao Declaration") [Docket No. 8]. Martin Assuncao is the President of the Debtor and his declaration details the Debtor's history, nature of its operations, and events leading to the necessity of its bankruptcy filing.

As noted, the Debtor is a family-run business that has operated for approximately 64 years. Unfortunately, the Debtor, like so many other businesses, experienced extraordinary challenges and setbacks during the 24 months preceding its bankruptcy filing due to the COVID-19 pandemic. In particular, the pandemic caused delays in projects, including in starting projects, and disruption of management of projects due to having to replace managers and workers.

Additionally, the Debtor encountered the following industry challenges especially relating to municipal projects, which constituted a significant portion of the Debtor's project portfolio: (i) reduced gross profit margins for work performed while cost of materials and labor increased significantly; (ii) working capital constraints, including long-term projects requiring significant time and expense to complete with payment delayed until project completion; and (iii) general collection issues.

In light of the circumstances, the Debtor initiated aggressive bidding to win projects, but was unfortunately subject to losses, miscalculations, and unprofitable jobs. The Debtor also hired new financial management, which led to errors in reporting and mis-projecting profit and losses and jobs.

Lastly, several creditors, including NGM, initiated litigation against the Debtor and/or alleged indemnitors.

### 1.9    Significant Events During the Bankruptcy Case.

On August 4, 2022, the Debtor filed first day motions (the "First Day Motions") including:

a) *Motion for Entry of an Order Authorizing the Debtor to Pay and Honor Pre-Petition Employee Wages, Salaries, Benefits, Expenses, and Other Obligations* (the "Employee Wages Motion") [Docket No. 3].

b) *Motion for Entry of an Order (I) Authorizing the Continued Use of (A) Existing Cash Management System and (B) Existing Bank Accounts and Business Forms, (II) Providing the United States Trustee with a 60-Day Objection Period, and (III) Granting Related Relief* (the "Cash Management Motion") [Docket No. 4].

c) *Motion for Entry of Interim and Final Orders (I) Authorizing (A) Post-Petition Financing and (B) Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; and (III) Scheduling a Final Hearing* (the "Financing Motion") [Docket No. 13].

A hearing on expedited time was held on the First Day Motions on August 4, 2022, whereafter the Court entered orders granting the Employee Wages Motion and the Cash Management Motion [Docket Nos. 20 and 22] and an interim order granting the Financing Motion [Docket No. 23].

On August 5, 2022, the Debtor filed a *Motion for Entry of an Order (I) Authorizing the Sale of Certain of the Debtor's Assets to Vollers Excavating and Construction, Inc., (II) Approving Settlement, (III) Authorizing Debtor to Enter into Subcontracts with Vollers for Certain Non-Bonded Projects, and (IV) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") [Docket No. 25].

A hearing on the Financing Motion and the Sale Motion was held on August 22, 2022. On August 24, 2022, the Court entered a final order granting the Financing Motion [Docket No. 84] (the "Final Financing Order"). On August 25, 2022, the Court entered an order granting the Sale Motion (the "Sale Order"). The Final Financing Order and the Sale Order included compromises and relief negotiated among the Debtor and several interested parties, including the United States Trustee, Manasquan, the SBA, NGM, and certain of the Debtor's subcontractors and counterparties to executory contracts and unexpired leases. The Final Financing Order and the Sale Order provided the following relief:[6]

- Authorized the Debtor to enter into a DIP Loan with Vollers in the maximum principal amount of $200,000 for payment of (i) accrued and unpaid payroll as of the Petition Date, (ii) payroll and labor costs (including applicable payroll taxes) for those certain Non-Bonded Projects going forward as part of the Vollers Transaction; and (iii) insurance coverage. Vollers was granted a DIP Lien on the DIP Collateral as more fully set forth in the Final Financing Order. The DIP Loan was assumed by Vollers at the closing of the Vollers

---

[6] Capitalized terms in the bullet point summaries shall have the same meaning ascribed to them in the Final Financing Order and/or the Sale Order unless otherwise defined herein.

8

Transaction, as set forth below.

- Provided Adequate Protection Liens and super priority administrative expense claims to Manasquan and the SBA as more fully set forth in the Final Financing Order.

- Approved payment to Manasquan from the proceeds of the Vollers Transactions in satisfaction of Manasquan's secured claim.

- Approved a payment of $25,000 from Manasquan to the Debtor's estate for payment of administrative expenses, which the Debtor is authorized to apply to any allowed professional fees.

- Approved the Debtor's proposed sale of assets to Vollers (the foregoing shall be referred to as the "Vollers Transaction", as more fully set forth in the Sale Order and the Asset Purchase Agreement annexed thereto as Exhibit A), including:

  o Vollers purchased various assets from the Debtor, including various vehicles and equipment.  The sale did not include accounts receivable from Non-Bonded Projects already collected by the Debtor, accounts receivable from Bonded Projects, or Avoidance Actions.

  o The Debtor was authorized to enter into subcontracts with Vollers for Vollers to complete the Subcontracted Projects, consisting of several of the Debtor's Non-Bonded Projects.

  o The Sale Order precluded any party asserting any claim against the Subcontracted Projects and specifically preserved the Debtor's status as a DBE pursuant to its subcontracts with Non-Bonded Project owners.

  o Vollers provided the following consideration for the Vollers Transactions:  (i) Vollers paid Manasquan $975,000 in satisfaction of Manasquan's secured claim against the Debtor, with Manasquan being entitled to file a general unsecured claim for any deficiency; (ii) Vollers assumed the Debtor's obligations under the Equipment Loans, valued at approximately $600,000;[7] (iii) Vollers agreed to share 25% of the net profits collected on the Subcontracted Projects, apportioned as follows:  (a) 10% with the Debtor, (b) 10% with the SBA on account of its secured claim against the Debtor, and (c) 5% with NGM on account of its claim against the Debtor (the "Kicker Provision"); and (iv) Vollers agreed to pursue Debtor's claims against Schiavone (the "Schiavone Claim") at Vollers' expense, with 25% of the net recovery

---

[7] A list of the Equipment Loans assumed by the Debtor and assigned to Vollers is set forth in Schedule 1.03(d) to the Asset Purchased Agreement annexed as Exhibit A to the Sale Order.

9

   to be paid to the Debtor's estate and 25% of the net recovery to be paid to NGM on account of its claim against the Debtor.

   o Vollers agreed to make offers of employment to the Debtor's non-union employees on terms not less favorable than the terms of employment with the Debtor. Vollers further agreed to assume certain holiday, vacation, and sick time for the Debtor's employees hired by Vollers, and to pay accrued union benefit plan obligations related to the Subcontracted Projects.

  The Vollers Transaction closed on or about August 26, 2022. The Debtor and Vollers thereafter executed subcontract agreements on each of the Non-Bonded Projects, wherein the Debtor's DBE status and obligations as a DBE contractor to the various Non-Bonded Project owners remained intact and subject to the terms of the Sale Order.

  On August 16, 2022, the Debtor filed a *Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Leases Effective as of the Petition Date* (the "Rejection Motion") [Docket No. 57]. On September 6, 2022, the Court entered an order approving the Rejection Motion, whereby the Debtor was authorized to reject several executory contracts and unexpired leases listed in Schedule 1 to the order [Docket No. 106]. The Court subsequently entered consent orders agreed to by (i) the Debtor and Horizon authorizing the rejection of the Debtor's health insurance policy [Docket No. 112], and (ii) the Debtor and Acrow Corporation authorizing the rejection of an unexpired equipment lease [Docket No. 125].

  On August 26, 2022, the Debtor filed (i) an application to retain Fox Rothschild LLP as its attorneys (the "Fox Rothschild Retention Application") [Docket No. 90], and (ii) an application to retain KCP Advisory Group LLC as financial advisors (the "KCP Retention Application") [Docket No. 91]. On September 2, 2022, the United States Trustee filed objections to the Fox Rothschild Retention Application and the KCP Retention Application [Docket Nos. 104 and 105]. The United States Trustee's objections were ultimately resolved and the Court entered an order on October 12, 2022 approving the Fox Rothschild Retention Application [Docket No. 137] and an order on October 19, 2022 approving the KCP Retention Application [Docket No. 144].

  On August 29, 2022, the Court entered a consent order agreed to by the Debtor and the NGM, which, among other relief, (i) authorized the Debtor to reject Bonded Projects (as defined in the consent order); (ii) granted NGM relief from the automatic stay to complete work on the Bonded Projects; and (iii) directed that Bonded Contract Proceeds (as defined in the consent order) be turned over and/or paid to NGM (the "NGM Rejection Order") [Docket No. 95].

  On November 9, 2022, the Court entered an order extending the time for the Debtor to file its Plan to January 30, 2023 [Docket No. 150].

  On January 3, 2022, the Court entered orders granting the first interim fee applications

of Fox [Docket No. 176], KCP [Docket No. 177], and the Trustee [Docket No. 180] (the "First Interim Fee Orders") in the following amounts:

- Fox: $214,957.50 in fees, less a $5,000 holdback subject to a final fee application as requested by the United States Trustee, and $7,475.93 in expenses.
- KCP: $124,198 in fees and $803.15 in expenses.
- Trustee: $31,680 in fees and $112 in expenses.

**1.10    Projected Recovery of Avoidance Actions**

The Debtor has not yet completed its investigation with regard to prepetition transactions that may be subject to Avoidance Actions but will do so soon and reserves the right to bring Avoidance Actions following confirmation of the Plan.

If you received a payment or other transfer of property within 90 days of the Petition Date, the Debtor may seek to avoid and recover such transfer.

During the year prior to the Petition Date, the Debtor made payments totaling approximately $510,533.34 to or for the benefit of Martin Assuncao and/or Lisa Assuncao, which may form the basis for potential Avoidance Action claims. The Debtor has not yet analyzed these claims. Martin Assuncao and Lisa Assuncao reserve their rights and are examining their defenses to potential Avoidance Action claims, including as to any expenditures made on behalf of the Debtor.

The right to bring any Avoidance Action claims following confirmation of the Plan is preserved. The Plan shall designate an independent Plan Administrator to investigate and pursue Avoidance Claims on a contingency basis. The Plan Administrator and the terms of his/her appointment shall be set forth in a plan supplement to be filed.

Additionally, contemporaneous with the Vollers Transaction, a separate entity owned by Martin Assuncao, ABECO LLC, sold certain assets consisting of seven (7) vehicles and equipment (the "ABECO Equipment") to Vollers for $51,305. To the extent the Debtor contributed funds for the original purchase of any piece of ABECO Equipment, such is believed to have occurred more than four (4) years prior to the Petition Date. The Debtor therefore believes there are no timely claims for turnover or to otherwise recover the proceeds paid by Vollers for the ABECO Equipment under the Bankruptcy Code or state law. Further, several pieces of the ABECO Equipment were damaged in a flood in 2021. Approximately $60,098.73 was paid and deposited into the Debtor's bank account from insurance claims on these pieces of the ABECO Equipment. The estate therefore abandons any right to pursue the proceeds from the sale of the ABECO Equipment.

**ARTICLE 2**
**THE PLAN**

The Debtor's Plan must describe how its Creditors will be paid. Certain Claims are

11

entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### 2.1    Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

A.    Administrative Expenses

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1. If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

12

2. If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3. Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | The Debtor is conducting its business in the ordinary course, including paying its post-petition trade, utilities, and tax debt as it comes due. These expenses are expected to be minimal. | Payment through the Plan as follows:<br><br>Payment in full no later than the later of: (i) the Effective Date of Plan, or as soon as practicable thereafter; (ii) on a date mutually agreed upon between the Debtor and the creditor; and (iii) the entry of a final order allowing the claim. |
| Administrative Tax Claim | The Debtor will continue to pay any Administrative Tax Claims as they come due. These expenses are minimal in the Debtor's ordinary course of business. | Payment through the Plan as follows:<br><br>Payment in full no later than the later of: (i) the Effective Date of Plan, or as soon as practicable thereafter; (ii) on a date mutually agreed upon between the Debtor and the creditor; and (iii) the entry of a final order allowing the claim. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | None. | Payment through the Plan as follows: Not applicable. |

13

| | | |
|---|---|---|
| Professional fees, as approved by the Bankruptcy Court | Professional fees and expenses for the Debtor's counsel through confirmation are estimated to be $125,000. $217,433.43 has been paid to date as authorized by the Court.<br><br>Professional fees and expenses for the Debtor's financial advisor(s) through confirmation are estimated to be $100,000. $125,001.15 has been paid to date as authorized by the Court. | After Bankruptcy Court approval, Payment through the Plan as follows:<br><br>Payment in full no later than the later of: (i) the Effective Date of Plan, or as soon as practicable thereafter; (ii) on a date mutually agreed upon between the Debtor and the creditor; and (iii) the entry of a final order allowing the claim.<br><br>As noted above, $100,000 was provided for the Debtor's professionals, consisting of $25,000 paid by Manasquan pursuant to the Final Financing Order and $75,000 paid by Vollers pursuant to the Sale Order.<br><br>On the Petition Date, Fox held a retainer balance of $67,690 and KCP held a retainer balance of $98,168.75, which amounts shall be applied by Fox and KCP to their respective fees and costs incurred in the Chapter 11 Case as approved by the Court.<br><br>On January 3, 2023, the Court entered the First Interim Fee Orders allowing fees and expenses to Fox, KCP, and the Trustee, as set forth above. |
| Clerk's Office fees | Clerk's Office fees are estimated to be $0.00, or nominal. | Paid in full on the Effective Date. |
| Other Administrative Expenses | None. | Payment through the Plan as follows: Not applicable. |
| Trustee | Trustee fees through confirmation are estimated to be $25,000. | Upon application under § 330 |

14

| | | |
|---|---|---|
| | $31,792 has been paid to date as authorized by the Court. | and after Bankruptcy Court approval, payment through the Plan as follows:<br><br>Payment in full no later than the later of: (i) the Effective Date of Plan, or as soon as practicable thereafter; and (ii) the entry of a final order allowing the claim.<br><br>As noted, pursuant to a consent order entered on September 21, 2022 [Docket No. 122], the Debtor provided the Trustee with a $25,000 retainer for his fees incurred in connection with the Chapter 11 Case. |
| TOTAL | **$250,000.** | |

### B.      Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

***There are Priority Tax Claims against the Debtor's estate.  To the extent such claims existed on the Petition Date, they will be paid in full over the course of five (5) years under the Plan.***

### 2.2      Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### A.      Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code.  If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. In addition, certain claims secured only by the debtor's principal residence, may require different treatment pursuant to § 1190(3) of the Code as set forth below, if applicable.

15

142291815.1

Case 22-16159-CMG    Doc 810-1    Filed 03/06/25    Entered 03/06/23 16:40:25    Desc Main
Exhibit A - TDR Proposed Order    Page 21 of 49

Case 22-16159-CMG    Doc 890    Filed 04/03/23    Entered 04/03/23 14:00:25    Desc Main
Exhibit A - Proposed Order    Page 21 of 48

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1 | Claimant: Manasquan Bank<br><br>Collateral Description: First priority lien on substantially all of the Debtor's asset pursuant to a UCC-1 financing statement.<br><br>Secured Claim Amount: $0.00.[8] | Impaired | On the Petition Date, Manasquan Bank held a first priority lien on substantially all of the Debtor's assets. Manasquan Bank's secured claim, to the extent it was actually secured, was addressed in connection with the Debtor's post-petition financing and the Vollers Transaction, including that Manasquan Bank agreed to release its liens in exchange of payment of $975,000 from Vollers pursuant to the Sale Order. Manasquan Bank's rights under third-party guarantees and mortgages and/or security agreements against non-Debtor property, were preserved.<br><br>Following approval of the Debtor's financing and the Vollers Transaction, Manasquan Bank filed an unsecured proof of claim (claim number 43-1) for $359,232.14 constituting its deficiency following the Vollers Transaction. Manasquan Bank's claim shall therefore be treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 2 | Claimant: SBA<br><br>Collateral Description: All tangible and intangible personal property pursuant to a UCC-1 financing statement.<br><br>Secured Claim Amount: $448,270.55[9] | Impaired | At the time of the Vollers Transaction, the SBA's secured claim was subordinate to the secured claim of Manasquan. Pursuant to the Sale Order, the SBA was paid $75,000 from Vollers and is entitled to receive 10% of the Kicker Provision in partial satisfaction |

16

| | | | of its secured claim. |
|---|---|---|---|
| | | | Following the Vollers Transaction, the Debtor does not believe it has any assets or claims subject to the SBA's secured claim and lien.  To the extent any additional assets or claims are discovered that are subject to the SBA's secured claim and lien, the SBA shall be entitled to the proceeds of the liquidation of said assets or claims up to the remaining balance of its secured claim, subject to the Debtor's right to assert a claim for recovery of the reasonable and necessary costs and expenses of preserving or disposing of such assets and claims pursuant to section 506(c) of the Bankruptcy Code. |
| | | | Any deficiency on the SBA's claim shall be classified and treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 3 | Claimant: NGM<br><br>Collateral Description: Asserted lien on Bonded Contract Proceeds under certain indemnity agreements with the Debtor. Also asserted UCC-1 financing statement. | Impaired | NGM has asserted an unliquidated secured claim without an amount stated (claim number 60).<br><br>Pursuant to the Sale Order, NGM is to receive to 5% of the Kicker Provision and 25% of any recovery on the Schiavone |

---

[8] Manasquan Bank was scheduled with a secured claim for $1,299,717.00, but as noted, Manasquan Bank's secured claim was addressed in connection with the Debtor's post-petition financing and the Vollers Transaction.

[9] The SBA filed a secured proof of claim for $523,270.55.  The amount listed above reflects a reduction of $75,000 for a payment to the SBA from Vollers on account on its secured claim in connection with the Vollers Transaction.

|  |  |  |  |
|---|---|---|---|
|  | Secured Claim Amount: Unknown/Unliquidated |  | Claim on account of its claim.<br><br>Pursuant to the NGM Rejection Order, all Bonded Contract Proceeds were either turned over or directed to NGM.<br><br>NGM's UCC-1 financing statement was not recorded against the Debtor. To the extent NGM asserts the UCC-1 financing statement is valid against the Debtor, any related secured interest was addressed in connection with the Debtor's post-petition financing and the Vollers Transaction.<br><br>Any remaining balance of NGM's claim shall be classified and treated as a General Unsecured Claim under Class 18 of the Plan., subject to the Debtor's right to object and/or seek estimation. |
| 4 | Claimant: Americredit Financial Services, Inc., d/b/a GM Financial ("Americredit")<br><br>Collateral: 2018 Chevrolet Silverado 1500; 2021 Chevrolet Tahoe; 2020 Chevrolet Colorado; 2017 Chevrolet Silverado 3500H; 2017 Chevrolet Silverado 3500(H); 2020 GMC Sierra.<br><br>Secured Claim Amount: $137,040,09 (aggregate of six (6) separate secured claims). | Unimpaired | The equipment financing loans with Americredit and underlying vehicles subject to the loans were assigned and transferred to Vollers as part of the Vollers Transaction pursuant to the Sale Order. Vollers is therefore responsible for all obligations going forward to Americredit and Americredit no longer has any secured claims against property of the Debtor or its estate. |
| 5 | Claimant: Santander Consumer USA Inc., d/b/a Chrysler Capital<br><br>Collateral: 2019 Jeep Grand Cherokee | Unimpaired | Secured claim to be satisfied by surrender of collateral and the Debtor has consented to relief from the automatic stay so that the claimant may |

18

142291815.1

| | | | |
|---|---|---|---|
| | Secured Claim Amount: $15,579.53 | | recover its collateral [Docket No. 184]. Any deficiency amount to be classified and treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 6 | Claimant: Wells Fargo Equipment Vendor Financial Services, LLC<br><br>Collateral: Kobelco Excavator Hydraulic and Kent Hammer Hydraulic<br><br>Secured Claim Amount: $169,949 | Unimpaired | The equipment financing loans with Wells Fargo and underlying equipment subject to the loans were assigned and transferred to Vollers as part of the Vollers Transaction pursuant to the Sale Order. The Debtor understands that Wells Fargo's claim has been satisfied by Vollers. Wells Fargo therefore no longer has a secured claim against property of the Debtor or its estate. |
| 7 | Claimant: Wells Fargo Equipment Finance, Inc.<br><br>Collateral: Dynapac CC1300 Asphalt Roller<br><br>Secured Claim Amount: $13,513 | Unimpaired | The equipment financing loans with Wells Fargo and underlying equipment subject to the loans were assigned and transferred to Vollers as part of the Vollers Transaction pursuant to the Sale Order. The Debtor understands that Wells Fargo's claim has been satisfied by Vollers. Wells Fargo therefore no longer has a secured claim against property of the Debtor or its estate. |
| 8 | Claimant: Kubota Credit Corporation<br><br>Collateral: Kubota SVL95-2SHFC<br><br>Secured Claim Amount: $46,496.46 | Unimpaired | The equipment financing loan and underlying equipment subject to the loan were assigned and transferred to Vollers as part of the Vollers Transaction pursuant to the Sale. Vollers is therefore responsible for all obligations going forward and claimant no longer has a secured claim against property of the Debtor or its estate. |

| 9 | Claimant: Hedinger & Lawless, LLC<br><br>Collateral: Asserted attorney charging liens for project payments under the following contracts: (i) Essex County Contract No. 18-239; (ii) Essex County Contract No. 20-045; (iii) Ocean County Contract No. 15-081-0960.<br><br>Secured Claim Amount: $44,247.20 | Impaired | The underlying projects are bonded projects, the proceeds for which have either been turned over or are to be paid directly to NGM as surety pursuant to the NGM Rejection Order. The Debtor is otherwise not in possession and does not expect to come into possession of any assets that would be subject to the claimant's asserted secured claim. Any deficiency amount to be classified and treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 10 | Claimant: Tiffany Electric<br><br>Collateral: Asserted mechanic's liens for work performed under subcontracts<br><br>Secured Claim Amount: $945,784.20 | Impaired | To the extent claimant had a valid and perfected lien on the Petition Date, such secured claim would have been subordinate to the secured claims of Manasquan Bank and the SBA and would still be subordinate to the secured claim of the SBA. The Debtor is not holding nor is expecting to receive any collateral of value that might be subject to claimant's asserted mechanic's lien. Claimant's claim shall therefore be treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 11 | Claimant: Trench Technologies LLC<br><br>Collateral: Asserted mechanic's liens for work performed under subcontracts.<br><br>Secured Claim: $27,298.70 | Impaired | To the extent claimant had a valid and perfected lien on the Petition Date, such secured claim would have been subordinate to the secured claims of Manasquan Bank and the SBA and would still be subordinate to the secured claim of the SBA. The Debtor |

| | | | is not holding nor is expecting to receive any collateral of value that might be subject to claimant's asserted mechanic's lien. Claimant's claim shall therefore be treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
|---|---|---|---|
| 12 | Claimant:  Diamond Sand and Gravel<br><br>Collateral:  Asserted mechanic's liens for work performed under subcontracts.<br><br>Secured Claim Amount: $129,944 | Impaired | To the extent claimant had a valid and perfected lien on the Petition Date, such secured claim would have been subordinate to the secured claims of Manasquan Bank and the SBA and would still be subordinate to the secured claim of the SBA.  The Debtor is not holding nor is expecting to receive any collateral of value that might be subject to claimant's asserted mechanic's lien.  Claimant's claim shall therefore be treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 13 | Claimant:  Zuccaro Inc.<br><br>Collateral:   Asserted mechanic's liens for work performed under subcontracts.<br><br>Secured Claim Amount: $112,704.35 | Impaired | To the extent claimant had a valid and perfected lien on the Petition Date, such secured claim would have been subordinate to the secured claims of Manasquan Bank and the SBA and would still be subordinate to the secured claim of the SBA.  The Debtor is not holding nor is expecting to receive any collateral of value that might be subject to claimant's asserted mechanic's lien.  Claimant's claim shall therefore be treated as a General Unsecured Claim under Class 18 of the Plan, |

142291815.1

| | | | subject to the Debtor's right to object. |
|---|---|---|---|
| 14 | Claimant:  United States Internal Revenue Service<br><br>Collateral:  Federal tax lien<br><br>Secured Claim Amount: $33,872.47 | Impaired | To the extent the claimant had a secured claim against any assets of the Debtor on the Petition Date, it would have been subordinate to the secured claims of Manasquan and the SBA and would still be subordinate to the secured claim of the SBA.  Following the Vollers Transaction, the Debtor does not have any assets or claims that would secure claimant's claim.  Additionally, claimant filed a proof of claim asserting only a priority claim and not a secured claim (claim number 17, as amended).<br><br>The claimant's claim shall be classified and treated as a General Unsecured Claim under Class 18 of the Plan, subject to the Debtor's right to object. |
| 15 | Claimant:  Komatsu Financial Limited Partnership<br><br>Collateral:  Komatsu PC138USCL-11 Hydraulic<br><br>Claim Amount:  $132,171 | Unimpaired | The equipment financing loan with Komatsu and underlying equipment subject to the loan were assigned and transferred to Vollers as part of the Vollers Transaction pursuant to the Sale Order.  The Debtor understands that Komatsu's claim has been satisfied by Vollers.  Komatsu therefore no longer has a secured claim against property of the Debtor or its estate. |
| 16 | Claimant:  VFS UC LLC<br><br>Collateral:  2016 Mack GU713<br><br>Claim Amount:  $0 | Unimpaired | Previously satisfied by payment in full to claimant with insurance proceeds and the vehicle was transferred to Vollers as part of the Vollers Transaction pursuant to the |

142291815.1

| | | | Sale Order. Claimant therefore no longer has a secured claim against property of the Debtor or its estate. |
|---|---|---|---|

### B.    Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 17 | Priority Unsecured Claims<br><br>Total amount of scheduled and/or filed claims: $819,000 | Impaired | As noted above, several Priority Unsecured Claims have been or will be paid by Vollers as part of the Vollers Transaction, and the Debtor believes that the ultimate amount of Allowed Priority Unsecured Claims to be paid through the Plan will not exceed $140,000 after reduction for claims paid or to be paid in connection with the Vollers Transaction.<br><br>Allowed Priority Unsecured Claims shall be paid in full over the five (5) year period of the Plan, with annual distributions under the Plan on account of Allowed Priority Unsecured Claims to not exceed the aggregate sum of $100,000 per year. |

### C.    Class of General Unsecured Claims

General unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart sets forth the Plan's proposed treatment of the class of General Unsecured Claims:

23

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 18 | General Unsecured Class<br><br>Total amount of scheduled and/or filed claims: $14,239,000 | Impaired | As noted above, the Debtor listed approximately $5,803,568.14 in general unsecured claims in Schedule E/F of its petition, which largely consists of various trade and operational-related claims, as well as NGM's claim.  General unsecured proofs of claim in the aggregate amount of approximately $14,239,000 have been filed and remain subject to review.  The filed proofs of claim include claims filed by Wiggins Plastics for $11,053,938.63 (claim number 56-2) and Knickerbocker Bed for $267,772.49 (claim number 57), which the Debtor believes will be resolved without the estate having liability.  The remaining balance of General Unsecured Claims, not including potential deficiency claims, NGM's claim, and various unliquidated claims, including unliquidated claims filed by Martin Assuncao and Lisa Assuncao, is estimated to be approximately $3,838,916.<br><br>Pro rata payment of Allowed Unsecured Claims as soon as practicable following payment in full of allowed Administrative Expenses and payment in full of Allowed |

24

| | | | Priority Tax Claims and Priority Unsecured Claims. |
|---|---|---|---|

### D. Class of Equity Interest Holders

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are Equity Interest holders. In a partnership, Equity Interest holders include both general and limited partners. In a limited liability company (an "LLC"), the Equity Interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the Equity Interest holder.

The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 19 | Equity Interest Class (membership interest in the Debtor) | Impaired | It is not anticipated that Equity Interest holders will receive any distributions under the Plan. Equity Interest Holders will retain a 51% interest in the Debtor to ensure that the Debtor maintains its DBE status so that the Debtor can continue to operate and fund the Plan. |

### 2.3 Estimated Number and Amount of Claims Objections.

The Debtor may object to the amount or validity of any Claim within 120 days of the Confirmation Date (the "Claim Objection Deadline") by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan. The Court may extend the Claim Objection Deadline upon a motion filed by the Debtor requesting additional time to objection to claims.

### 2.4 Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

### Rejection of Executory Contracts and Unexpired Leases.

25

All Executory Contracts in which the Debtor has an interest, whether listed on the Debtor's Official Form 206G ("Schedule G") or not, to the extent not previously rejected pursuant to an order of the Court, shall be rejected by the Debtor unless assumed prior to the entry of the Confirmation Order.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject an Executory Contract, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

Pursuant to D.N.J. LBR 3003-1(b), the deadline for filing a proof of claim based on a claim arising from the rejection of an Executory Contract is thirty days after rejection. Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed unless the Bankruptcy Court orders otherwise.

**2.5** **Means for Implementation of the Plan and Debtor's Future Management.**

The Plan is a five-year (60 month) plan to be funded by: (i) cash on hand; (ii) 10% of any net profits payable by Vollers under the Kicker Provision; (iii) 25% of any recovery on the Schiavone Claim; (iv) the first $500,000 of future net profits from new business after the Plan is confirmed followed by 51% of any future net profits generated thereafter over the five year period of the Plan;[10] and (v) any recoveries from Avoidance Actions.

Martin Assuncao will own 51% of the Debtor and an entity to be designated and owned by Vollers will own 49% of the Debtor. The Debtor, by and through Martin Assuncao, will, however, be completely responsible for the negotiation and execution of all future construction contracts and to perform, manage, and supervise the work involved. Martin Assuncao will also be solely responsible to purchase all materials and supplies to be used in connection with any future construction contract, including, but not limited to, negotiating price, determining quality, quantity, ordering the material and installing (where applicable) and paying for the material.

Martin Assuncao shall, either personally or with a full-time skilled and knowledgeable superintendent who will be under the Mr. Assuncao's direct supervision, be responsible for, among other things, scheduling work operations, receiving quotes, ordering equipment and materials, preparing and submitting certified payrolls, hiring and terminating employees, making all operational and managerial decisions, and supervise daily operations.

ABI will maintain a regular workforce and will supplement its workforce, as necessary, with union labor. ABI shall be responsible to pay for all payroll and labor and responsible for all payroll and labor compliance requirements for all employees within the control of the Debtor.

---

[10] The Debtor's operating expenses include a management fee for Vollers equal to 10% of the direct operating costs of the Debtor. Vollers will receive 49% of future net profits after the first $500,000 of future net profits is paid to the Debtor to fund the Plan.

ABI as necessary, may purchase and own or lease equipment pursuant to equipment financing or lease agreements at arms-length commercially reasonable terms or lease equipment from industry suppliers. ABI will insure and completely control the operation of the equipment. The Debtor will perform and provide all Commercially Useful Functions pursuant to 49 CFR 26.55.

On the Effective Date, Vollers will provide a working line of credit to the Debtor in the amount of $250,000 to permit the Debtor to maintain adequate insurance and retain employees to restart estimating and bidding operations for future construction subcontracts. The Debtor's goal is to build sufficient backlog and run its operations to permit the Debtor to secure bonding capacity in the future to allow the Debtor to bid on public projects in the State of New Jersey.

On Confirmation of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equitable Interests except as provided in the Plan, to the Debtor. The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date.

The Debtor's DBE status has been in place and preserved continuously since the Petition Date with respect to each of the Debtor's contracts with each Non-Bonded Project owner. Section 362 and the Sale Order approving the transactions with Vollers also preserved all obligations of the Debtor since the Petition Date including any obligation to provide any and all commercially useful functions. Nothing herein shall prohibit the Debtor from continuing to satisfy the DBE requirements of each Non-Bonded Project or pursue new projects under its DBE status post-confirmation.

### 2.6 <u>Payments.</u>

If the Plan is confirmed under § 1191(a) or (b), the Debtor shall make all Plan payments to Creditors provided for in the Plan.

### 2.7 <u>Tax Consequences of the Plan.</u>

*<u>Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.</u>*

Creditors should consult their own tax professionals to consider the consequences of any discharge, and the general tax consequences of the receipt of distributions under the Plan.

### 2.8 <u>Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan</u>

Debtor has provided projected financial information. Those projections are listed in Exhibits A and B.

27

## ARTICLE 3
## FEASIBILITY OF PLAN

### 3.1     Ability to Initially Fund Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash, are attached hereto as Exhibit A.

### 3.2     Ability to Make Future Plan Payments And Operate Without Further Reorganization.

The Debtor shall submit the first $500,000 of future net profits from new projects followed by 51% of any future net profits generated thereafter directly to creditors as is necessary for the execution of the Plan.

The Debtor has provided projected financial information. Those projections are listed in Exhibits A and B to the Plan (as referenced in § 2.9 above).

The Debtor's financial projections show that the Debtor will have an aggregate total cash flow during the Plan, after paying operating expenses and post-confirmation taxes, of $86,000. The final Plan payment is expected to paid on the 60th month after the Effective Date.

***You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.***

## ARTICLE 4
## LIQUIDATION ANALYSIS.

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as Exhibit C.

## ARTICLE 5
## DISCHARGE OF DEBTOR.

### 5.1     Discharge.   If the Plan is confirmed under § 1191(a), on the Confirmation Date of the Plan, the Debtor will be discharged from any debt that arose before the confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b),** as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall

28

grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt –

    (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the court; or

    (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

## ARTICLE 6
## GENERAL PROVISIONS.

### 6.1    Title to Assets.

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the estate.

### 6.2    Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

### 6.3    Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4    Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear and allow all

applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

### 6.5    Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 6.6    No Waiver.

Except as otherwise specifically provided herein, nothing set forth in this Plan shall be deemed a waiver or release of any claims, rights or Causes of Action against any Person other than the Debtor.

### 6.7    Modification of Plan.

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a).  However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.8    Final Decree.

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case.  Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### ARTICLE 7
### ATTACHMENTS

The following documents accompany the Plan [check those applicable, and list

any other attachments here]:

[ ]      Debtor's Assets at Fair Market Value, annexed as Exhibit __.

[ ]      Debtor's Liabilities, annexed as Exhibit __.

[X]      Financial forecast for the Debtor, annexed as **Exhibit B.**

[ ]      Debtor's most recent financial statements issued before bankruptcy, annexed as Exhibit __.

[ ]      Debtor's most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case annexed as Exhibit __.

[ ]      Summary of the Debtor's periodic operating reports filed since the commencement of the Debtor's bankruptcy case annexed as Exhibit __.

[ ]      Executory Contracts and Unexpired Leases, to be Assumed annexed as Exhibit __.

[ ]      Executory Contracts and Unexpired Leases to be Assumed and Assigned, annexed as Exhibit __.

[ ]      Executory Contracts and Unexpired Leases to be Rejected, annexed as Exhibit __.

[X]      Tables showing the amount of cash on hand as of the Effective Date, and the sources of that cash, annexed as **Exhibit A.**

[X]      Liquidation Analysis, annexed as **Exhibit C.**

## ARTICLE 8
## FREQUENTLY ASKED QUESTIONS

**What Is the Debtor Attempting to Do in Chapter 11?**  Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor attempts to restructure the claims held against it.  Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11.  The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?**  In order to confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is

31

doing with this Plan. If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class, what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. **Section 2.2** lists all classes of claimants and their types of claims.

**Why Is Confirmation of a Plan of Reorganization Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** **Section 2.2** of the Plan identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all claim holders for their review, consideration and approval. The deadline by which ballots must be returned is  FEBRUARY 28, 2023 . Ballots should be mailed to the following address:

142291815.1

Fox Rothschild LLP
Attn: Joseph J. DiPasquale, Esq.
49 Market Street
Morristown, NJ 07960

**How Do I Determine When and How Much I Will Be Paid?**  Section 2.2 details the timing Creditors can expect payment. Creditors can expect pro rata payment of their Allowed Claim along with other holders of Allowed Claims.

## ARTICLE 9
## DEFINITIONS

A.      The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan.  The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code.

B.      **Administrative Claimant**: Any person entitled to payment of an Administration Expense.

C.      **Administrative Convenience Class:** A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

D.      **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

E.      **Administrative Tax Claim**:   Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

F.      **Allowed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

G.      **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any

33

offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

H.  **Allowed Priority Unsecured Claim**: A Priority Unsecured Claim, other than a Priority Tax Claim, to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

I.  **Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

J.  **Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

K.  **Avoidance Actions**: Any and all claims or causes of action to avoid or recover a transfer of property, or avoid an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code and any other applicable non-bankruptcy law, whether or not litigation has been commenced with respect to such claims or causes of action as of the Effective Date

L.  **Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

M.  **Bankruptcy Court**: The United States Bankruptcy Court for the District of New Jersey.

N.  **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

O.  **Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

P.  **Chapter 11 Case**: This case filed under chapter 11 of the Bankruptcy Code in the Bankruptcy Court in which Assuncao Bros., Inc., is the Debtor-in-Possession [Case No. 22-16159-CMG].

Q.  **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor,

34

whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

R.　**Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

S.　**Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

T.　**Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

U.　**Confirmation Hearing**: The hearing to be held on   3/7/23  , 2023 to consider confirmation of the Plan.

V.　**Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

W.　**Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

X.　**Debtor** and **Debtor-in-Possession**: Assuncao Bros., Inc., the debtor-in-possession in this Chapter 11 Case.

Y.　**Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed.

Z.　**Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

AA.　**Effective Date**: Pursuant to D.N.J. LBR 3020-1, the effective date of a chapter 11 plan is 30 days after entry of the order confirming the plan unless the plan or confirmation order provides otherwise.

BB.　**Equity Interest**: An ownership interest in the Debtor.

CC.　**Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

DD.　**Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

EE.    **IRC**: The Internal Revenue Code. Title 26 of the United States Code, as amended.

FF.    **Petition Date**: August 3, 2022, the date the chapter 11 petition for relief was filed.

GG.    **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

HH.    **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

II.    **Priority Unsecured Claim**:  Any Claim other than a Priority Tax Claim entitled to priority payment under Section 507(a) of the Bankruptcy Code.

JJ.    **Reorganized Debtor**: The Debtor after the Effective Date.

KK.    **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

LL.    **Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

MM.    **Trustee**:  Scott S. Rever, the subchapter v trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

NN.    **Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 Case which is not a secured Claim.

Respectfully submitted,

DATED:  January 30, 2023

**FOX ROTHSCHILD LLP**
*Counsel for the Debtor and Debtor-in-Possession*

By:    */s/  Joseph J. DiPasquale*
Joseph J. DiPasquale

## **VERIFICATION**

I, MARTIN ASSUNCAO, hereby certify and verify under penalty of perjury that:

I am the President of the Debtor. I have read this Plan of Reorganization and affirm that all factual references are true and accurate to the best of my knowledge, information, and belief.  I am aware that if any of the allegations contained in the foregoing Plan are willfully false, that I am subject to punishment.

*/s/Martin Assuncao*
Martin Assuncao

142291815.1

**EXHIBIT A – Cash on hand on the Effective Date of the Plan[11]**

Cash on hand on the Effective Date of the Plan:  $148,771

Borrowing under Vollers Line of Credit:  $250,000

Less –

    Amount of Administrative Expenses payable
    on Effective Date of the Plan  $249,343

    Amount of statutory costs and charges  $40,000

       Balance after paying these amounts……..  $109,428

The sources of the cash the Debtor will have on hand by the Effective Date are estimated as follows:  The Debtor will have approximately $148,771 that is currently held by KCP Advisory Group and access to a $250,000 line of credit from Vollers on the Effective Date. All other sources of cash to the fund the plan are anticipated to be generated through future projects or otherwise recovered after the Effective Date.

---

[11] All figures stated herein are estimates.

142291815.1

## EXHIBIT B – Cash Flow Projections

Pursuant to Section 1190(1)(C) of the Bankruptcy Code

**Assuncao Bros, Inc.**
Cash Flows 2023 - 2027
Projected as of          3/1/2023

| | | 2023 | 2024 | 2025 | 2026 | 2027 | Cumulative | NOTES |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | |
| Cash Held at KCP - Estate | | 148,771 | - | - | - | - | 148,771 | (A) |
| Vollers "Kickers" | | | | | | | | |
|   - From Net Collections | | 38,888 | - | - | - | - | 38,888 | (B) |
|   - From Pulaski Settlement | | 75,000 | - | - | - | - | 75,000 | (C) |
| Potential Preference Claims/Settlements | | TBD | | | | | - | (D) |
| Other | | - | - | - | - | - | - | |
| **TOTAL** | | 262,659 | - | - | - | - | 262,659 | |
| **Disbursements** | | | | | | | | |
| Professional Fees | | | | | | | | |
|   - Billed through 3/1/23 | | (249,343) | - | - | - | - | (249,343) | (E) |
| ABI Operating Costs | | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (250,000) | (F) |
| Other Bankruptcy costs | | (40,000) | - | - | - | - | (40,000) | (G) |
| **TOTAL** | | (339,343) | (50,000) | (50,000) | (50,000) | (50,000) | (539,343) | |
| **Net Cash Flow Before New Business** | | (76,684) | (50,000) | (50,000) | (50,000) | (50,000) | (276,684) | |
| **New Business Post Filing** | | 5 | 9 | 15 | 18 | 20 | 20 | (H) |
| Sales / Collections | | 2,307,921 | 4,154,257 | 6,923,762 | 8,308,514 | 9,231,682 | 30,926,135 | (I) |
| Direct Operating Costs | | (1,961,732) | (3,531,118) | (5,885,197) | (7,062,237) | (7,846,930) | (26,287,215) | (J) |
| Other Operating Costs | | (100,000) | (200,000) | (300,000) | (300,000) | (300,000) | (1,200,000) | (K) |
| Vollers Management Fee | 10.0% | (196,173) | (353,112) | (588,520) | (706,224) | (784,693) | (2,628,721) | (L) |
| **Net Cash Flow from Operations** | | 50,015 | 70,027 | 150,045 | 240,053 | 300,059 | 810,199 | |
| **Net to Vollers** | 49.0% | 24,507 | 34,313 | 73,522 | 117,626 | 147,029 | 396,997 | (M) |
| ABI **Net to Estate** | 51.0% | 25,508 | 35,714 | 76,523 | 122,427 | 153,030 | 413,201 | |
| ABI **Less: ABI Disbursements** | | (76,684) | (50,000) | (50,000) | (50,000) | (50,000) | (276,684) | |
| | | (51,176) | (14,286) | 26,523 | 72,427 | 103,030 | 136,518 | |
| ABI **Net of est Tax** | | (51,176) | (14,286) | 19,892 | 54,320 | 77,273 | 86,023 | (N) |
| **Total Cash Flow** | | $ (51,176) | $ (14,286) | $ 19,892 | $ 54,320 | $ 77,273 | $ 86,023 | |
| **Ch 11 Priority Payments** | AMOUNT | | | | | | | |
| First $500,000 FOR CREDITORS | | $ (26,669) | $ 20,027 | $ 93,414 | $ 171,947 | $ 241,282 | $ 500,000 | (O) |
| Union Arrearages (Net of Est Vollers Part) | (138,632) | 9,761 | (7,330) | (34,190) | (62,934) | (43,940) | (138,632) | |
| Federal Tax | (166,918) | 11,753 | (8,825) | (41,166) | (75,774) | (52,905) | (166,918) | (P) |
| State & Local Taxes | (73,219) | 5,155 | (3,871) | (18,058) | (33,239) | (23,207) | (73,219) | |
| | (378,769) | 26,669 | (20,027) | (93,414) | (171,947) | (120,051) | (378,769) | |
| Net Amount for Unsecured Creditors | | $ - | $ - | $ - | $ - | $ 121,231 | $ 121,231 | |
| **Ch 11 General Unsecured Payments** | 3,725,027 | $ - | $ - | $ - | $ - | $ (121,231) | $ (121,231) | (Q) |
| | | | 0.0% | 0.0% | 0.0% | 3.3% | 3.3% | |

**NOTES**

(A)  Funds held by KCP Advisory Group for the benefit of the estate
(B)  Estimated Collections to the estate under the Vollers Kicker agreement to the estate
(C)  Estimated Collections to the estate under the Vollers Kicker agreement from the Pulaski settlement
(D)  Estimated collections on 90 day and insider payments
(E)  Professional fees estimated through 1/31/23 based on discussion with professionals
(F)  Estimated costs for continuing ABI operations including utilities, licenses, permits, etc
(G)  Estimated costs associated with finalizing Ch11 emergence
(H)  Conservative estimate for new business based on average 4 year trend per contract
(I)  Estimated Revenues post emergence utilizing DBE status. Historically 16-26 contracts per year (2018-022),
(J)  Estimated direct costs post emergence. Historically 16-26 contracts per year (2018-022),
(K)  Other Operating costs include primarily employee payroll
(L)  Assume 10% Management fee for project management
(M)  Assumes 51% of Net Profit from contracts remains with the estate
(N)  Estimated net cash flow to the estate less operating costs and less estimates for taxes
(O)  Agreement with Vollers before 51-49 splits of contract profits, a minimum of $500,000 will be contributed to claims
(P)  Projected priority claim payments, net of contributions agreed to by Vollers
(Q)  Projected recoveries to General Unsecured Creditors

Amount from Claims register

|  | |
|---:|---|
| 14,239,334 | Estimated Unsecured |
| (11,053,939) | Less: Wiggins Plastic |
| (267,772) | Less: Knickerbocker |
| (270,035) | Less: Vollers payments |
| 409,382 | Add: SBA (net of payment & Kicker) |
| 668,058 | Add: Reclassifications to Unsec |
| 3,725,027 | |

**EXHIBIT C** – **Liquidation Analysis**

Pursuant to Section 1190(1)(B) of the Bankruptcy Code

**Assuncao Bros, Inc.**
Liquidation Analysis
Projected as of    2/1/2023

| ASSETS | Amounts | Est Liquidation % | Estimated to Debtor | Notes |
|---|---|---|---|---|
| Cash on Hand | 5,000 | 100.0% | 5,000 | (A) |
| Cash Held at KCP - Estate | 148,771 | 100.0% | 148,771 | (B) |
| Vollers "Kickers" | | | | |
| From Net Collections | 388,884 | 10.0% | 38,888 | (C) |
| From Pulaski Settlement | 300,000 | 25.0% | 75,000 | (D) |
| Potential Preference Claims/Settlements | 733,276 | | TBD | (E) |
| Other | | | - | |
| Furniture, Fixtures & Equipment | | | - | (F) |
| | | | $ 267,659 | |
| Less: Professional Fees Estimated through 1/31/23 | | | (199,343) | (G) |
| **NET AVAILABLE FOR OBLIGATIONS** | | | $ 68,316 | |

| ADMINISTRATIVE CLAIMS | | | | |
|---|---|---|---|---|
| Chapter 7 Trustee Fees | | 100.0% | (50,000) | |
| Chapter 7 Professionals | | 100.0% | (25,000) | |
| Secured Debt Amounts | | 100.0% | - | |
| Winddown Costs | | 100.0% | (25,000) | (H) |
| Employee Related Obligations | | 100.0% | - | |
| Other Administrative Claims | | 100.0% | - | |
| | | | (100,000) | |
| **AMOUNT AVAILABLE FOR PRIORITY CLAIMS** | | | $ (31,684) | |

| PRIORITY CLAIMS | | | | |
|---|---|---|---|---|
| Union Arrearages | 818,011 | | | (I) |
| Net of estimated Vollers obligation | | (679,379) | (138,632) | (J) |
| Federal Tax | 166,918 | | (166,918) | (K) |
| State & Local Taxes | 201,404 | (128,185) | (73,219) | (L) |
| 503(b)(9) Claims | | | - | |
| Other | | | - | |
| | 1,186,333 | | (378,769) | |

| **Net Proceeds Available for Unsecured Creditors** | | | $ (410,453) | |
|---|---|---|---|---|
| Accounts Payable | | | 270,035 | (M) |
| Other Debts | | | - | |
| Rejected Contracts & Arrearages | | | - | |
| Subtotal Unsecured Creditors | | | 270,035 | |
| **Percentage Recovery to Unsecured Creditors** | | | **0.0%** | |

---

**NOTES**

(A)    Actual Cash in Hand at the Debtor is limited as Financial advisors are holding funds and project funding is via the Vollers agreement
(B)    Funds held by KCP Advisory Group for the benefit of professionals
       Funds held by KCP Advisory Group for the benefit of the estate
(C)    Collections to the estate under the Vollers Kicker agreement to the estate
(D)    Collections to the estate under the Vollers Kicker agreement from the Pulaski settlement
(E)    Estimated collections on 90 day and insider payments
(F)    Furniture, Fixtures and Equipment, was sold to Vollers.
(G)    Professional fees estimated through 1/31/23 based on discussion with professionals
(H)    Estimates for Windown with a Chapter 7 Trustee
(I)    Union arrearages calculated from filed claims
(J)    Amount under Vollers agreement to subsidize Union claims
(K)    Taxes from Claim filings less amount to reconcile with Debtor record
(L)    State taxes from Claim filings less amount to reconcile with Debtor record
(M)    Amount from Claims register

|              |                                     |
| -----------: | ----------------------------------- |
|   14,239,334 | Estimated Unsecured                 |
| (11,053,939) | Less: Wiggins Plastic               |
|    (267,772) | Less: Knickerbocker                 |
|    (270,035) | Less: Vollers payments              |
|      409,382 | Add: SBA (net of payment & Kicker)  |
|      668,058 | Add: Reclassifications to Unsec     |
|    3,725,027 |                                     |